## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>iPic-Gold Class Entertainment, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-11739 (___)<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS: (A) AUTHORIZING DEBTORS IN POSSESSION TO (I) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364, (II) GRANT LIENS AND SUPERPRIORITY CLAIMS TO POSTPETITION LENDERS PURSUANT TO 11 U.S.C. §§ 364; (III) USE CASH COLLATERAL, AND (IV) PROVIDE ADEQUATE PROTECTION TO PREPETITION CREDIT PARTIES, (B) MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364; AND (C) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C) AND LOCAL BANKRUPTCY RULE 4001-2**

iPic-Gold Class Entertainment, LLC and its affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors"), hereby submit this motion (this "Motion") for entry of an interim order ("Interim Order")[2] substantially in the form attached hereto as **Exhibit A**, and following a final hearing to be set by the Court (the "Final Hearing"), entry of a final order (the "Final Order" and collectively with the Interim Order, the "Orders"), pursuant to sections 105(a), 362, 363, and 364 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 4001-2:  (a) authorizing the Debtors to incur postpetition debt and to use cash collateral, (b) granting liens and superpriority claims in favor of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: iPic Entertainment Inc. (9582); iPic-Gold Class Entertainment, LLC (4684); iPic Gold Class Holdings LLC (6315); iPic Media LLC (0150); iPic Texas, LLC (N/A); and Delray Beach Holdings, LLC (1035).  The Debtors' principal place of business is 433 Plaza Real, Suite 335, Boca Raton, FL 33432.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Interim Order.

the DIP Lenders (as defined below), (c) providing adequate protection to the Pre-Petition Credit Parties (as defined below), (d) modifying the automatic stay, (e) scheduling a final hearing, and (f) granting related relief.

## Overview

1.      The Debtors commenced these cases in order to maximize going concern value for the benefit of all stakeholders.  The Debtors intend to conduct a marketing and sale process through these chapter 11 cases that will preserve jobs and yield distributions to their creditors.  However, the Debtors need financing and access to cash collateral in order to maintain operations and facilitate the Debtors' ongoing sale and restructuring process.

2.      As of the Petition Date, the Debtors had approximately $205 million in outstanding secured principal obligations under the Pre-Petition Credit Agreement (as defined below).  By this Motion, the Debtors seek authority to consummate a DIP Facility (as defined below) with the DIP Lenders on the terms set forth in the DIP Loan Agreement (as defined below), consisting of new revolving loans in an amount up to $16 million.  The proceeds of the DIP Facility will be used to pay (a) postpetition operating expenses and other working capital requirements of the Debtors, (b) costs and expenses incurred in administering these cases; and (c) interest and fees (including professional fees and expenses) due under the DIP Loan Documents (as defined below).  There is no roll-up of the Pre-Petition Debt (as defined below) contemplated under the DIP Facility.

3.      The DIP Facility presents these estates with the best economic terms available and provides the Debtors with adequate liquidity to maintain operations in the ordinary

course and satisfy ongoing administrative expenses associated with these cases.  Accordingly, by

this Motion, the Debtors seek the entry of the Interim Order and the Final Order, *inter alia*:

a.      authorizing the Debtors to obtain post-petition financing from the Teachers' Retirement System of Alabama, a body corporate of the State of Alabama created under Section §§ 16-25-1 *et seq.,* of the Alabama Code ("TRSA"), and the Employees' Retirement System of Alabama, a body corporate of the State of Alabama created under Section §§ 16-25-1, *et seq.,* of the Alabama Code ("ERSA," together with TRSA, each a "DIP Lender," and collectively, the "DIP Lenders"), consisting of a superpriority, secured revolving credit facility in the principal amount of up to $16,000,000 (the "DIP Facility") to be used for general working capital and liquidity purposes, including the payment of Administrative Expenses as described herein and in that certain *Debtor-In-Possession Loan and Security Agreement,* dated August 5, 2019, by and among the DIP Lenders, as Lenders, and the Debtors, as Borrower (substantially in the form attached to the Motion, together with all schedules, exhibits and annexes thereto, and as any time amended, the "DIP Loan Agreement"), in substantially the form attached hereto as **Exhibit B**, of which amount $10,500,000 will be available under the DIP Facility on an interim basis (the "Interim Amount Limit") during the Interim Period (as defined below), on the terms and conditions set forth in the DIP Loan Documents (as defined in the DIP Loan Agreement) and in the Interim Order;

b.      authorizing the Debtors to execute and enter into the DIP Loan Documents and to perform all such other and further acts as may be required in connection with the DIP Loan Documents;

c.      authorizing the Debtors to use proceeds of the DIP Facility solely as expressly permitted in the DIP Loan Documents and in accordance with the Interim Order;

d.      granting automatically perfected (i) priming security interests in and liens on all of the DIP Collateral (as defined below) solely with respect to the Pre-Petition Debt and the Pre-Petition Collateral (as defined below) and (ii) non-priming security interests in and liens on all DIP Collateral upon which there are either pre-existing permitted senior liens or no pre-existing liens, to the DIP Lenders to the extent provided herein, and granting superpriority administrative expense status to the DIP Obligations (as defined below);

e.      authorizing the Debtors to use Cash Collateral (as defined below), subject to the Interim Amount Limit during the Interim Period;

f.      providing adequate protection to the Pre-Petition Lender (as defined below) to the extent of any diminution in value of its interests in the DIP Collateral (as defined below) and subject to the Carve-Out (as defined below);

3

g.      authorizing the Debtors to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Loan Documents as such amounts become due and payable;

h.      vacating and modifying the automatic stay pursuant to Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the other DIP Loan Documents;

i.      subject only to and effective upon entry of the Final Order, waiving the Debtors' ability to surcharge against collateral pursuant to Section 506(c) of the Bankruptcy Code;

j.      scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and in connection therewith, giving and prescribing the manner of notice of the Final Hearing on the Motion; and

k.      granting the Debtors such other and further relief as is just and proper.

4.      An immediate and ongoing need exists for the Debtors to obtain the DIP Facility in order to permit, among other things, the orderly continuation of the operation of their business, to maintain business relationships with vendors, suppliers and customers, to pay payroll obligations, and to satisfy other working capital, development, and operational needs so as to maximize the value of their respective businesses and assets as debtors in possession under chapter 11 of the Bankruptcy Code. The Debtors do not have sufficient available resources of working capital to operate their businesses in the ordinary course without post-petition financing. The Debtors' ability to maintain business relationships with vendors and customers, to pay employees, and otherwise to fund operations is essential to the Debtors' viability and to the preservation of the going concern value of their business pending a sale of their assets or other restructuring.

## Jurisdiction and Venue

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court*

4

*for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.     The statutory predicates for the relief sought herein are sections 105(a), 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

7.     On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Concurrently herewith, the Debtors have filed a motion with this Court requesting joint administration of the Debtors' chapter 11 cases (the "Cases") for procedural purposes only.  The Debtors are operating their business and managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or an examiner in these cases, and no official committee has yet been appointed by the Office of the United States Trustee.

8.     The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filing, is set forth in

detail in the *Declaration of David M. Baker in Support of First Day Pleadings* (the "First Day Declaration") filed concurrently herewith and fully incorporated herein by reference.

## Relevant Factual Background

### A.    The Debtors' Ongoing Business

9.    The Debtors are a leading provider of polished-casual dining in a luxury theater auditorium environment.  The Debtors are one of the largest combined movie theater and restaurant entertainment destinations with locations that provide a luxurious movie-going experience at an affordable price.  The Debtors provide customers with high-quality, chef-driven culinary and mixology in unique destinations that include premium movie theaters, restaurants and lounges.

10.    The Debtors currently operate 123 screens at 16 locations in 9 states, with an additional 2 locations under construction, and have executed leases for an additional 9 sites in California, Georgia, Virginia, Washington, Connecticut, New York, Texas and Florida.  In addition, the Debtors applied for licenses to operate theaters in Saudi Arabia.

11.    The Debtors continue to pursue a disciplined new store growth strategy in both new and existing markets where they may achieve consistent high store revenues and attractive store-level cash-on-cash returns.  As of the Petition Date, the Debtors employed approximately 240 full time and 1,770 part-time employees.

12.    The Debtors commenced these cases in order to preserve value for their stakeholders.  The Debtors intend to conduct a marketing and sale process through these cases with the goal of preserving jobs and maximizing recoveries to creditors.

**B.**     **Prepetition Secured Debt**

13.     Pursuant to that certain *Second Amended and Restated Master Loan and Security Agreement* dated February 1, 2018, as amended by Modification Agreement dated June 22, 2018, as further amended by Second Modification Agreement dated June 29, 2018, as further amended by Third Modification Agreement dated March 4, 2019 (as so amended, the "Pre-Petition Loan Agreement"), by and among iPic-Gold Class Entertainment, LLC, iPic Gold Class Holdings, LLC, iPic Texas, LLC, iPic Media, LLC, Delray Beach Holdings, LLC, and Bay Colony Realty, LLC,[3] collectively, the "Pre-Petition Obligors"),[4] TRSA, as administrative and collateral agent (together, the "Pre-Petition Agent"), and TRSA and ERSA, as Lenders (the "Pre-Petition Lenders," and collectively with the Pre-Petition Agent, the "Pre-Petition Credit Parties"), made a term loan facility available to the Pre-Petition Obligors in an aggregate principal amount not to exceed $225,828,169.  The Pre-Petition Loan Agreement, together with any other agreement, note, instrument, guaranty, mortgage, fixture filing, deed of trust, financing statement, pledge, assignment, and other document executed at any time in connection therewith, in each case as the same may be amended, modified, restated or supplemented from time to time, are hereinafter referred to collectively as the "Pre-Petition Loan Documents").

14.     Pursuant to certain of the Pre-Petition Loan Documents, each of the Pre-Petition Obligors granted the Pre-Petition Agent, for the benefit of the Pre-Petition Credit Parties and to secure such Pre-Petition Obligors' obligations and indebtedness under the Pre-Petition Loan Documents, first priority liens on and security interests in the Collateral (the "Pre-Petition

---

[3]  Bay Colony Realty, LLC was dissolved prepetition and is not a Debtor in these proceedings.
[4]  Debtor iPic Entertainment, Inc. is not a Pre-Petition Obligor and is not a party to the DIP Facility.

Security Interests"), as defined in the Pre-Petition Loan Agreement and Collateral Documents (hereafter, the "Pre-Petition Collateral").

15.    As of the Petition Date, the Pre-Petition Obligors, jointly and severally, were justly and lawfully indebted and liable under the Pre-Petition Loan Documents to the Pre-Petition Credit Parties for term loans in the outstanding principal amount of $205,340,772 (the "Pre-Petition Loans", and together with all other obligations of any Pre-Petition Obligor in respect of indemnities, guaranties and other payment assurances given by any Pre-Petition Obligor for the benefit of Pre-Petition Credit Parties, and all interest, fees, costs, legal expenses and all other amounts heretofore or hereafter accruing thereon or at any time chargeable to any Pre-Petition Obligor in connection therewith, collectively referred to as the "Pre-Petition Debt").

16.    Substantially all cash, securities or other property of the Pre-Petition Obligors (and the proceeds therefrom) as of the Petition Date, including, without limitation, all amounts on deposit or maintained by any Pre-Petition Obligor in any account with any Pre-Petition Credit Party or any bank or other depository institution (each a "Depository Institution"), was subject to rights of setoff or to valid, perfected, enforceable first-priority liens under the Pre-Petition Loan Documents and applicable law, and is included in the Pre-Petition Collateral, and therefore the Pre-Petition Obligors' cash balances are cash collateral of the Pre-Petition Credit Parties within the meaning of Section 363(a) of the Bankruptcy Code.  All such cash (including, without limitation, all proceeds of Pre-Petition Collateral and all proceeds of property encumbered by liens and security interests granted under the Interim Order), is referred to herein as "Cash Collateral."

C.      **Background to Proposed DIP Facility**

17.     Prior to the Petition Date, the Debtors recognized a need for further outside financing and began the process of considering potential funding sources.  The Debtors, through their advisors, discussed with various third parties the opportunity to provide financing to the Debtors, but no alternative funding proposals were provided to the Debtors.

18.     Separately, the Debtors performed due diligence regarding the reasonableness of the terms proposed for the DIP Facility by the DIP Lenders, including by comparing such terms to other debtor-in-possession credit facilities provided in the marketplace. Based on such analysis, the Debtors believe that the DIP Facility is provided on reasonable market terms.  The DIP Lenders are unwilling to provide financing to the Debtors on an unsecured or subordinated basis.

19.     After careful review of their financing options, the Debtors concluded that the DIP Lenders' proposed terms would allow the Debtors to meet their goals and provide the Debtors with sufficient liquidity on the best available economic terms.  Through the DIP Loan Documents, the Debtors will continue to have access to sufficient liquidity for their ongoing operations as well as to provide confidence to vendors and employees that the Debtors will be able to consummate a going concern sale or other restructuring.  All negotiations with the DIP Lenders were conducted at arms' length and in good faith.  The outcome of such negotiations is the DIP Loan Agreement pending before this Court.

20.     The Debtors now seek to move forward with the proposed DIP Facility on the terms set forth in the DIP Loan Documents.  Subject to this Court's approval, the Debtors

9

intend to draw on the DIP Facility in order to satisfy the Debtors' ongoing working capital needs through their restructuring process.

## <u>Concise Statement of Relief Requested</u>

21.    In accordance with Bankruptcy Rule 4001(b) and Local Rule 4001-2, below is a summary[5] of the terms of the proposed financing and use of cash collateral:

| | |
|---|---|
| **BORROWERS**: | Debtors (excluding iPic Entertainment, Inc.) |
| **DIP LENDERS**: | Teachers' Retirement System of Alabama and the Employees' Retirement System of Alabama |
| **DIP FACILITY / USE OF PROCEEDS** | $16,000,000 superpriority priming secured debtor-in-possession financing facility, consisting of a revolving loan facility to be used for general working capital and liquidity purposes.  For purposes of the Interim Order, the Debtors' borrowing authority under the DIP Facility shall be capped at the Interim Amount Limit of $10,500,000.<br><br>The Debtors also shall be authorized to use Cash Collateral in accordance with the Budget.  There is no roll-up of the Pre-Petition Debt contemplated under the DIP Facility. |
| **BUDGET**: | The "<u>Budget</u>" shall mean the thirteen-week cash flow budget in the form attached as Exhibit 1 to the Interim Order (including any updates thereto approved by the DIP Lenders).  Any changes or updates to the Budget shall be subject to approval of the DIP Lenders, in their sole discretion. |
| **TERMINATION DATE**: | The "<u>Termination Date</u>" means the earliest to occur of (i) the expiration of ninety (90) days after the Petition Date, (ii) the date upon which the DIP Lenders elect to terminate the Availability Period and accelerate the Obligations in accordance with Section 7.2 of the DIP Loan Agreement following the occurrence and continuance of an Event of Default, and (iii) the Closing Date, or such later date as to which the DIP Lenders may expressly agree in writing in their sole discretion. |

---

[5]  The summaries and descriptions of the terms and conditions for the proposed financing and use of cash collateral and the provisions of the Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof.  The summaries and descriptions are qualified in their entirety by the proposed Interim Order and the DIP Loan Documents.  In the event there is any conflict between this Motion and the Interim Order or the DIP Loan Documents, the Interim Order and the DIP Loan Documents will control in all respects.

| | |
|---|---|
| **INTEREST / FEES**: | Rate:  10.5% per annum.  Accruing interest shall be payable monthly. No principal amortization required pending occurrence of the Termination Date. |
| | |
| | Commitment Fee: 2.00%.  Payable upon entry of the Interim Order. |
| **DEFAULT INTEREST**: | 2.00% above contract rate. |
| **SECURITY**: | All of each Debtor's pre-petition and post-petition real and personal property, including, without limitation, all of each Debtor's cash, accounts, inventory, equipment, fixtures, general intangibles, documents, instruments, chattel paper, deposit accounts, letter-of-credit rights, commercial tort claims, investment property, intellectual property, real property and leasehold interests, contract rights, and books and records relating to any assets of such Debtor and all proceeds (including, without limitation, insurance proceeds) of the foregoing, whether such assets were in existence on the Petition Date or were thereafter created, acquired or arising and wherever located (all such real and personal property, including, without limitation, all Pre-Petition Collateral and the proceeds thereof, being collectively hereinafter referred to as the "DIP Collateral"), and (iii) that such security interests and liens have the priorities hereinafter set forth.  Notwithstanding the foregoing, pending entry of the Final Order, the DIP Collateral shall not include a lien upon and security interest in any of Debtors' claims and causes of action pursuant to Sections 502(d), 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code ("Avoidance Claims") or any proceeds or other property ("Avoidance Proceeds") recovered in connection with the successful prosecution, settlement or collection of any Avoidance Claims. |

As security for Debtors' payment and performance of all DIP Obligations, each DIP Lender shall have and is hereby granted valid, binding, enforceable, non-avoidable and automatically and properly perfected security interests in and liens upon all of the DIP Collateral, subject to the provisions in Paragraph 9(d) (collectively, the "DIP Liens") and in the priorities set forth herein.  Subject to the provisions of Paragraph 26 of the Interim Order and the Carve-Out and any break-up fees and expense reimbursement obligations of the Debtors approved by the Court with respect to the APA (as defined in the DIP Loan Agreement), the DIP Liens shall be:

(a) Unencumbered Property.  Pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected, first priority senior liens on, and security interests in, all DIP Collateral that is not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date, or to any valid, perfected and unavoidable interests in such property arising out of liens arising subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

DOCS_SF:101519.3

(b) <u>Liens Junior to Certain Other Liens</u>.  Pursuant to Section 364(c)(3) of the Bankruptcy Code, junior only to valid, binding, perfected and unavoidable interests of any other parties arising out of liens, if any, on such property existing immediately prior to the Petition Date that were senior in priority to the liens of the Pre-Petition Credit Parties, or to any valid, perfected and unavoidable interests in such property arising out of liens arising subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code that are senior in priority to the liens of the Pre-Petition Credit Parties.

(c) <u>Priming DIP Liens</u>.  Pursuant to Section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected security interests in and liens upon the DIP Collateral, which security interests and liens shall be prior and senior in all respects to (i) the security interests and liens in favor of Pre-Petition Credit Parties with respect to the Pre-Petition Collateral, and (ii) the Adequate Protection Liens (as defined below) with respect to the Pre-Petition Collateral.

(d) <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens and the Adequate Protection Liens, aside from the Carve-Out and unless the Adequate Protection Liens are successfully challenged pursuant to Paragraph 26 of the Interim Order, shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of any Debtor or its estate under Section 551 of the Bankruptcy Code, (B) any liens or security interests granted by any Debtor to other persons or entities, or (C) any intercompany or affiliate liens or security interests of the Debtors; (ii) subordinated to or made *pari passu* with any other lien or security interest under Section 363 or 364 of the Bankruptcy Code or otherwise; or (iii) subject to Sections 510, 549 or 550 of the Bankruptcy Code.  In no event shall any person or entity who pays (or, through the extension of credit to any Debtor, causes to be paid) any of the DIP Obligations or the obligations and indebtedness of the Pre-Petition Credit Parties, be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or security interests granted to or in favor of, or conferred upon, any DIP Lender by the terms of any DIP Loan Documents or the Interim Order unless such person or entity contemporaneously causes Full Payment of the Pre-Petition Debt owed to such DIP Lender to be made.

**SUPERPRIORITY**:    All DIP Obligations shall constitute joint and several allowed superpriority claims (the "<u>Superiority Claims</u>") against each Debtor (without the need to file any proof of claim) pursuant to Section 364(c)(1) of the Bankruptcy Code having priority in right of payment over all other obligations, liabilities and indebtedness of each Debtor, whether now in existence or hereafter incurred by any Debtor, and over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order

12

approving the grant), 507, 546(c), 552(b) 726, 1113 or 1114 of the Bankruptcy Code.  Such Superpriority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all pre-petition and post-petition property of Debtors and all proceeds thereof; *provided, however*, that the Superpriority Claims shall be subject to the Carve-Out (as defined below) and any break-up fees and expense reimbursement obligations of the Debtors approved by the Court with respect to the APA (as defined in the DIP Loan Agreement); *provided, however*, that to the extent Adequate Protection Claims that are entitled to superpriority administrative status are payable out of Avoidance Claims and Avoidance Proceeds, such payment shall be subject to entry of the Final Order.

**CARVE-OUT**:             Notwithstanding anything in the Interim Order, any DIP Loan Documents, any Pre-Petition Loan Documents, or any other order of this Court to the contrary, the DIP Obligations, the DIP Liens and Superpriority Claims in favor of the DIP Lenders, the Adequate Protection Liens in favor of the Pre-Petition Agent, the Adequate Protection Claims in favor of the Pre-Petition Credit Parties, and the Pre-Petition Debt and the Pre-Petition Security Interests in favor of the Pre-Petition Credit Parties shall be subject and subordinate in all respects to the payment of the following Carve-Out.  As used in the Interim Order, the "Carve-Out" means the sum of (a) all fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court, (b) all of the reasonable fees and expenses from time to time incurred by each Professional retained by the Debtors and the Committee (amounts set forth in the Budget are specific to each Professional and may be rolled over to subsequent weeks), including any fees earned by PJ Solomon Securities, LLC ("PJS") as investment banker for the Debtors that are approved by this Court, that are (i) incurred prior to the date of delivery of a Default Notice (as defined below) (except in the case of any fees earned by PJS, which shall be included in the Carve-Out whenever incurred), and (ii) included in an approved Budget (except in the case of any fees earned by PJS, which shall be included in the Carve-Out in the amount approved by this Court), and (c) a maximum of $250,000 for all of the reasonable fees and expenses from time to time incurred by Professionals retained by Borrower (other than PJS, which is addressed above) that are incurred from and after the date of delivery of a Default Notice; *provided,* that nothing in this Interim Order shall be construed to impair the ability of any party to object to the fees, expenses, reimbursements or compensation of any Professional, whether or not in excess of the coverage provided by the Carve-Out.  In no event shall the Carve-Out, or the funding of the DIP Loans to satisfy the Carve-Out, result in any reduction in the amount of the DIP Obligations or the Pre-Petition Debt.  Prior to the date of delivery of a Default Notice:  (A) an amount sufficient to pay the Carve-Out for Professional Fees may be funded by the Debtors on a weekly basis into a trust account held by Debtors' counsel (the "Professional Fee Trust Account") in accordance with the approved Budget, (B) the Debtors shall be permitted to borrow

under the DIP Loan Agreement to fund the Professional Fee Trust Account in the amounts contemplated under clause (b) above, and (C) the Debtors shall be permitted to pay, from the Professional Fee Trust Account, as and when the same may become due and payable, the allowed Professional Fees of each Professional.  Following the date of delivery of a Default Notice, the Debtors shall be permitted to fund the Professional Fee Trust Account in the amount of $250,000 contemplated under clause (c) above.  All amounts funded by the Debtors to the Professional Fee Trust Account shall continue to constitute DIP Collateral.  Any excess amounts remaining in the Professional Fee Trust Account after payment of the Carve-Out for Professionals shall be refunded to the Debtors and shall remain DIP Collateral.

**CREDIT BID**:

Following entry of the Final Order and subject to the requirements of section 363(k) of the Bankruptcy Code, but without prejudice to any successful challenge brought prior to the Challenge Deadline, the DIP Lenders and the Pre-Petition Credit Parties shall each have the right to credit bid, individually or on a combined basis, up to the full amount of the applicable outstanding DIP Obligations and Pre-Petition Debt (as applicable), in each case including any accrued interest or other agreed charges, in any sale of the DIP Collateral (or any part thereof) or Pre-Petition Collateral (or any part thereof), as applicable, without the need for further Court order authorizing same, and whether such sale is effectuated through Section 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise.  For the avoidance of doubt, without prejudice to any successful challenge brought prior to the Challenge Deadline, no plan of reorganization or liquidation, nor any motion in connection with a sale of any Debtor's assets under Section 363 of the Bankruptcy Code, in any of these Chapter 11 Cases shall seek to limit or otherwise restrict the right of Pre-Petition Agent or the DIP Lenders to credit bid for all or any part of the Pre-Petition Collateral or DIP Collateral.

**CONDITIONS**:

Customary conditions for financings of this type, as set forth in Article IV of the DIP Loan Agreement.

**REPS/WARRANTIES**:

Customary representations and warranties for financings of this type, as set forth in Article V of the DIP Loan Agreement.

**COVENANTS/VARIANCES**:

Customary affirmative and negative covenants for financings of this type, as set forth in Articles VI of the DIP Loan Agreement.

In addition, commencing on the first Wednesday following the end of the fourth (4th) Loan Week and continuing on Wednesday of each week thereafter, the Debtors are required to deliver to the DIP Lenders (i) a comparison of actual to budgeted results of operations for the preceding four (4) Loan Weeks, and (ii) a report of all income and expense variance on a line-item basis for the preceding four (4) Loan Weeks (the "Variance Report").  If any Variance Report shall indicate that the Debtors' cumulative net cash flow for the trailing four (4) Loan Weeks shall be less than ninety percent (90%) of the amount of net cash flow

DOCS_SF:101519.3

projected in the Approved Budget(s) covering such period (negative variance of 10% or less being "<u>Permitted Variance</u>" hereunder), then an Event of Default shall be deemed to exist at the option of DIP Lenders; provided that the DIP Lenders may, in their sole discretion, waive any violation of the Permitted Variance limit set forth herein or authorize the Debtors to exceed the Permitted Variance by written notice to the Debtors (each a "<u>Permitted Variance Exception</u>").

**EVENTS OF DEFAULT**:          Customary events of default for financings of this type, as set forth in Article VII of the DIP Loan Agreement.

Specifically, the DIP Loan Agreement requires the Debtors' to employ a chief restructuring officer reasonably acceptable to Lender. The DIP Loan Agreement also imposes certain milestones on the Debtors as follows:

(a)  Subject to the Bankruptcy Court's availability, an order approving bid procedures in a form acceptable to Lender shall not have been entered by the Bankruptcy Court on or before the date that is thirty (30) days after the Interim Order, or such later date as may be agreed to in writing by Lender in its sole discretion. The order approving bidding procedures shall provide for bids to be received on or before October 11, 2019, and the auction to occur on October 17, 2019.

(b)  Subject to the Bankruptcy Court's availability, the Bankruptcy Court approval of the sale shall not have been entered by the Bankruptcy Court on or before October 25, 2019, or such later date as may be agreed to in writing by Lender in its sole discretion.

(c)  Subject to the Bankruptcy Court's availability, the sale transaction shall not have closed on or before ninety (90) days after the Petition Date, or such later date as may be agreed to in writing by Lender in its sole discretion.

**REMEDIES**:          Upon the occurrence and continuance of an Event of Default, and following the expiration of any applicable cure period set forth in the DIP Loan Agreement, (a) the DIP Lenders may file with the Court and serve upon the Debtors, counsel for the Debtors, counsel for the Committee and the U.S. Trustee a written notice (a "<u>Default Notice</u>") describing the Events of Default that exist, in which event effective five (5) business days thereafter (the "<u>Default Notice Period</u>"), the DIP Lenders shall be fully authorized, in their sole discretion, to demand payment of all DIP Obligations, and hold and apply any balances in any accounts of the Debtors to the payment or cash collateralization of any of the DIP Obligations, subject to payment of the Carve-Out; and (b) each DIP Lender and the Pre-Petition Agent shall be deemed to have received complete relief from the automatic stay imposed by Section 362(a) of the Bankruptcy Code with respect to all of the Collateral, effective following the expiration of the Default Notice period, unless the Court determines otherwise after an expedited hearing. Upon the effectiveness of any relief from the automatic stay granted or deemed to have been granted

15

and subject to payment of the Carve-Out, the DIP Lenders and the Pre-Petition Agent may enforce their respective DIP Liens, the Pre-Petition Security Interests, and the Adequate Protection Liens, as applicable, with respect to the DIP Collateral, take all other actions and exercise all other remedies under the DIP Loan Documents, the Pre-Petition Loan Documents and applicable law that may be necessary or deemed appropriate to collect any of its DIP Obligations and/or the Pre-Petition Debt, proceed against or realize upon all or any portion of the Collateral as if these Chapter 11 Cases or any superseding Chapter 7 case was not pending, and otherwise enforce any of the provisions of the Interim Order.  The DIP Lenders shall provide for cash payment of the Carve-Out from the proceeds of the DIP Collateral before any sums are paid to the DIP Lenders from such proceeds.

**STIPULATIONS/WAIVERS**:    Subject to standard challenge rights of parties in interest, the Debtors (including iPic Entertainment, Inc.) will stipulate under the Interim Order and the Final Order that the Pre-Petition Debt constitutes the legal, valid and binding obligations of the Pre-Petition Obligors that is properly secured by the Pre-Petition Collateral and is enforceable against them, and no portion of the Pre-Petition Debt is subject to avoidance, recharacterization, reduction, set off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination or any other challenges pursuant to the Bankruptcy Code or applicable nonbankruptcy law or regulation by any person or entity. The Debtors will also release all claims against the Pre-Petition Credit Parties, subject to the challenge rights of parties in interest.  The Committee's investigation budget is limited to $25,000.

In addition, the Interim Order and Final Order will include customary waivers, including the waiver of the automatic stay in connection with the DIP Lenders' enforcement of remedies following an Event of Default, and subject to entry of the Final Order, the waiver of any surcharge of costs or expenses with respect to the DIP Lenders' or Pre-Petition Credit Parties' interest in the DIP Collateral under section 506(c) of the Bankruptcy Code, provided that the following administrative expenses are fully funded by the Debtors consistent with the Budget:  (a) the Carve-Out and (b) all expenses that are accrued and unpaid through the date of an Event of Default under the line items in the Budget designated as "Payroll Costs," "Sales Taxes" and "PACA/PASA Claims."  Subject to entry of the Final Order, in no event will the DIP Lenders or Pre-Petition Credit Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

**ADEQUATE PROTECTION:**    As adequate protection for any Collateral Diminution suffered by any Pre-Petition Credit Party, the Pre-Petition Agent is entitled, pursuant to Sections 105, 361, 363(e) and 364 of the Bankruptcy Code, to adequate protection of its interests in the Pre-Petition Collateral in an amount equal to the Collateral Diminution (the "<u>Adequate Protection Claims</u>"). As used in the Interim Order, "<u>Collateral Diminution</u>" shall mean an amount equal (and limited) to the aggregate diminution of the fair

market value of any of the Pre-Petition Collateral (including Cash Collateral) from and after the Petition Date for any reason provided for in the Bankruptcy Code, including, without limitation, any such diminution resulting from the Carve-Out, the use of Cash Collateral, the priming of the Pre-Petition Agent's security interests in and liens on the Pre-Petition Collateral by the DIP Liens pursuant to the DIP Loan Documents and the Interim Order, the depreciation, sale, loss or use by any Debtor (or any other decline in value) of such Pre-Petition Collateral, the amount of any fees and expenses paid to retained professionals in these Chapter 11 Cases, in accordance with the Budget, and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code.  The Pre-Petition Agent is hereby granted, subject to the Carve-Out and the rights of third parties preserved under Paragraph 26 and solely to the extent of any Collateral Diminution, the following for the benefit of Pre-Petition Credit Parties:

(a)  <u>Adequate Protection Liens</u>.  The Pre-Petition Agent, for the benefit of the Pre-Petition Credit Parties, is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution by any Debtor of security agreements, pledge agreements, mortgages, financing statements or other agreements) valid, perfected replacement security interests in and liens on all of the DIP Collateral (the "<u>Adequate Protection Liens</u>"). The Adequate Protection Liens on DIP Collateral shall be junior and subordinate only to the DIP Liens, the Carve-Out, and any break-up fees and expense reimbursement obligations of the Debtors approved by the Court with respect to the APA (as defined in the DIP Loan Agreement).  The Adequate Protection Liens shall not be subject to Sections 506(c) (effective upon entry of the Final Order), 510, 549, or 550 of the Bankruptcy Code, and unless otherwise ordered by the Court, no lien avoided and preserved for the benefit of any estate pursuant to Section 510 of the Bankruptcy Code shall be made *pari passu* with or senior to any Adequate Protection Liens.

(b)  <u>Priority of Adequate Protection Claims</u>.  The Adequate Protection Claims, if any, will be allowed as superpriority administrative claims pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code, which, subject to the Superpriority Claims, the Carve-Out, and any break-up fees and expense reimbursement obligations of the Debtors approved by the Court with respect to the APA (as defined in the DIP Loan Agreement), shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, which shall at all times be senior to the rights of each Debtor, and any successor trustee or any creditor in these Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code, *provided, however*, that the Adequate Protection Claims entitled to superpriority administrative status shall only be

17

payable out of Avoidance Claims and Avoidance Proceeds subject to entry of the Final Order.

(c) <u>Fees and Expenses of Professionals for Pre-Petition Credit Parties</u>. As additional adequate protection, the Debtors shall pay (i) the reasonable and documented professional fees and expenses (including, but not limited to, the fees and disbursements of counsel, third-party consultants, financial advisors, and auditors) payable to or incurred by any Pre-Petition Credit Party under and pursuant to the Pre-Petition Loan Documents arising prior to the Petition Date, and (ii) on a current basis, the reasonable and documented professional fees and expenses (including, but not limited to, the fees and disbursements of counsel, third-party consultants, including financial consultants, and auditors) payable to or incurred by any Pre-Petition Credit Party under and pursuant to the Pre-Petition Loan Documents arising on or subsequent to the Petition Date, in each case in compliance with the Budget. At the option of the Pre-Petition Credit Parties, all such amounts may be added to the Pre-Petition Debt in lieu of current payment thereof by the Debtors.

INDEMNIFICATION:                Each Debtor generally agrees to indemnify the DIP Lenders and their respective related parties with respect to the DIP Facility.

## Disclosures

22.    Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, a debtor in possession seeking authority to use cash collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing. The debtor in possession must also justify the inclusion of such provisions. Set forth below are the disclosures required in accordance with such rules:

a.    Local Rule 4001-2(a)(i)(A) requires a debtor to disclose whether it has granted cross-collateralization to a prepetition secured creditor in connection with the debtor's cash collateral usage or additional financing. **The proposed Interim Order does not provide for the granting of cross-collateralization protection to any prepetition secured creditor.**

b.    Local Rule 4001-2(a)(i)(B) and Bankruptcy Rule 4001(c)(1)(B)(iii) and (viii) require the disclosure of provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of a secured creditor's prepetition lien or (ii) the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the Committee at least sixty (60) days from the date of its formation to investigate

such matters. **The proposed Interim Order contains stipulations and waivers in favor of the Pre-Petition Credit Parties, subject to a challenge period for any committee or other party in interest by no later than (a) with respect to a creditors' committee (if appointed), sixty (60) calendar days from the appointment of such committee, and (b) seventy-five (75) calendar days after entry of the Interim Order, subject to further extension by written agreement of the secured parties. Interim Order ¶26(b).**

c.      Local Rule 4001-2(a)(i)(C) and Bankruptcy Rule 4001(c)(1)(B)(x) require the disclosure of provisions that seek to waive a debtor's rights without notice under section 506(c) of the Bankruptcy Code. **The proposed Interim Order provides, subject to entry of the Final Order, that the DIP Lenders and the Pre-Petition Credit Parties are entitled to a waiver of the surcharge provisions of section 506(c) of the Bankruptcy Code. Interim Order ¶16.**

d.      Local Rule 4001-2(a)(i)(D) and Bankruptcy Rule 4001(c)(1)(B)(xi) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code. **The proposed Interim Order provides, subject to entry of the Final Order, that Avoidance Claims and Avoidance Proceeds are included in the DIP Collateral. Interim Order ¶6(e).**

e.      Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that deem prepetition secured debt to be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor' prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code). **Not applicable. There is no roll-up of the Pre-Petition Debt contemplated under the DIP Facility.**

f.      Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out. **The proposed Interim Order does not provide for disparate treatment for committee professionals, aside from projecting lower fees for committee professionals than Debtor professionals in the Budget**.

g.      Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for the priming of any secured lien without the consent of that lienholder. **The proposed Interim Order does not provide for the priming of any secured lien without the consent of that lienholder**.

h.      Local Rule 4001-2(a)(i)(H) requires disclosure of provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1). **The proposed Interim Order provides, subject to entry of the Final Order, that the DIP Lenders and the Pre-Petition Credit Parties are entitled to a waiver of the equity of the case provisions of section 552(b)(1) of the Bankruptcy Code. Interim Order ¶14.**

i.      Bankruptcy Rule 4001(c)(1)(B)(ii) requires disclosure of the provision of adequate protection or priority for claims arising prior to the commencement of the case. **The proposed Interim Order provides that the Pre-Petition Credit Parties will be granted adequate protection, in the form of replacement liens and superpriority claims (junior in all cases to the DIP Facility and the Carve-Out), to the extent of any diminution in the value of the Pre-Petition Collateral as of the Petition Date. Interim Order ¶13.**

j.      Bankruptcy Rule 4001(c)(1)(B)(iv) requires disclosure of provisions that constitute a waiver or modification of the automatic stay. **The proposed Interim Order describes the modification of the automatic stay to the extent necessary to implement the Interim Order.  Interim Order ¶25.**

k.      Bankruptcy Rule 4001(c)(1)(B)(vii) requires disclosure of provisions that waive or modify the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate.  **The proposed Interim Order includes provisions that provide for the automatic perfection and validity of the DIP Liens without the necessity of any further filing or recording under the laws of any jurisdiction**. **Interim Order ¶20.**

### Need for Financing and Use of Cash Collateral

23.     The Debtors have an urgent and immediate need for access to funds available under the DIP Facility and the use of the Cash Collateral.  Such funding is necessary in order for the Debtors to have sufficient liquidity to operate their business, satisfy their vendor and customer obligations, and pay their employees.  Without immediate access to the DIP Facility and Cash Collateral, the Debtors would be forced to terminate operations and liquidate their assets, which would put numerous employees out of work and irreparably damage the Debtors' efforts to maintain going concern value.  Accordingly, the Debtors strongly urge the Court to authorize the DIP Facility and continued use of Cash Collateral on the terms contemplated herein, initially on an interim basis and, following a final hearing, on a final basis.

**Basis for Relief**

A.    **The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code**

24.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c).

25.    In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

> a.    unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
> b.    the credit transactions are necessary to preserve assets of the estate;
>
> c.    the terms of the credit agreement are fair, reasonable, and adequate;
>
> d.    the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors; and
>
> e.    the proposed financing agreement adequately protects the prepetition secured parties.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)).

26.     For the reasons discussed below, the Debtors satisfy the standards required to obtain postpetition financing in these cases on a secured superpriority basis as to the DIP Collateral under sections 364(c)(1), (2), and (3) of the Bankruptcy Code.

**B.     The Debtors Were Unable to Obtain Financing on More Favorable Terms**

27.     Under current circumstances, the Debtors are not able to obtain alternative financing from outside parties on an unsecured or junior secured basis.

28.     As outlined above, the Debtors engaged in a prepetition marketing process in order to obtain debtor-in-possession financing.  The DIP Lenders offered the best available economic proposal under the circumstances.  The DIP Lenders are unwilling to lend into the DIP Facility except on a fully secured and first priority basis as to the Collateral.

29.     The Debtors respectfully submit that their efforts to obtain postpetition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code. *See, e.g., In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

**C.     The Proposed Financing is Necessary to Maximize
           the Value of the Debtors' Estates**

30.     The Debtors seek to use the proceeds of the DIP Facility for general working capital purposes in accordance with the Budget and in order to allow the Debtors to maximize value through a going concern sale process or other restructuring.  The DIP Facility represents the best economic alternative for a new debtor-in-possession lending arrangement.

31.      Without immediate access to the DIP Facility, the Debtors would be forced to terminate operations and liquidate their assets, which would put all of the Debtors' dedicated employees and various vendors at risk and irreparably damage the Debtors' efforts to maintain going concern value and to consummate a sale or other restructuring that would maximize value for the benefit of all constituents.  Accordingly, the Debtors strongly urge the Court to authorize the DIP Facility on the terms contemplated herein.

**D.      The Terms of the Proposed Financing are Fair, Reasonable, and Appropriate**

32.      In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

33.      The terms of the DIP Loan Agreement were negotiated in good faith and at arm's-length between the Debtors and the DIP Lenders, resulting in an agreement that is designed to permit the Debtors to maximize the value of their assets and to effectuate an orderly going concern sale or other restructuring process.  The Debtors submit that the proposed terms of the DIP Facility are fair, reasonable, and appropriate under the circumstances.  *See, e.g.*, *Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every

possible lender); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997)

(authorizing postpetition financing that would preserve the value of the debtor's assets).

**E.**     **Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment**

34.     A debtor's decision to enter into a postpetition lending facility under

section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See, e.g.*,

*Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964,

974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility

"reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34,

38 (Bankr. S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must

reflect a debtor's business judgment).

35.     Bankruptcy courts routinely accept a debtor's business judgment on many

business decisions, including the decision to borrow money.  *See, e.g., Group of Inst. Investors v.*

*Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding

assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko*

*Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board

room and not to this Court").  Further, one court has noted that "[m]ore exacting scrutiny

[of the debtors' business decisions] would slow the administration of the debtor's estate and

increase its cost, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten the court's ability to control a case impartially."

*Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

36.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious, *In re Curlew Valley Assocs.,* 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.,* 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

37.     For the reasons set forth above, the Debtors' sound business judgment clearly supports approval of the DIP Facility in order to allow the Debtors to gain access to needed financing and thereby maximize value for all constituents through a going concern sale or other restructuring process.

## F.     Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral

38.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (A) each entity that has an interest in such cash collateral provides consent, or (B) the court approves the use of cash collateral after notice and a hearing.  *See* 11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

39.     Here, the Debtors seek authority to use the Cash Collateral pursuant to the Budget and on terms consistent with the proposed Interim Order.

40.     Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Bankruptcy Rule 4001(b)(2).  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 449 (D. Colo. 1985); *see also In re Ames Dep't Stores Inc.,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).  After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the debtor's business.

41.     As previously noted, in order to continue to operate their business and maintain going concern value as part of an ongoing orderly sale or other restructuring process, the Debtors require access to the DIP Facility and the use of Cash Collateral.  Such use will provide the Debtors with the necessary funds to fully honor all of their ongoing obligations to employees, vendors, and customers and allow the Debtors to maximize going concern value. The Debtors' goal is to make this bankruptcy process as seamless as possible from the perspective of the Debtors' employees, vendors, and customers.

42.     Absent access to Cash Collateral, the Debtors would face immediate and irreparable harm.  The Debtors' business would be shut down and their assets liquidated, which would result in the termination of numerous employees and loss of going concern value at the

expense of the Debtors' stakeholders.  Thus, immediate access to Cash Collateral is essential to

the Debtors' continued viability and ability to successfully reorganize through a going concern

sale or other restructuring process.

## G.      Interim Order and Final Hearing

43.      Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors

request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the

time and date prior to the final hearing for parties to file objections to the Motion.

44.      The urgent need to preserve going concern value, and avoid immediate

and irreparable harm to all of the Debtors' estates, makes it imperative that the Debtors be

authorized to access the DIP Facility and use Cash Collateral, pending the Final Hearing, in

order to continue their operations and to allow the Debtors to administer their cases.  Without the

ability to make draws under the DIP Facility and use Cash Collateral, the Debtors would be

unable to meet their ongoing obligations and would be unable to fund their working capital

needs, thus causing irreparable harm to the Debtors and the value of these estates.  Accordingly,

the Debtors respectfully request that, pending the hearing on a Final Order, the Interim Order be

approved in all respects and that the terms and provisions of the Interim Order be implemented

and be deemed binding and that, after the Final Hearing, the Final Order be approved in all

respects and the terms and provisions of the Final Order be implemented and be deemed binding.

## Notice of Motion

45.      The Debtors will provide notice of this Motion to the following parties, or

their counsel, if known: (a) the Office of the United States Trustee; (b) counsel for the DIP

Lenders and Pre-Petition Credit Parties; (c) the Debtors' thirty largest unsecured creditors on a consolidated basis; (d) any party of record that has asserted a lien in the Debtors' assets; and (e) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### Notice with Respect to Final Hearing

46.     No trustee, examiner or statutory committee has been appointed in these Cases.  Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that they be authorized to provide notice of the Final Hearing by serving a copy of this Motion, together with the Interim Order, by hand or overnight mail or courier service (or for those set up to receive electronic transmissions, by electronic transmission), upon the following parties, or their counsel, if known: (a) the Office of the United States Trustee; (b) counsel for the DIP Lender and Pre-Petition Credit Parties; (c) the Debtors' thirty largest unsecured creditors on a consolidated basis; (d) any party of record that has asserted a lien in the Debtors' assets; and (e) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002. The Debtors respectfully request that such notice is sufficient and request that this Court find that no further notice of the Final Hearing and Final Order is required.

**No Prior Request**

47.     No prior request for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors request entry of the Interim Order and the Final Order under sections 105, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-2:  (a) authorizing the Debtors to incur postpetition debt and to use cash collateral, (b) granting liens and superpriority claims in favor of the DIP Lenders, (c) providing adequate protection to the Pre-Petition Credit Parties, (d) modifying the automatic stay, (e) scheduling a final hearing, and (f) granting related relief.

Dated:   August 5, 2019                              PACHULSKI STANG ZIEHL & JONES LLP

                                                                     */s/ Peter J. Keane*
                                                                     Jeffrey N. Pomerantz (CA Bar No. 143717)
                                                                     Debra I. Grassgreen (CA Bar No. 169978)
                                                                     Peter J. Keane (DE Bar No. 5503)
                                                                     919 N. Market Street, 17th Floor
                                                                     P.O. Box 8705
                                                                     Wilmington, DE 91899 (Courier 19801)
                                                                     Telephone:  (302) 652-4100
                                                                     Facsimile:  (302) 652-4400
                                                                     E-mail:      jpomerantz@pszjlaw.com
                                                                                      dgrassgreen@pszjlaw.com
                                                                                      pkeane@pszjlaw.com

                                                                     *Proposed Attorneys for Debtors and Debtors in Possession*