## **EXHIBIT B**

**DIP Loan Agreement**

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

**THIS DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "Agreement"), is made and effective as of the 5th day of August, 2019 (the "Effective Date"), by and among **IPIC-GOLD CLASS ENTERTAINMENT, LLC,** a Delaware limited liability company, **IPIC GOLD CLASS HOLDINGS LLC,** a Delaware limited liability company, **IPIC TEXAS, LLC,** a Texas limited liability company, **IPIC MEDIA, LLC,** a Florida limited liability company, and **DELRAY BEACH HOLDINGS, LLC,** a Florida limited liability company (individually and collectively as more particularly described below, "Borrower"), **TEACHERS' RETIREMENT SYSTEM OF ALABAMA**, a body corporate of the State of Alabama created under §§ 16-25-1 *et seq.*, of the Alabama Code ("TRSA"), and **EMPLOYEES' RETIREMENT SYSTEM OF ALABAMA**, a body corporate of the State of Alabama created under §§ 36-27-1, *et seq.*, of the Alabama Code ("ERSA", and together with TRSA, individually and collectively as more particularly described below, "Lender").

## R E C I T A L S:

On August 5, 2019 (the "Petition Date"), Borrower and certain of its Affiliates filed voluntary petitions for relief under Title 11 of the United States Code (as now or hereafter in effect, or any successor thereto, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), such cases being jointly administered under Case No. 19-[_____]-[___], and are collectively referred to herein as the "Case", and such debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Borrower has requested that Lender provide a senior secured super priority debtor-in-possession credit facility to Borrower in an aggregate principal amount not to exceed $16,000,000 for the purposes set forth herein, and Lender is willing to do so on the terms and conditions set forth herein.

Each debtor comprising Borrower acknowledges that it will receive substantial direct and indirect benefits by reason of the making of the loans and other financial accommodations provided in this Agreement.

To provide for the security and repayment of all obligations of any kind of Borrower hereunder and under the other DIP Loan Documents (as herein defined), Borrower will provide to Lender the Liens, status and protection set forth in the Interim DIP Order and the Final DIP Order (each as herein defined).

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE ONE - DEFINITIONS

1.1 Definitions.  In addition to the terms defined elsewhere in this Agreement or in any Exhibit or Schedule hereto, when used in this Agreement, the following terms shall have the following respective meanings (such meanings shall be equally applicable to the singular and plural forms of the terms used, as the context requires):

"Administrative Expenses" shall collectively mean, to the extent approved by the Bankruptcy Court if such approval is required under the Bankruptcy Code, (i) all fees payable pursuant to 28 U.S.C. § 1930, (ii) all fees and expenses incurred by Borrower's Professionals,  (iii) all fees and expenses incurred by Professionals retained by the Committee,  (iv) the actual and necessary costs and expenses involved in preserving the bankruptcy estates of Borrower, including wages, salaries and other general administrative

1

expenses incurred by Borrower,  (v) all fees and expenses of the notice and claims agent in the Case, (vi) all fees and expenses of the United States Trustee (the "US Trustee"), and (vii) all such other expenses incurred by Borrower as may be permitted by the Bankruptcy Code or approved by the Bankruptcy Court.

"Advance" means each disbursement of DIP Loan proceeds made, or deemed to have been made, in accordance with this Agreement.

"Affiliate" shall have the meaning set forth in the Bankruptcy Code.

"APA" means a definitive written asset purchase agreement in form and substance reasonably acceptable to Lender between Borrower and a prospective purchaser pursuant to which substantially all Property of Borrower will be sold pursuant Section 363 of the Bankruptcy Code.  As used herein, the term APA shall mean and include, as the context may require (i) an initial APA between Borrower and a "stalking horse" bidder, and (ii) any replacement thereof with an APA on substantially equivalent terms between Borrower and the winning bidder (or backup bidder) chosen at the Auction; provided that no APA shall include any break-up fees or expense reimbursement provisions unless approved by Lender in its sole discretion.

"Approved Budget" means Borrower's operating budget as submitted to and approved by Lender from time to time pursuant to Section 2.9 of this Agreement.  The initial Approved Budget is attached hereto as Exhibit A.

"Auction" has the meaning set forth in the definition of Sale Procedures Order.

"Availability Period" means the period during which Advances of the DIP Loan shall be available hereunder, which period shall commence upon the entry of the Interim Order and end on the Termination Date.

"Borrower" means each of the borrower parties identified in the preamble to this Agreement severally and individually, and all of the borrower parties identified in the preamble to this Agreement jointly and collectively, it being the intention of the parties that the term "Borrower" shall for all purposes mean and refer to each such party, *mutatis mutandis*, with full and equal force and effect on both an individual and collective basis.

"Borrower's Business" means the business of developing, owning and operating first class upscale cinema facilities for the screening of films and other media, which feature 40 to 52 seat auditoriums, full recline seating, food and beverage service including alcoholic beverages available before, during and after film screenings, and up to a 200 seat restaurant.

"Borrower's Representative" means the CRO or any other authorized person reasonably acceptable to Lender to communicate with Lender in matters pertaining to this Agreement.

"Business Day" means any day other than a Saturday, Sunday or recognized holiday on which commercial banks in Alabama are authorized or required to be closed for business.

"Capitalized Lease" means any lease of Property by a Person as lessee which, as determined in accordance with GAAP, is required to be capitalized on the balance sheet of such Person.

"Capitalized Lease Obligations" of any Person means, as of the date of any determination thereof, the amount at which the aggregate rental obligations due and to become due under all Capitalized Leases

under which such Person is a lessee would be reflected as a liability on a balance sheet of such Person as determined in accordance with GAAP.

"Carve Out" shall have the meaning set forth in the Financing Orders.

"Change in Control" means (i) an event or series of events as a result of which any "person" or "group" (as such terms are used in Sections 13(d)(3) and 14(d) of the Exchange Act) is or becomes, directly or indirectly, the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, whether or not applicable) of more than 50% of the combined voting power of the then outstanding securities entitled to vote generally in elections of directors, managers or trustees, as applicable, of Borrower or any successor entity ("Voting Stock"), (ii) the completion of any consolidation with or merger of Borrower into any other Person, or any sale, conveyance, transfer or lease by Borrower of all or substantially all of its assets to any Person, or any merger of any other Person into Borrower in a single transaction or series of related transactions, and, in the case of any such transaction or series of related transactions, the outstanding common stock of Borrower is changed or exchanged as a result, unless the stockholders of Borrower immediately before such transaction own, directly or indirectly, immediately following such transaction, at least 51% of the combined voting power of the outstanding voting securities of the Person resulting from such transaction in substantially the same proportion as their ownership of the Voting Stock immediately before such transaction, or (iii) the occurrence of any event whereby less than a majority of the Board of Directors of Borrower shall be persons who were serving in such capacity on the Effective Date.

"Closing Date" means the date upon which a sale pursuant to Section 363 of the Bankruptcy Code shall be consummated pursuant to the Sale Order to the winning bidder (or backup bidder) chosen at the Auction.

"Collateral" shall have the meaning set forth in Section 3.1 of this Agreement.

"Committee" means any statutory committee appointed by the Bankruptcy Court in the Case.

"Credit Amount" means a principal amount of $16,000,000 and No/100 Dollars ($16,000,000.00), in DIP Loan proceeds available to be advanced to Borrower pursuant to this Agreement.

"CRO" means a chief restructuring officer reasonably acceptable to Lender, it being acknowledged that William J. Nolan of FTI Consulting, shall be deemed to be acceptable to Lender.

"CRO Scope" means the scope of authority granted to the CRO under his or her engagement with Borrower, which shall at all times include the following, subject to the review and supervision of Borrower's board of directors, managers, or members, as applicable: (i) the CRO shall be endowed with such corporate authority as would customarily be exercised by an executive officer of a corporation, (ii) the CRO shall bear general responsibility for the day-to-day management and oversight of the business operations and affairs of Borrower, (iii) the CRO shall bear primary responsibility for preparation and submission of all Proposed Budgets and other financial reporting under this Agreement, (iv) the CRO shall bear primary responsibility for assuring that Borrower operates in compliance with the terms of this Agreement and all orders of the Bankruptcy Court.  For the avoidance of doubt, absent express authority of Borrower's board of directors, managers, or members, the CRO shall not have authority to:  (x) hire and fire Borrower's employees and representatives, (y) execute contracts or agreements on behalf of Borrower, or (z) consummate a sale of assets or other restructuring on behalf of Borrower.

"Default" means the occurrence or existence of any event, circumstance, state of facts or condition which, but for the giving of any required notice, the expiration of any applicable grace or cure period or the satisfaction of any other condition precedent, would constitute an Event of Default hereunder.

"Default Rate" means a fixed rate of interest equal to twelve and one-half percent (12.50%) per annum.

"DIP Loan" means the credit facility made available to Borrower pursuant to the terms of this Agreement and the Financing Orders in an aggregate outstanding principal amount not exceeding the Credit Amount.

"DIP Loan Documents" means this Agreement, the DIP Loan Note, the Security Documents and all other agreements, documents and instruments heretofore, now or hereafter delivered to Lender in connection with or pursuant to this Agreement, all as the same may from time to time be amended, modified, extended or renewed.

"DIP Loan Note" means that certain Promissory Note of even date herewith evidencing the DIP Loan and payable by Borrower to Lender in a principal amount equal to the Credit Amount.

"Distribution" in respect of any Person means (a) dividends or other distributions of cash, equity interests, assets or other property on or in respect of any shares of stock, membership interest or other equity interest in such Person; and (b) the redemption, repurchase or other acquisition of any shares of stock, membership interest or other equity interest in such Person or of any warrants, rights or other options to purchase any such stock, membership interest or other equity interest (except when solely in exchange for such stock, membership interest or other equity interest).

"Dollars" and "$" means legal tender of the United States of America.

"Environmental Law" means any federal, state or local statute, law, rule, regulation, order, consent decree, judgment, permit, license, code, deed restriction, common law, treaty, convention, ordinance or other governmental requirement, domestic or foreign, relating to public health, safety or the environment, including, without limitation, those relating to releases, discharges or emissions to air, water, land or groundwater, to the use of groundwater, to the use and handling of polychlorinated biphenyls or asbestos, to the disposal, treatment, storage or management of hazardous or solid waste, hazardous substances or crude oil, or any fraction thereof, to exposure to toxic or hazardous materials, to the handling, transportation, discharge or release of gaseous or liquid hazardous substances, in each case applicable to any of the Property owned, leased or operated by Borrower or any Subsidiary or the operation, construction or modification of any such Property, including, without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, the Hazardous Materials Transportation Act, the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1976, the Safe Drinking Water Control Act, the Clean Air Act of 1966, the Toxic Substances Control Act of 1976, the Occupational Safety and Health Act of 1977, the Emergency Planning and Community Right-to-Know Act of 1986, the National Environmental Policy Act of 1975, the Oil Pollution Act of 1990, and any amendments to these laws and any rules and regulations promulgated thereunder.

4

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, together with the regulations thereunder, in each case as in effect from time to time.

"Event of Default" has the meaning ascribed thereto in Section 7.1 of this Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities Exchange Commission.

"Excluded Assets" means those Properties of Borrower with respect to which no Lien shall be granted to Lender as security for the Obligations except as described in this definition.  The Excluded Assets shall be comprised solely of (i) the Carve Out, (ii) any inter-company claims between or among, as applicable, Borrower and all proceeds thereof, and (iii) any form of Property with respect to which the creation of a Lien is prohibited by applicable law, but only so long as such prohibition remains in effect and specifically excluding any proceeds thereof received by Borrower.

"Final Order" means an order of the Bankruptcy Court, satisfactory to Lender in its sole discretion, approving the DIP Loan Documents and granting the Superpriority Claim status and Liens described in Article 3 of this Agreement, which Final Order (i) shall have been entered upon an application or motion of Borrower satisfactory in form and substance to Lender in all material respects, on such prior notice to such parties as may in each case be entitled to notice under the Bankruptcy Code, (ii) shall be in full force and effect, and (iii) shall not have been stayed, reversed, modified or amended in any respect; and, if the Final Order is the subject of a pending appeal in any respect, neither the making of any Advances nor the performance by Borrower of any of its obligations hereunder or under the DIP Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

"Financing Orders" means, collectively, the Interim Order and the Final Order.

"First Day Orders" means all orders entered by the Bankruptcy Court based upon the first-day motions filed by Borrower in the Case on the Petition Date or within three (3) days thereafter.

"Fixed Rate" means a fixed rate of interest equal to ten and one-half percent (10.50%) per annum.

"GAAP" means the consistent application of such generally accepted accounting principles as may then be applicable in the United States of America.

"Indebtedness" means, with respect to any Person, without duplication, all indebtedness, liabilities and obligations of such Person including, without limitation, all (i) obligations of such Person for borrowed money or for the deferred purchase price of Property or services (including, without limitation, all notes payable and all obligations evidenced by bonds, debentures, notes or other similar instruments), (ii) obligations secured by any Lien on, or payable out of the proceeds of production from, any Property or assets owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligations, (iii) indebtedness, liabilities and obligations of third parties, including joint ventures and partnerships of which such Person is a venturer or general partner, recourse to which may be had against such Person, (iv) obligations created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person, notwithstanding the fact that the rights and remedies of the seller, lender or lessor under such agreement in the event of default are limited to repossession or sale of such Property, (v) Capitalized Lease Obligations of such Person, (vi) all accounts payable of such Person, (vii) all indebtedness, liabilities and obligations of such Person under

guarantees or endorsements, and (viii) all obligations of such Person, contingent or otherwise, relative to the face amount of letters of credit (as may be reduced pursuant to their terms), whether or not drawn.

"Interim Order" means an interim order of the Bankruptcy Court approving the DIP Loan to be made by Lender upon the entry of the Interim Order in accordance with this Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time with the express written consent of Lender, and granting the Superpriority Claim status and Liens described in Article 3 of this Agreement, which Interim Order (i) shall be in full force and effect, and (ii) shall not have been stayed, reversed, or, without Lender's consent, modified or amended in any respect; and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of any Advances nor the performance by Borrower of any of its obligations hereunder or under the DIP Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

"Investment" means any investment by Borrower in any Person, whether payment therefor is made in cash, in kind, or in equity interests of Borrower, and whether such investment is by acquisition of equity interests or Indebtedness, or by loan, advance, transfer of property out of the ordinary course of business, capital contribution, equity or profit sharing interest, extension of credit on terms other than those normal in the ordinary course of business, guaranteeing or otherwise becoming liable (contingently or otherwise) in respect of the Indebtedness of any Person, or otherwise.

"Investment Banker" means an investment banking firm satisfactory to Lender (it being understood that PJ Solomon Securities, LLC is satisfactory) retained by Borrower to market substantially all Property of Borrower for sale pursuant to Section 363 of the Bankruptcy Code.

"IRS Code" means the Internal Revenue Code of 1986, as amended, and any successor statute of similar import, together with the regulations thereunder, in each case as in effect from time to time. References to sections of the IRS Code shall be construed to also refer to any successor sections.

"Lender" means each of the lender parties identified in the preamble to this Agreement severally and individually, and all of the borrower parties identified in the preamble to this Agreement jointly and collectively, it being the intention of the parties that the term "Lender" shall for all purposes mean and refer to each such party, *mutatis mutandis*, with full and equal force and effect on both an individual and collective basis.

"Lien" means any interest in Property securing an obligation owed to, or a claim by, a Person who is not the owner of such Property, whether such interest is based on common law, statute or contract, including, without limitation, any security interest, mortgage, deed of trust, deed to secure debt, hypothecation, prior claim, right of retention, right in rem, pledge, assignment, judgment lien, deemed trust or other lien or encumbrance of any kind or nature whatsoever, any conditional sale or trust receipt, and any consignment or bailment for security purposes.  The term "Lien" shall include reservations, exceptions, encroachments, easements, servitudes, rights-of-way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting Property.

"Loan Week" means each calendar week from and after the Petition Date.

"Material Adverse Effect" means a material adverse effect on the Properties, rights, duties, obligations, liabilities, business, operations, income, condition or prospects (financial or otherwise) of Borrower, or on any Liens or other rights granted to Lender under the DIP Loan Documents or the Financing Orders; provided, however, that the commencement and maintenance of the Case shall not, in

and of themselves, be deemed as having a Material Adverse Effect, but any future event which materially worsens the effect of any such matters shall not be excluded from resulting in a Material Adverse Effect.

"<u>Obligations</u>" means, without duplication, any and all present and future Indebtedness (including, without limitation, principal of the DIP Loan, interest thereon, fees, collection costs and expenses, attorneys' fees and other agreed charges under the DIP Loan Documents), liabilities and obligations of Borrower evidenced by or arising under or in connection with this Agreement or any other DIP Loan Document, whether direct or contingent, due or to become due or now existing or hereafter arising.

"<u>Operating Account</u>" means Borrower's general demand deposit account acceptable to Lender, or such other debtor in possession operating account as may be opened by Borrower at the direction of the Bankruptcy Court.

"<u>Permitted Liens</u>" means any of the following: (a) Liens for property taxes and assessments or governmental charges or levies, provided that payment thereof is not then required by <u>Subsection 6.1(c)</u> of this Agreement; (b) (i) deposits to secure the performance of bids, tenders, trade contracts or leases (other than Capitalized Leases) or to secure statutory obligations, surety or appeal bonds or other Liens of like general nature incurred in the ordinary course of business and not in connection with the borrowing of money or the acquisition of inventory or other Property, and (ii) Liens (other than any Liens imposed by ERISA) arising in the ordinary course of business or incidental to the ownership of Properties and assets (including Liens in connection with worker's compensation, unemployment insurance and other like laws, carrier's, mechanic's, materialmen's, repairmen's, vendor's, warehousemen's and attorneys' liens and statutory landlords' liens); provided in each case that payment thereof is not then required by <u>Subsection 6.1(d)</u> of this Agreement; (c) Survey exceptions, issues with regard to the merchantability of title, easements or reservations, or rights of others for rights-of-way, servitudes, utilities and other similar purposes, or zoning or other restrictions as to the use of real properties, which could not reasonably be expected to have a Material Adverse Effect; (d) Liens permitted by Lender in writing; (e) Liens on Properties in respect of judgments or awards, the Indebtedness with respect to which is permitted by <u>Subsection 6.2(a)(iv)</u>; and (f) Pre-Petition Liens in favor of Lender under the Pre-Petition Loan Documents.

"<u>Person</u>" means any natural person or recognized legal entity of any kind whatsoever, including, without limitation, any individual, sole proprietorship, partnership, joint venture, trust, trustee, unincorporated organization, association, corporation, limited liability company, institution, entity or government (whether national, federal, state, county, city, municipal or otherwise including, without limitation, any instrumentality, division, agency, body or department thereof).

"<u>Permitted Variance</u>" has the meaning set forth in <u>Subsection 2.9(b)</u> of this Agreement.

"<u>Permitted Variance Exception</u>" has the meaning set forth in <u>Subsection 2.9(b)</u> of this Agreement.

"<u>Post-Petition</u>" means that the event or thing so described accrued, arose, attached, was created or otherwise came into existence on or after the Petition Date.

"<u>Pre-Petition</u>" means that the event or thing so described accrued, arose, attached, was created or otherwise came into existence prior to the Petition Date.

"<u>Pre-Petition Collateral</u>" means all Property of Borrower which was, as of the Petition Date, subject to a valid and perfected Lien in favor Lender as security for the Pre-Petition Loans.

"<u>Pre-Petition Loan Documents</u>" collectively means (i) that certain Second Amended and Restated Master Loan and Security Agreement dated February 1, 2018, as amended by Modification Agreement dated June 22, 2018, as further amended by Second Modification Agreement dated June 29, 2018, as further amended by Third Modification Agreement dated March 4, 2019, by and among Borrower, Lender and certain other signatories therein identified (the "<u>Pre-Petition Loan Agreement</u>"), (ii) all "Loan Documents" as such term is defined in the Pre-Petition Loan Agreement, (iii) all other Pre-Petition instruments, documents and agreements evidencing or securing the Pre-Petition Loan, and (iv) all Pre-Petition amendments, modifications, supplements or restatements of any of the foregoing.

"<u>Pre-Petition Loan</u>" means the Indebtedness owing to Lender evidenced or secured by the Pre-Petition Loan Documents.

"<u>Professionals</u>" means the attorneys, accountants, financial advisors and other professional consultants retained by any Person to provide representation or advice in connection with the Case, Borrower's Business, the DIP Loan, the DIP Loan Documents, the Collateral, any sale transaction or any other transaction contemplated hereby or thereby; provided that in the case of Borrower such term shall refer only to Professionals retained Post-Petition by Borrower or the Committee pursuant to order of the Bankruptcy Court.

"<u>Property</u>" means any interest of any kind whatsoever in any form of tangible or intangible property, asset, right, claim, benefit or entitlement, whether real, personal or mixed, and which shall include the Collateral with respect to Borrower.

"<u>Restricted Investment</u>" means any Investment, or the incurrence of any liability to make any expenditure for an Investment, other than (i) Investments made Pre-Petition, (ii) Investments permitted by the First Day Orders or any other order of the Bankruptcy Court approved by Lender, and (iii) Investments in any Subsidiaries of Borrower existing on the Effective Date.

"<u>Sale Motion</u>" means, collectively, one or more motions filed by Borrower in the Case in form and substance reasonably acceptable to Lender as Lender shall reasonably deem necessary or appropriate in order to effectuate the auction sale of substantially all of Borrower's Property (other than Excluded Assets or assets rejected pursuant to the terms of the APA) pursuant to Section 363 of the Bankruptcy Code.

"<u>Sale Order</u>" means, collectively, one or more orders of the Bankruptcy Court in form and substance reasonably acceptable to Lender entered pursuant to the Sale Motion (i) approving the sale of substantially all of Borrower's Property to the winning bidder chosen at the Auction pursuant to the APA submitted by such winning bidder, (ii) approving the back-up bidder chosen at the Auction and the APA submitted by such back-up bidder, and (iii) authorizing consummation of the transactions contemplated thereby.

"<u>Sale Procedures Order</u>" means, collectively, one or more orders of the Bankruptcy Court in form and substance reasonably satisfactory to Lender entered pursuant to the Sale Motion approving (i) sales and bidding procedures pursuant to Section 363 of the Bankruptcy Code for the solicitation of offers to purchase Borrower's Property, (ii) the conduct of an auction for the sale of substantially all of Borrower's Property in the event of receipt of any such offers (the "<u>Auction</u>"), (iii) if no "stalking horse" bidder is then in place, the form of the APA against which bids will be taken, and (iv) authorizing Lender to credit bid the Indebtedness owing under the Pre-Petition Loan Documents and the DIP Loan Documents on a combined basis at the Auction (Lender's "<u>Credit Bid Rights</u>").

"<u>Security Documents</u>" shall have the meaning set forth in <u>Section 3.3(b)</u> of this Agreement.

DOCS_SF:101591.7 39566/001

"Subsidiary" means (a) any corporation of which more than twenty percent (20%) of the issued and outstanding capital stock entitled to vote for the election of directors is at the time owned directly or indirectly by Borrower and/or any one or more Subsidiaries, or (b) any partnership, limited liability company, business trust, or any other similar entity of which more than twenty percent (20%) of the voting interests is at the time owned directly or indirectly by Borrower and/or any one or more Subsidiaries.

"Superpriority Claim" means, subject to the Carve Out and the terms of the Financing Orders, a claim against Borrower in the Case that is a superpriority Administrative Expense claim having priority over any and all Administrative Expenses, diminution claims and all other claims, now existing or hereafter arising, of any kind whatsoever including, without limitation, any and all Administrative Expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and any and all Administrative Expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such claims or expenses may become secured by a judgment lien or other non-consensual lien, levy or attachment.

"Termination Date" means the earliest to occur of (i) the expiration of ninety (90) days after the Petition Date, (ii) the date upon which Lender shall elect to terminate the Availability Period and accelerate the Obligations in accordance with Section 7.2 of this Agreement following the occurrence and continuance of an Event of Default, and (iii) the Closing Date, or such later date as to which Lender may expressly agree in writing in its sole discretion.

"Variance Report" has the meaning set forth in Subsection 2.9(b) of this Agreement.

1.2    Accounting Terms and Determinations.  Except as otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP as in effect from time to time, applied on a basis consistent (except for changes accompanied by a concurrence from Borrower's independent certified public accountants) with the most recent audited financial statements of Borrower delivered to Lender.

1.3    Certain Matters of Construction.  The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  Any pronoun used shall be deemed to cover all genders.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".  Article and section headings, tables of contents and lists of exhibits or schedules appear as matters of convenience only and shall not affect the interpretation of this Agreement.  All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.  All references to any of the DIP Loan Documents shall include any and all amendment or modifications thereto and any and all restatements, extensions or renewals thereof. All references to any Person shall mean and include the successors and permitted assigns of such Person.  All references to "including" and "include" shall be understood to mean "including, without limitation".  All references to the time of day shall mean the time of day on the day in question in Montgomery, Alabama, unless otherwise expressly provided in this Agreement.  All references to any Property of Borrower shall mean and include all Property of Borrower's estate.  A Default shall be deemed to exist and shall "continue" or be "continuing" at all times during the period commencing on the date that such Default occurs and ending on the date that such Default is either waived in writing by Lender or is cured by Borrower within any period of cure expressly provided in this Agreement; an Event of Default shall exist and shall "continue" or be "continuing" at all times

9

commencing on the date such Event of Default occurs and ending (if at all) on the date that such Event of Default has been waived (permanently or temporarily) in writing by Lender.

## ARTICLE TWO - THE DIP LOAN

2.1     <u>Advances of the DIP Loan</u>.    Subject to the terms and conditions set forth in this Agreement, and so long as no Default or Event of Default has occurred and is continuing, during the Availability Period Lender shall make Advances to Borrower from time to time in an aggregate principal amount at any one time outstanding not to exceed the Credit Amount.    Advances of the Credit Amount may be borrowed, repaid and re-borrowed by Borrower on a revolving basis during the Availability Period.

2.2     <u>Use of Proceeds</u>.

(a)     <u>Operating Expenses</u>.    Advances shall be available exclusively for the purpose of funding working capital costs and expenses set forth in the Approved Budget including, without limitation (i) Post-Petition costs and expenses related to the continued operation of Borrower's Business in the ordinary course and consistent with past practices, as set forth in the Approved Budget, (ii) fees, costs and expenses incurred in connection with the administration of the DIP Loan as provided in this Agreement, and (iii) Administrative Expenses incurred by Borrower in connection with the Case.

(b)     <u>Protective Advances</u>.    Notwithstanding any contrary provision herein set forth, Lender shall at all times have the right, but not the obligation, to fund Advances to or for the benefit of Borrower in excess of amounts required under the Approved Budget, or in excess of the limitations set forth in this <u>Section 2.2</u>, if deemed necessary or appropriate by Lender.    Nothing herein shall limit the right of Lender to make such Advances as may from time to time be necessary for the protection and preservation of the Collateral.

(c)     <u>Restricted Use of Proceeds</u>.    Notwithstanding anything to the contrary contained herein or in the Approved Budget, in no event shall proceeds of the DIP Loan be used to pay any Administrative Expenses incurred in connection with the assertion of or joinder in any claim, counterclaim, action, contested matter, objection, defense or other proceeding, the purpose of which is to seek or the result of which would be to obtain any order, judgment, declaration, or similar relief (a) invalidating, setting aside, avoiding or subordinating, in whole or in part, any of the Obligations or the Liens in any of the Collateral granted to Lender under this Agreement or the Financing Orders, (b) declaring any of the DIP Loan Documents to be invalid, not binding or unenforceable in any respect, (c) preventing, enjoining, hindering or otherwise delaying Lender's enforcement of any of the DIP Loan Documents or any realization upon any Collateral (unless such enforcement or realization is in direct violation of an explicit provision in any of the Financing Orders), (d) declaring any Liens granted or purported to be granted under any of the DIP Loan Documents to have a priority other than as set forth in <u>Section 3.6</u> of this Agreement, or (e) objecting to the amount or method of calculation by Lender of any of the Obligations; provided, however, that if a Committee is appointed, cash collateral of Lender and, if needed, proceeds of the DIP Loan may be used by such Committee to pay its fees and expenses incurred in connection with the investigation of Lenders' claims and pre-petition liens up to the maximum amount of $50,000, and provided that any such investigation is commenced within the challenge period set forth in, and otherwise complies with, the Final Order.    Nothing in this <u>Subsection 2.2(e)</u> shall be construed to waive Lender's right to object to any requests, motions or applications made in or filed with the Bankruptcy Court, including any applications for interim or final allowances of Professional fees and expenses or other Administrative Expenses.

(d)     <u>Limitation on Advances</u>.    Notwithstanding any contrary provision of this Agreement, Borrower shall not request any Advance hereunder which would result in Borrower's cash position over

the ensuing two (2) week period, as reasonably projected by the CRO after payment of all budgeted expenses, exceeding an average daily balance of $2,500,000.

2.3     <u>Draw Requests; Representations</u>.  Borrower shall be entitled to not more than two (2) Advances each calendar month.  Each request for an Advance shall be submitted to Lender not less than five (5) Business Days prior to the date upon which funding of such Advance is sought by Borrower, and shall be in the form of the Notice of Borrowing attached hereto as <u>Exhibit B</u>.  Each request for an Advance shall be deemed to constitute Borrower's contemporaneous representation and warranty (i) that on the date of, and after giving effect to, such Advance, no Default or Event of Default has occurred and is continuing; and (ii) that on the date of, and after giving effect to, such Advance, all of the representations and warranties of Borrower contained in this Agreement and the other DIP Loan Documents are true and correct in all respects as if made on and as of the date of such Advance (except to the extent that such representations and warranties expressly relate solely to an earlier date, in which case such representations and warranties shall have been true and correct on and as of such earlier date); and (iii) that such Advance is in accordance with, and will be used to fund costs and expenses of Borrower set forth in, the Approved Budget.  Notwithstanding anything to the contrary herein provided, no Advance shall be made during the last five (5) Business Days in September.  Each Notice of Borrowing must be submitted in compliance with the provisions of <u>Section 8.7</u> hereof with a contemporaneous transmission by e-mail to each of hunter.harrell@rsa-al.gov and rachel.daniels@rsa-al.gov.

2.4     <u>Delivery of Advances</u>.  Each Advance shall be delivered to Borrower by wire transfer to the Operating Account pursuant to wiring instructions set forth in the Notice of Borrowing.

2.5     <u>DIP Loan Note</u>.  The DIP Loan, all Advances thereof, and all interest accruing thereon, shall be evidenced by and payable in accordance with this Agreement and the DIP Loan Note.

2.6     <u>Interest</u>.  Prior to the occurrence of an Event of Default, the outstanding principal balance of the DIP Loan shall bear simple interest at the Fixed Rate.  Upon the occurrence of any Event of Default, and for as long as the same shall remain outstanding, at the option of Lender all Obligations of Borrower shall bear interest at the Default Rate.  All interest accruing on the DIP Loan or on any other Obligation hereunder shall be computed on the basis of a year of 360 days and paid for the actual number of days elapsed (including the first day but excluding the last day).

2.7     <u>Term, Payments and Maturity</u>.

(a)     All interest accruing on the outstanding principal balance of the DIP Loan shall be due and payable in arrears on each successive monthly anniversary of the date of entry of the Interim Order.  No interim payments of principal will be required prior to the Termination Date.

(b)     All Obligations of Borrower shall be due and payable in full, without notice or demand, on the Termination Date.  Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, subject to <u>Section 7.3</u> and the terms of the Financing Orders, Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court; <u>provided</u>, <u>however</u>, that amounts necessary to fund the Carve Out shall be retained by Borrower in the Operating Account, with any excess to be returned to Lender by Borrower upon the entry of a final decree closing the last bankruptcy case commenced by a Borrower.

(c)     The outstanding principal balance of the DIP Loan may be prepaid by Borrower at any time and from time to time, in whole or in part, without premium or penalty.

(d)    All payments shall first be applied to accrued and unpaid interest, with any balance remaining then being applied in reduction of principal.

2.8    <u>Commitment Fee</u>.  In consideration of the extension of credit evidenced hereby, Borrower shall pay to Lender a commitment fee in an amount equal to two hundred basis points (2.00%) of the Credit Amount ($320,000).  Said commitment fee shall be included in the Approved Budget and deemed fully earned and non-refundable on the date of entry of the Interim Order, and shall be due and payable by Borrower on the Termination Date.

2.9    <u>Submission and Approval of Budgets; Variance Reports</u>.

(a)    Proceeds of the DIP Loan will be advanced in accordance with, and for the purposes set forth in, the Approved Budget.  Commencing on the first Wednesday following the end of the fourth (4th) Loan Week, and on each Wednesday thereafter, Borrower shall submit to Lender a rolling 13-week update of the prior Approved Budget (each, a "<u>Proposed Budget</u>") showing the projected cash needs of Borrower for the applicable periods.  Such budget, and any interim changes thereto, shall be subject to review and approval by Lender in its sole discretion before being deemed an Approved Budget hereunder, and shall include, at a minimum, Borrower's good faith projection of all payroll costs and costs to be paid under operating expenses, general and administrative expenses, debt service payments, adequate protection payments, Administrative Expenses and other expenses to be incurred by Borrower for the applicable period, together with an aging of accounts receivable, projected cash receipts and estimate of gross and net operating income for the applicable period.  Upon approval of any Proposed Budget, the same shall constitute the Approved Budget hereunder, but until such Proposed Budget shall have been approved, the prior Approved Budget shall continue in full force and effect.

(b)    Commencing on the first Wednesday following the end of the fourth (4th) Loan Week and continuing on Wednesday of each week thereafter, Borrower shall deliver to Lender (i) a comparison of actual to budgeted results of operations for the preceding four (4) Loan Weeks, and (ii) a report of all income and expense variance on a line-item basis for the preceding four (4) Loan Weeks in a form to be agreed upon (the "<u>Variance Report</u>").  If any Variance Report shall indicate that Borrower's cumulative net cash flow for the trailing four (4) Loan Weeks shall be less than ninety percent (90%) of the amount of net cash flow projected in the Approved Budget(s) covering such period (negative variance of 10% or less being "<u>Permitted Variance</u>" hereunder), then an Event of Default shall be deemed to exist at the option of Lender; provided that Lender may, in its sole discretion, waive any violation of the Permitted Variance limit set forth herein or authorize Borrower to exceed the Permitted Variance by written notice to Borrower (each a "<u>Permitted Variance Exception</u>").

2.10    <u>Effect on Pre-Petition Loan Documents</u>.  Borrower hereby reaffirms its obligations under the Pre-Petition Loan Documents.  Upon entry of the Interim Order, the Pre-Petition Loan Documents and all liens and security interests granted thereby in the Pre-Petition Collateral shall continue in full force and effect, but Borrower shall have no obligation to perform any of the covenants set forth in the Pre-Petition Loan Documents except as may otherwise be set forth herein or in any order of the Bankruptcy Court, it being the intention of the parties that this Agreement and the Financing Orders shall henceforth control the lending relationship between Borrower and Lender.

<b><u>ARTICLE THREE - SECURITY</u></b>

3.1    <u>Grant of Security Interest</u>.  As security for the prompt satisfaction of all Obligations, subject to the terms of the Financing Orders, Borrower hereby grants, bargains, sells, conveys, mortgages, assigns, transfers, sets over and delivers to Lender, and grants to Lender a continuing lien upon and security interest in, all right, title and interest of Borrower in and to all Property of Borrower of every

12

kind, nature and description, wherever located and whether now owned or hereafter acquired, other than the Excluded Assets (collectively, the "Collateral"). For the avoidance of doubt, and by way of explanation and not limitation, the Collateral shall include:

(a)    All of Borrower's Property which is or may be subject to Article 9 of the Uniform Commercial Code, together with all replacements therefor, additions and accessions thereto, and proceeds (including, but without limitation, insurance proceeds) and products thereof, including, without limitation, the following (each as defined by the Uniform Commercial Code):

(1)    Accounts (including, without limitation, notes, drafts, acceptances, letters of credit, and other rights to payment);

(2)    Chattel Paper;

(3)    Commercial Tort Claims;

(4)    Deposit Accounts;

(5)    Documents;

(6)    Equipment;

(7)    General Intangibles;

(8)    Goods;

(9)    Instruments;

(10)    Inventory;

(11)    Investment Property;

(12)    Letter-of-Credit Rights;

(13)    Payment Intangibles;

(14)    Software;

(15)    Supporting Obligations;

(16)    Rights as seller of Goods and rights to returned or repossessed Goods;

(17)    All existing and future leases and use agreements of personal property entered into by Borrower as lessor with other Persons as lessees, including without limitation the right to receive and collect all rentals and other monies, including security deposits, at any time payable under such leases and agreements;

(18)    All existing and future leases and use agreements of personal property entered into by Borrower as lessee with other Persons as lessors, including without limitation the leasehold interest of Borrower in such property, and all options to purchase such property or to extend any such lease or agreement;

13

(19)    All Fixtures of Borrower;

(20)    All moneys of Borrower and all bank accounts, deposit accounts, lock boxes and other accounts in which such moneys may at any time be on deposit or held and all investments or securities in which such moneys may at any time be invested and all certificates, instruments and documents from time to time representing or evidencing any of the same;

(21)    All claims of Borrower in any pending litigation and claims for any insurance proceeds; and

(22)    All Records pertaining to any of the Collateral (provided that Borrower shall be entitled to retain true and correct copies of all such Records in the event that Lender at any time takes possession thereof).

(b)    All real Property rights or interests now owned or hereafter acquired by Borrower, whether leasehold, fee or mixed, and all contingent remainders and rights of reversion.

(c)    All (i) tradenames, trademarks, trademark registrations, trademark applications, patents, patent applications, copyrights, trade secrets, and other intellectual property of Borrower and all continuations, divisions, renewals or reissues thereof, (ii) all income, royalties, damages and payments now or hereafter due or payable with respect thereto including, without limitation, damages and payments for past or future infringements thereof, (iii) the right to sue for past, present and future infringements thereof, and (iv) all rights corresponding thereto throughout the world.

(d)    All claims or causes of action that constitute property of Borrower's bankruptcy estate under Section 541 of the Bankruptcy Code including, without limitation, claims and causes of action under Chapter 5 of the Bankruptcy Code.

(e)    Any and all other Property of Borrower of any kind, nature, or description whether or not identified in any one or more of the Security Documents.

(f)    All interest, dividends, proceeds, products, rents, royalties, issues and profits of any of the Property described above and all notes, certificates of deposit, checks and other instruments from time to time delivered to or otherwise possessed by Lender for or on behalf of Borrower in substitution for or in addition to any of said property.

(g)    All Pre-Petition Collateral.

3.2    <u>Identification of Collateral</u>.  No submission by Borrower to Lender of a schedule or other particular identification of Collateral shall be necessary to grant to Lender a Lien upon or to vest in Lender security title to and a security interest in each and every item of Collateral now existing or hereafter created or acquired, but rather such Lien, security title and security interest shall vest in Lender immediately upon the creation or acquisition or any item of Collateral hereafter created or acquired, without the necessity for any other or further action by any Borrower or by Lender.

3.3    <u>Perfection and Maintenance of Liens</u>.

(a)    Pursuant to the terms of the Financing Orders, the Liens of Lender in and to all Collateral described herein or in any other Security Document shall be perfected automatically and without further action by Lender or Borrower.  No filing or registration of any kind shall be required in order to perfect the Liens granted herein or in any other Security Document.  Nevertheless, Lender may elect, from an

14

abundance of caution and in order to remove uncertainty, to file or record all such financing statements, mortgages, deeds of trust, deeds to secure debt, security agreements, fixture filings, assignments, memoranda or other instruments or evidences of perfection as Lender may deem appropriate, and no such filing or recording shall in any manner alter, diminish or otherwise limit the automatic perfection of all Liens granted by the Financing Orders.

(b)      In order to further evidence and perfect the security interest of Lender in the Collateral, Borrower agrees that it shall execute and deliver to Lender all such mortgages, deeds of trust, deeds to secure debt, assignments, pledge agreements, security agreements, affidavits, certificates, documents and instruments with respect to the Collateral as Lender may from time to time request (collectively referred to herein as the "Security Documents").

(c)      Borrower authorizes Lender to prepare and record or file all such notices or instruments of perfection as may be necessary or desirable, in the sole discretion of Lender, to establish, perfect and maintain Lender's Lien upon the Collateral including, without limitation, Uniform Commercial Code financing statements (collectively referred to herein as the "Perfection Documents").

(d)      Borrower hereby appoints Lender as its true and lawful attorney-in-fact (without requiring Lender to act as such), which power shall be coupled with an interest and irrevocable, to prepare and record or file any Security Documents or Perfection Documents, and to perform all other acts that Lender deems appropriate, to establish, perfect, maintain and continue Lender's Lien upon the Collateral and to protect and preserve the Collateral.

3.4      Costs of Perfection.  Borrower shall pay, or reimburse Lender upon demand for the payment of, all costs, expenses and taxes of any kind or character incurred in connection with filing or recording the Security Documents or the Perfection Documents in such jurisdictions as Lender may designate.  All such costs and expenses may be funded through Advances hereunder in Lender's sole discretion.

3.5      Further Assurances.  Upon request by Lender, Borrower will make, execute and deliver or cause to be made, executed and delivered to Lender and, where appropriate, cause to be recorded or filed, as applicable, and from time to time thereafter to be re-recorded or refiled, as applicable, at such time and in such offices and places as shall be deemed necessary by Lender, any and all such instruments of further assurance, certificates and other documents as may, in the reasonable opinion of Lender, be necessary or desirable in order to effectuate, complete, or perfect, or to continue and preserve, the operation and effect of this Agreement and the Security Documents.

3.6      Priority of Liens.  Borrower hereby covenants, represents and warrants that, upon entry of the Financing Orders and in accordance with the Financing Orders, the Obligations and the Liens against the Collateral securing the Obligations shall, subject to the Carve-Out (i) be Superpriority Claims other than in respect of the Excluded Assets, and (ii) pursuant to Section 364(d)(1) of the Bankruptcy Code, constitute perfected first priority priming Liens on all Collateral which shall prime any Liens existing on the Petition Date under the Pre-Petition Loan Documents.

3.7      No Discharge; Survival of Claims.  Borrower agrees that (i) its Obligations hereunder and under the other DIP Loan Documents shall not be discharged by the entry of an order confirming any reorganization plan, dismissing the Case or converting the Case to a case under Chapter 7 of the Bankruptcy Code (and Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge with respect to such Obligations), and (ii) the Superpriority Claims granted to Lender pursuant to the Financing Orders and described in Article Three of this Agreement and the Liens granted to Lender pursuant to the Financing Orders and described in Article Three of this Agreement shall not be

affected in any manner by the entry of an order confirming any reorganization plan, dismissing the Case or converting the Case to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE FOUR - CONDITIONS TO ADVANCES

4.1    <u>General Conditions</u>.  Unless otherwise indicated herein, prior to making any Advance hereunder Lender shall be entitled, in its sole discretion, to require that any one or more of the following requirements be satisfied as of the date of such Advance (unless waived by Lender in its sole discretion):

(a)    This Agreement and all other DIP Loan Documents, each duly authorized and executed, shall have been delivered to Lender.

(b)    Prior to making the initial Advance, certified copies of resolutions of Borrower, duly adopted, which authorize the execution, delivery and performance of the DIP Loan Documents and specifically identify Borrower's Representatives shall have been received by Lender.

(c)    Prior to making the initial Advance, an incumbency certificate which shall identify by name and title and bear the signatures of all of the officers of Borrower executing any of the DIP Loan Documents delivered at or prior to the closing shall have been received by Lender.

(d)    All Security Documents required by Lender shall have been filed or recorded in such offices as Lender shall direct, and all fees, taxes or other charges in connection with such filing or recording shall have been paid.  Lender confirms that, as of the Effective Date, no Security Documents are presently required.

(e)    All information, approvals, documents or other instruments as Lender may reasonably request shall have been received by Lender.

(f)    On the date of and immediately after giving effect to each Advance, no Default or Event of Default shall have occurred and be continuing.

(g)    No change resulting in a Material Adverse Effect shall have occurred since the Effective Date.

(h)    Prior to making the initial Advance, all of the First Day Orders shall have been entered by the Bankruptcy Court and shall be satisfactory in form and substance to Lender in its sole discretion.

(i)    The Interim Order, and when required hereunder the Final Order, shall have been entered by the Bankruptcy Court and shall be satisfactory in form and substance to Lender in its sole discretion.

## ARTICLE FIVE - REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender that:

5.1    <u>Existence and Power</u>.  Borrower (i) is a legal business entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization set forth in the preamble to this Agreement; (ii) has all requisite powers and all governmental and regulatory licenses, authorizations, consents and approvals required to carry on Borrower's Business as now conducted; and (iii) is qualified to transact business as a foreign entity in, and is in good standing under the laws of, all states in which it is required by applicable law to maintain such qualification and good standing except

16

for those states in which the failure to qualify or maintain good standing could not reasonably be expected to have a Material Adverse Effect.

5.2 <u>Authorization</u>.  The execution, delivery and performance of this Agreement and the other DIP Loan Documents are within the powers of Borrower and, subject to entry of the Financing Orders, have been duly authorized by all necessary action of Borrower.

5.3 <u>Governmental Approvals</u>.  Except for the entry of the Interim Order (and, where applicable, the Final Order), no consent or approval of any governmental agency or authority is required in connection with the execution, delivery and performance by Borrower of the DIP Loan Documents.

5.4 <u>Binding Effect</u>.  Subject in each case to the entry of the Interim Order (or, where applicable, the Final Order), all DIP Loan Documents to which it is a party are legal, valid and binding obligations of Borrower, enforceable in accordance with their respective terms, and all future DIP Loan Documents not executed contemporaneously with the execution of this Agreement, when executed and delivered in accordance with this Agreement, will constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their respective terms.

5.5 <u>ERISA</u>.  To the extent applicable, Borrower has fulfilled its obligations under the minimum funding standards of ERISA and the IRS Code with respect to each plan and is in compliance in all material respects with the presently applicable provisions of ERISA and the IRS Code, and has not incurred any liability to the Pension Benefit Guaranty Corporation or to a plan under Title IV of ERISA which the failure to comply with could have a Material Adverse Effect.

5.6 <u>No Defaults</u>.  Except as disclosed in a written notice from Borrower to Lender, Borrower is not in default in the performance, observance or fulfillment of any (i) obligations, covenants or conditions contained in any indenture, agreement or other instrument to which it is a party, and which could have a Material Adverse Effect, or (ii) judgment, order, writ, injunction, decree or decision of the Bankruptcy Court or any other court, tribunal, arbitral board, government agency or authority.

5.7 <u>Liabilities, Litigation</u>.  Except as disclosed or referred to in the most recent financial statements of Borrower or other documentation delivered or disclosed to Lender, Borrower has no material (individually or in the aggregate) liabilities, direct or contingent, and Borrower has not received any written notice of any material (individually or in the aggregate) litigation, legal or administrative proceeding, investigation or other action of any nature pending or, to the knowledge of Borrower, threatened against or affecting Borrower.

5.8 <u>Tax Payments</u>.  Except as disclosed in a written notice from Borrower to Lender, Borrower has filed all tax returns and reports with respect to which the failure to file could have a Material Adverse Effect, and has paid all taxes, assessments, fees and other governmental charges levied upon Borrower or upon any Property owned by Borrower or upon any income of Borrower, which are due and payable, including interest and penalties, with respect to which the failure to pay could have a Material Adverse Effect, or has provided adequate reserves for the payment thereof.

5.9 <u>Title to Property</u>.  Except as disclosed in a written notice from Borrower to Lender, Borrower is the sole and absolute owner of, or has the legal right to use and occupy, all Property it claims to own which is necessary for Borrower to conduct Borrower's Business free and clear of all Liens other than Permitted Liens.  Except as disclosed in a written notice from Borrower to Lender, Borrower enjoys peaceful and undisturbed possession in all material respects under all leases under which it is operating as lessee which are necessary for the conduct of Borrower's Businesses free and clear of all Liens other than Permitted Liens.

17

5.10    <u>Compliance With Laws</u>.  Other than any non-compliance that would not, individually or in the aggregate, reasonably be expected to have a Materially Adverse Effect, Borrower has complied in all material respects with all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, certificates, franchises, permits, licenses, authorizations, directions and requirements of all federal, state, county, municipal and other governments, agencies, departments, divisions, commissions, boards, courts, authorities, officials and officers, domestic or foreign, including, without limitation, (i) subject to any Bankruptcy Court orders limiting or conditioning such compliance, all laws regarding the collection, payment, and deposit of employees' income, unemployment, social security, sales, and excise taxes, (ii) all requirements of ERISA, (iii) all Environmental Laws, and (iv) all laws pertaining to occupational safety and health.

5.11    <u>Burdensome Agreements</u>.  Borrower is not a party to any indenture, agreement or other instrument affecting Borrower's Business or Borrower's Properties which could have a Material Adverse Effect except as disclosed in the most recent balance sheet of Borrower delivered to Lender.

5.12    <u>Subsidiaries</u>.  Borrower presently has no Subsidiaries (other than any Borrower which is itself a Subsidiary of another Borrower).

5.13    <u>Approved Budget</u>.  The Approved Budget as of the Effective Date reflects, and each Proposed Budget hereafter submitted by Borrower shall reflect, Borrower's good faith estimate and projection of (i) all operating expenses to be incurred by Borrower in the ordinary course of business, consistent with past practices, and (ii) all Administrative Expenses to be incurred by Borrower in connection with the Case, in each case during the periods covered thereby.

5.14    <u>Investment Company</u>.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

5.15    <u>Margin Stock</u>.  No proceeds of the DIP Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Requirements of Law or by the terms and conditions of this Agreement or the other DIP Loan Documents.

## <u>ARTICLE SIX - COVENANTS</u>

6.1    <u>Affirmative Covenants of Borrower</u>.  At all times prior to payment in full of the Obligations, Borrower covenants and agrees as follows:

(a)    <u>Notice of Default</u>.  Promptly upon, and in any event within three (3) Business Days of, becoming aware of the occurrence of any event which constitutes a Default, Borrower will deliver written notice thereof to Lender together with a detailed statement by a responsible officer of Borrower outlining the steps being taken to cure such Default.

(b)    <u>Compliance with Laws</u>.  To the extent the failure to comply could have a Material Adverse Effect, Borrower will observe and comply with all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, certificates, franchises, permits, licenses,

18

authorizations, directions and requirements of all federal, state, county, municipal and other governments, agencies, departments, divisions, commissions, boards, courts, authorities, officials and officers, domestic or foreign, including, without limitation, (i) subject to any Bankruptcy Court orders limiting or conditioning such compliance, all laws regarding the collection, payment, and deposit of employees' income, unemployment, social security, sales, and excise taxes, (ii) all applicable requirements of ERISA, (iii) all applicable Environmental Laws, and (iv) all laws pertaining to occupational safety and health.

(c)     Payment of Taxes.  Borrower will pay and discharge all Post-Petition taxes, assessments and governmental charges or levies imposed upon it, or upon its income and profits, prior to the date on which penalties might attach thereto and all lawful claims which, if unpaid, might become a Lien upon the assets of Borrower; provided, however, that Borrower shall not be required to pay and discharge any such tax, assessment, charge, levy or claim so long as the legality thereof shall be contested in good faith and by appropriate proceedings and for which adequate provision in accordance with GAAP has been made, except that Borrower shall pay or cause to be paid all such taxes, assessments and governmental charges forthwith upon the commencement of proceedings to sell, seize or collect any Property attached as security therefor, unless such sale, seizure or collection is stayed by the filing of an appropriate bond.

(d)     Payment of Claims.  Borrower will promptly pay and discharge all Post-Petition (i) trade accounts payable in accordance with usual and customary business practices, and (ii) claims for work, labor or materials which if unpaid might become a Lien upon any of its Property or assets; provided, however, that Borrower shall not be required to pay any such account payable or claim the payment of which is being contested in good faith and, if necessary, by appropriate proceedings and for which adequate provision as determined in accordance with GAAP has been made, except that Borrower shall pay or cause to be paid all such accounts payable and claims forthwith upon the commencement of proceedings to foreclose any Lien which is attached as security therefor, unless such foreclosure is stayed by the filing of an appropriate bond.

(e)     Insurance.  Borrower shall maintain, and shall cause each of its Subsidiaries to maintain, with financially sound and reputable insurance companies, insurance on all its Properties in such amounts and against such risks as Lender shall reasonably require, which shall at least be equal to such coverage and amounts as are usually insured against in the same general area by companies engaged in the same or a similar business; provided, however, such requirements shall not exceed those set forth in the Pre-Petition Loan Documents.  All such insurance may be subject to reasonable deductible amounts. Borrower shall deliver to Lender certificate(s) of insurance on the date hereof and upon the annual (or other shorter period of time) renewal of such policies specifying the details of all insurance then in effect, together with a certificate of an officer of Borrower that all premiums then due have been paid.  Borrower shall notify Lender immediately in writing of any material fire or other casualty to or accident involving any of the Collateral, whether or not such fire, casualty or accident is covered by insurance.  Borrower shall notify promptly the insurance company and submit an appropriate claim and proof of claim to the insurance company if any Collateral is damaged or destroyed by fire or other casualty.  Borrower shall not declare or agree with underwriters that any Collateral is a compromised, agreed, arranged or constructive total loss without the prior written consent of Lender.  All such policies of insurance shall cover the interest of Lender as mortgagee, loss payee or additional insured in accordance with the requirements of the Pre-Petition Loan Documents.

(f)     Maintenance of Property.  Borrower will at all times maintain, protect and keep in good repair, working order and condition (ordinary wear and tear excepted), all Property necessary to the operation of Borrower's Business.

(g)      Maintenance of Intellectual Property.  Borrower will obtain or maintain in full force and effect, all licenses, franchises, patents, trademarks, copyrights, intellectual property, permits, authorizations and other rights as are necessary for the conduct of Borrower's Business.

(h)      Existence.  Borrower will do all things necessary to (i) preserve and keep in full force and effect at all times its legal existence, and (ii) be duly qualified to do business in all jurisdictions where the nature of its business or its ownership of Property requires such qualification except for those jurisdictions in which the failure to qualify could not reasonably be expected to have a Material Adverse Effect.

(i)      Notice of Claims.  Promptly upon, and in any event within three (3) Business Days of, becoming aware of any adverse claim herein described, Borrower shall provide written notice to Lender of (i) the filing of any Lien against any Property of Borrower, or (ii) the existence of any material dispute under any contract or agreement to which Borrower is a party, or (iii) the filing of any lawsuit by or against Borrower, or (iv) the entry of any judgment against Borrower.

(j)      Maintenance of Books and Records, Consultations, Audits and Inspections, and Reporting.  Borrower will maintain books and records in accordance with GAAP and in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities. Borrower will, and it will cause each of its Subsidiaries to, permit Lender and Lender's Professionals to discuss the affairs, finances and accounts of Borrower with the CRO and other officers of Borrower and its independent public accountants, all at such reasonable times and as often as Lender may request; provided, however, that Borrower shall not be required to permit Lender or Lender's Professionals to engage in any such discussions that would or, in Borrower's reasonable discretion, could result of in a waiver of privilege with respect to any communications between Borrower and Borrower's Professionals. Borrower will also permit inspection of its Properties, books and records by Lender (and any Person appointed by Lender) during normal business hours and at other reasonable times.  In general, Borrower shall at all times cooperate fully with Lender and Lender's Professionals in the delivery of any and all such information related to Borrower's Business or any Properties of Borrower as may be reasonably requested.

(k)      Further Assurances.  Borrower will execute and deliver to Lender, at any time and from time to time, any and all further agreements, documents and instruments, and take any and all further actions which may be required under applicable law, or which Lender may from time to time reasonably request, in order to effectuate the transactions contemplated by this Agreement and the other DIP Loan Documents.

(l)      Use of Proceeds.  Borrower shall use the proceeds of the DIP Loan solely for the purposes permitted by this Agreement.

(m)      CRO.  Borrower shall (a) retain and continue to retain the CRO under terms of engagement satisfactory to Lender, (b) file a motion or application within three (3) days after the Petition Date seeking Bankruptcy Court approval of the retention of the CRO *nunc pro tunc* to the Petition Date, and (c) obtain Bankruptcy Court approval of the retention of the CRO within thirty (30) days after the Petition Date.  At all times, Borrower shall vest the CRO with full operational authority and managerial control to carry out the CRO Scope.  In addition, Borrower shall cause the CRO to communicate with and meet with Lender as reasonably requested by Lender.

(n)      Investment Banker.  Borrower shall (a) retain and continue to retain the Investment Banker under terms of engagement satisfactory to Lender, (b) file a motion or application within three (3) days after the Petition Date seeking seek Bankruptcy Court approval of the retention of the Investment

Banker *nunc pro tunc* to the Petition Date, and (c) obtain Bankruptcy Court approval of the retention of the Investment Banker within thirty (30) days after the Petition Date. In addition, Borrower shall cause the Investment Banker to meet with and communicate with Lender as reasonably requested by Lender.

6.2    <u>Negative Covenants of Borrower</u>. At all times prior to payment in full of the Obligations, Borrower covenants and agrees as follows:

(a)    <u>Limitation on Indebtedness</u>. Borrower will not incur or be obligated on any Indebtedness other than: (i) obligations to Lender under the DIP Loan Documents; (ii) Indebtedness relating to employee benefit plans; (iii) Indebtedness in respect of taxes, assessments, governmental charges or levies and claims for labor, materials and supplies to the extent that payment therefor shall not then be required to be made in accordance with this Agreement; (iv) Indebtedness in respect of judgments or awards (which do not constitute an Event of Default) that have been in force for less than the applicable period for taking an appeal and for which adequate provision as determined in accordance with GAAP has been made so long as execution is not levied thereunder and in respect of which Borrower shall at the time in good faith be prosecuting an appeal or proceedings for review and a suspending appeal bond in the full amount of such judgment or award shall have been obtained by Borrower with respect thereto; (v) current liabilities of Borrower incurred in the ordinary course of Borrower's Business or in connection with Borrower's prosecution of the Case and not incurred through (A) the borrowing of money, or (B) the obtaining of credit except for credit on an open account basis customarily extended and in fact extended in connection with normal purchases of goods and services; (vi) endorsements for collection, deposits or negotiation and warranties of products or services, in each case incurred in the ordinary course of business; (vii) Indebtedness in respect of performance, surety or appeal bonds obtained in the ordinary course of Borrower's Business; and (viii) Indebtedness existing as of the Petition Date.

(b)    <u>Consolidation, Merger, Sale of Assets, Dissolution, Etc</u>. Except in connection with any transaction approved by the Bankruptcy Court in connection with the Sale Procedures Order, Borrower will not (i) directly or indirectly merge into or with or consolidate with any other Person or permit any other Person to merge into or with or consolidate with it or (ii) sell, assign, lease, transfer, abandon or otherwise dispose of any of its Property, except for sales permitted under this Agreement.

(c)    <u>Changes in Nature of Business</u>. Borrower will not engage in any business if, as a result, the general nature of the business which would then be engaged in by Borrower, considered as a whole, would be substantially changed from Borrower's Business.

(d)    <u>Change in Control</u>. Borrower shall not allow any Change in Control to occur.

(e)    <u>Ownership of Subsidiaries</u>. Borrower will not acquire or cause to be formed any Subsidiaries.

(f)    <u>Liens</u>. Except with respect to Permitted Liens, Borrower will not mortgage or encumber any of its Property or suffer any Liens to exist on any of its Property without the prior written consent of Lender.

(g)    <u>No Contest</u>. Borrower will not contest the validity, legality, binding effect or priority of the Pre-Petition Loan Documents, the DIP Loan Documents or any Liens in favor of Lender upon the Collateral.

(h)    <u>Restricted Investments</u>. Borrower will not, directly or indirectly, make or hold any Post-Petition Restricted Investments.

(i)    <u>Critical Vendors</u>.  Borrower will not pay any critical vendors for Pre-Petition claims without (i) the prior written consent of Lender, which consent shall not be unreasonably withheld, and (ii) an appropriate order from the Bankruptcy Court.  Notwithstanding the foregoing, Lender agrees that Borrower shall be permitted to pay any Pre-Petition claims to critical vendors which are included in the Approved Budget (subject to Permitted Variances and Permitted Variance Exceptions) and authorized by an appropriate order of the Bankruptcy Court.

(j)    <u>Change in CRO</u>.  Without the prior written consent of Lender, Borrower will not terminate the CRO or in any manner alter, diminish or limit the CRO Scope.

(k)    <u>Executive Compensation</u>.  Borrower shall not increase the gross compensation or benefits paid to, for or on behalf of any executive officer or senior management employee of Borrower without the prior written consent of Lender, which consent may be granted or withheld in Lender's sole discretion.

(l)    <u>Agreements</u>.    Borrower shall not contest or reject in the Case any Pre-Petition indenture, contract, agreement, lease or other instrument which is necessary to the continued conduct of Borrower's Business, other than as may be required by the APA.

(m)    <u>State of Organization; Location of Chief Executive Office</u>.  Borrower shall not change its state of organization, principal place of business or chief executive office, unless Borrower has obtained Lender's prior written consent and has taken such action as is necessary to cause the security interest of Lender in the Collateral to continue to be a first priority perfected security interest subject only to Permitted Liens.

(n)    <u>Other Borrowings</u>.  Borrower irrevocably waives any right it may have, and hereby agrees that at no time shall it seek authority from the Bankruptcy Court (i) to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code other than the DIP Loan on the terms and conditions set forth herein, or (ii) to propose or support any plan of reorganization or liquidation with respect to Borrower that does not provide for the indefeasible payment in full and satisfaction of all Obligations.

## <u>ARTICLE SEVEN - EVENTS OF DEFAULT AND REMEDIES</u>

7.1    The occurrence of any of the following events or circumstances shall constitute an "<u>Event of Default</u>" hereunder:

(a)    Borrower shall fail to pay any Obligation within three (3) Business Days of the date upon which such Obligation is due and payable.

(b)    Any representation or warranty of Borrower made in this Agreement, in any other DIP Loan Document or in any certificate, agreement, instrument or statement furnished or made or delivered pursuant hereto or thereto shall prove to have been untrue or incorrect in any material respect (or in the case of any representation or warranty qualified by a materiality standard, in any respect) when made or effected.

(c)    Borrower shall fail to perform or observe any term, covenant, condition or agreement contained in this Agreement or in any other DIP Loan Document, or if there shall at any time exist any event, occurrence, condition or state of facts which constitutes a breach or violation of any term, covenant, condition or agreement contained in this Agreement or in any other DIP Loan Document and Borrower shall not have cured such failure to perform or breach within ten (10) days after the receipt of notice of such failure to perform or breach from Lender; <u>provided</u>, <u>however</u>, that there shall be no

22

obligation of notice and no cure period with respect to any breach or violation of <u>Subsections 6.2(g)</u> or <u>6.2(n)</u> of this Agreement, which shall constitute an immediate Event of Default.

(d)    If there shall occur or exist any "Default" or "Event of Default" under, and as defined in, any DIP Loan Document other than this Agreement and Borrower shall not have cured such "Default" or "Event of Default" within any notice, grace or cure period specified with respect thereto in such other DIP Loan Document.

(e)    This Agreement or any other DIP Loan Document shall at any time for any reason (other than permitted cancellation by Lender) cease to be in full force and effect or shall be declared to be null and void by a court of competent jurisdiction, or if the validity or enforceability hereof or thereof shall be contested or denied by Borrower, or if the transactions contemplated hereunder or thereunder shall be contested by Borrower, or if Borrower shall repudiate or deny any liability or obligation hereunder or thereunder.

(f)    If any enforcement action is brought against Borrower with respect to any Pre-Petition Indebtedness in excess of $100,000 owing to any other creditor, and collection in respect of such action is not effectively stayed by the automatic stay in the Case.

(g)    If any judgment, decree, arbitration award or ruling shall be entered against Borrower involving, in the aggregate, a Post-Petition liability (not paid or covered by insurance) of $100,000.00 or more and enforcement or collection in respect of such judgment, decree, award or ruling shall not have been vacated, paid, discharged, stayed or suspensively appealed within thirty (30) days from the entry thereof.

(h)    The Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or Borrower shall file a motion or other pleading seeking the dismissal of the Case under Section 1112 of the Bankruptcy Code or otherwise; a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Case and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof; or an application shall be filed by Borrower for the approval of any other Superpriority Claim (other than the Carve Out) in the Case which is *pari passu* with or senior to the claims of Lender with respect to the Collateral hereunder, or there shall arise or be granted any such pari passu or senior Superpriority Claim with respect to the Collateral.

(i)    The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any material portion of the Collateral, or an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying any Financing Order, as applicable.

(j)    Except as permitted by the Financing Orders or the First Day Orders, Borrower shall make any unauthorized payment (in cash, in kind or otherwise) of any Pre-Petition Indebtedness (other than indebtedness owing under the Pre-Petition Loan Documents).

(k)    Other than as permitted by the Carve-Out and subject to entry of the Final Order, Borrower (or any successor in interest to Borrower, including, without limitation, any trustee in the Case) shall assert any claim for Administrative Expenses against any of the Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise.

23

(l)     Any change having a Material Adverse Effect shall have occurred since the Effective Date.

(m)     Subject to the Bankruptcy Court's availability, the Final Order shall not have been entered by the Bankruptcy Court on or before the date that is thirty (30) days after entry of the Interim Order, or such later date as may be agreed to in writing by Lender in its sole discretion.

(n)     Subject to the Bankruptcy Court's availability, an order approving bid procedures in a form acceptable to Lender shall not have been entered by the Bankruptcy Court on or before the date that is thirty (30) days after the Interim Order, or such later date as may be agreed to in writing by Lender in its sole discretion.  The order approving bidding procedures shall provide for bids to be received on or before October 11, 2019, and the auction to occur on October 17, 2019.

(o)     Subject to the Bankruptcy Court's availability, the Bankruptcy Court approval of the sale shall not have been entered by the Bankruptcy Court on or before October 25, 2019, or such later date as may be agreed to in writing by Lender in its sole discretion.

(p)     Subject to the Bankruptcy Court's availability, the sale transaction shall not have closed on or before ninety (90) days after the Petition Date, or such later date as may be agreed to in writing by Lender in its sole discretion.

(q)     Borrower shall at any time be in material default of its obligations under any APA, the Financing Orders, the Sale Order or any other orders of the Bankruptcy Court.

(r)     Any APA shall be rescinded, terminated, repudiated, declared to be null and void by a court of competent jurisdiction, or otherwise cease to be in full force and effect for any reason other than cancellation or default by the purchaser thereunder.

(s)     The sale transaction between Borrower and the successful bidder (or a successful back-up bidder) authorized by the Sale Order sale shall fail to close in accordance with its terms.

(t)     The Bankruptcy Court shall enter any order the effect of which is to materially limit, restrict, curtail, reduce, suspend, stay or enjoin Lender's Credit Bid Rights.

(u)     If any Variance Report shall reflect a negative variance exceeding the Permitted Variance (subject to the effect of any Permitted Variance Exception granted by Lender).

(v)     If Borrower shall challenge the application of any payments authorized by the Financing Orders pursuant to Section 506(b) of the Bankruptcy Code.

(w)     If Borrower shall seek any relief under the Bankruptcy Code including, without limitation, Section 105 of the Bankruptcy Code, to the extent such relief would in any way restrict or impair the rights and remedies of Lender provided in the Financing Orders or in any DIP Loan Document.

7.2     <u>Termination and Acceleration</u>.  Upon the occurrence and during the existence of any Default, Lender shall be under no obligation to fund any Advance hereunder.  If an Event of Default shall have occurred and is continuing, then without further order of or application to the Bankruptcy Court, and without notice to any Person, but subject to the terms of the Financing Orders, Lender may, in its sole and absolute discretion, terminate the Availability Period and declare all Obligations to be immediately due and payable, whereupon all of the Obligations shall become and be immediately due and payable, without

presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Borrower; provided, however, that upon the occurrence of any event described in Subsection 7.1(h) of this Agreement, the discretion of Lender to make Advances under this Agreement shall automatically terminate and all Obligations shall automatically become immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Borrower.

7.3     Remedies; Relief from Stay.  Borrower acknowledges that, subject to the terms of the Financing Orders, Lender has been granted full and complete relief from stay to pursue any and all remedies to which it may be entitled, including the right to demand immediate possession of the Collateral and the Pre-Petition Collateral and to liquidate the same in the manner provided by applicable law, all without further order of or application to the Bankruptcy Court.  Upon the occurrence of any Event of Default, but subject to the terms of the Financing Orders, Lender shall be entitled to the exercise of any and all rights and remedies available to it under the DIP Loan Documents and the Pre-Petition Loan Documents, at law or in equity.  All such rights and remedies may be exercised successively or concurrently in such order and manner as Lender may in its sole discretion elect, and no such election shall constitute a waiver by Lender of any other right or remedy.  Without limiting the generality of the foregoing, Lender may, without notice, but subject to the terms of the Financing Orders, take any or all of the following actions at the same or different times:

(a)     Cancel Lender's obligations arising under the DIP Loan Documents.

(b)     Institute appropriate proceedings to specifically enforce performance of the terms and conditions of the DIP Loan Documents.

(c)     Take immediate possession of the Collateral.

(d)     Appoint or seek appointment of a receiver, without notice and without regard to the solvency of Borrower or the adequacy of the security, for the purpose of preserving the Collateral, preventing waste, and to protect all rights accruing to Lender by virtue of this Agreement and the other DIP Loan Documents.  All reasonable expenses incurred in connection with the appointment of such receiver, or in protecting, preserving, or improving any Collateral shall be charged against the Borrower and shall be secured by Lender's Liens hereunder.

(e)     Perform any and all of the duties and obligations and exercise all the rights and remedies of Borrower contained in any contracts of Borrower as fully as Borrower could itself.

(f)     Notify customers that Accounts have been assigned to Lender, demand and receive information from customers with respect to Accounts, forward invoices to customers directing them to make payments to Lender, collect all Accounts in Lender's or Borrower's name and take control of any cash or non-cash proceeds of Collateral.

(g)     Enforce payment of any Accounts, prosecute any action or proceeding with respect to any Accounts, extend the time of payment of any Accounts, make allowances and adjustments with respect thereto and issue credits against Accounts in the name of Lender or Borrower.

(h)     Settle, compromise, extend, renew, release, terminate or discharge, in whole or in part, any Account or deal with the same as Lender may deem advisable.

(i)     Require Borrower to open all mail only in the presence of a representative of Lender, who may take therefrom any remittance on Collateral.

25

(j)     Exercise any and all rights and remedies of Borrower under or in connection with any contracts or otherwise in respect of the Collateral, including, without limitation, any and all rights of any Borrower to demand or otherwise require payment of any amount under, or performance of any provision of, any assigned agreement.

(k)     Enter upon the premises of Borrower or any other place or places where any Collateral is located and kept, and through self-help and without judicial process, without first obtaining a final judgment or giving Borrower notice and opportunity for a hearing on the validity of Lender's claim, without any pre-seizure hearing as a condition to repossession through court action and without any obligation to pay rent to Borrower, remove the Collateral therefrom to the premises of Lender or of any agent of Lender, for such time as Lender may desire, in order effectively to collect or liquidate the Collateral.

(l)     Collect, receive, appropriate, repossess, foreclose upon and realize upon the Collateral, or any part thereof, and to sell, lease, assign, give option or options to purchase, or sell or otherwise dispose of and deliver the Collateral (or contract to do so), or any part thereof, in one or more lots or parcels, at public or private sale or sales, at any exchange broker's board or at any of Lender's offices or elsewhere, at such prices as Lender may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  Lender shall have the right upon any such public sale or sales, and to the extent permitted by law, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption, which equity of redemption Borrower hereby releases.  Borrower waives all claims, damages, and demands against Lender arising out of the repossession, retention or sale of the Collateral.

(m)     Use, and permit any purchaser of any of the Collateral from Lender to use, without charge, any intellectual property, promotional or advertising materials or other property of a similar nature which pertains to, or is included in, any of the Collateral, in advertising for sale, preparing for sale and selling any Collateral, and all of Borrower's rights under all licenses and all franchise agreements shall inure to Lender's benefit.

(n)     Send any written notice to Borrower required by law in the manner set forth in this Agreement; and any notice sent by Lender in such manner at least ten (10) days (counting the date of sending) prior to the date of a proposed disposition of the Collateral shall be deemed to be reasonable notice (provided, however, that nothing contained herein shall be deemed to require 10 days' notice if, under the applicable circumstances, a shorter period of time would be allowed under applicable Law).

(o)     Exercise, in addition to all other rights which it has under this Agreement or other applicable law, all of the rights and remedies of a secured party upon default under the Uniform Commercial Code or other applicable Law.

Borrower acknowledges that upon any sale or liquidation of the Collateral or the Pre-Petition Collateral pursuant to non-bankruptcy remedies under state law as permitted hereby, Lender shall be entitled (but shall not be required) to credit bid the Obligations hereunder and the Indebtedness of Borrower owing under the Pre-Petition Loan Documents on a combined basis in such order and manner as Lender may elect.

7.4     <u>No Limitation on Rights and Remedies</u>.  The enumeration of the powers, rights and remedies in this Article shall not be construed to limit the exercise thereof to such time as an Event of Default occurs if, under applicable law or any other provision of this Agreement or any other DIP Loan Document, Lender has any of such powers, rights and remedies regardless of whether an Event of Default has occurred, and any limitation contained herein or in any of the other DIP Loan Documents as to

26

Lender's exercise of any power, right or remedy for a period of time only during the continuance of an Event of Default shall only be applicable at such time as Lender shall have actual knowledge that such Event of Default is no longer continuing and for a reasonable time thereafter as may be necessary for Lender to cease the exercise of such powers, rights and remedies (it being expressly understood and agreed that until such time as Lender shall obtain such knowledge and after the expiration of such reasonable time, Lender shall have no liability whatsoever for the commencement of or continuing exercise of any such power, right or remedy).

7.5    <u>Attorney-in-Fact</u>.    Subject to the terms of the Financing Orders, Borrower hereby constitutes and appoints Lender, or any other Person whom Lender may designate, as Borrower's attorney-in-fact (such appointment being coupled with an interest and being irrevocable until Lender's Liens and claims shall have been satisfied), at Borrower's sole cost and expense, to exercise any one or more of the rights, powers or remedies set forth below at any time after the occurrence and during the continuance of an Event of Default (and all acts of such attorney-in-fact or designee taken pursuant to this <u>Section 7.5</u> are hereby ratified and approved by Borrower, and said attorney or designee shall not be liable for any acts or omissions nor for any error of judgment or mistake of fact or law):

(a)    To take or to bring, in the name of Lender or in the name of Borrower, all steps, action, suits or proceeding deemed by Lender necessary or desirable to effect collection of Accounts.

(b)    To settle, adjust, compromise, extend, renew, discharge, terminate or release any Accounts in whole or in part.

(c)    To settle, adjust or compromise any legal proceedings brought to collect any Accounts.

(d)    To notify customers to make payments on the Accounts directly to Lender or to a lockbox designated by Lender.

(e)    To transmit to customers notice of Lender's interest in the Accounts and to demand and receive from such customers at any time, in the name of Lender or of any Borrower or of the designee of Lender, information concerning the Accounts and the amounts owing thereon.

(f)    To sell or assign any of the Collateral upon such terms, for such amounts and at such time or times as Lender deems advisable, and to execute and deliver in the name of Borrower any deeds, bills of sale, assignments or other instruments of transfer in connection therewith.

(g)    To take control, in any manner, of any item of payment on, or proceeds of, Collateral.

(h)    To prepare, file and sign Borrower's name on any proof of claim in bankruptcy or similar document against any customer of Borrower.

(j)    To prepare, file and sign Borrower's name on any notice of lien, assignment or satisfaction of lien or similar document in connection with the Collateral.

(j)    To sign or endorse the name of Borrower upon any Chattel Paper, Document, Instrument, invoice, freight bill, bill of lading, warehouse receipt or similar document or agreement relating to the Collateral.

(k)    To use the information recorded on or contained in any data processing equipment and computer hardware and software relating to the Collateral to which Borrower has access.

(l)      To enter into contracts or agreements for the management of the Collateral and the further construction or completion thereof as said attorney-in-fact or designee or Lender may from time to time deem appropriate and charge any costs thereby incurred to Borrower's account.

(m)     To receive, take, endorse, assign and deliver in Lender's name or in the name of Borrower any and all checks, notes, drafts and other instruments.

(n)      To receive, open and dispose of all mail addressed to Borrower and to notify postal authorities to change the address for the delivery thereof to such address as Lender may designate.

(o)      To do all acts and things necessary, in Lender's discretion, to fulfill Borrower's obligations under this Agreement and to otherwise carry out the purposes of this Agreement.

## ARTICLE EIGHT - MISCELLANEOUS

8.1      <u>No Waiver</u>.  No failure or delay by Lender in exercising any right, remedy, power or privilege hereunder or under any other DIP Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The remedies provided herein and in the other DIP Loan Documents are cumulative and not exclusive of any remedies provided by law.  Nothing herein contained shall in any way affect the right of Lender to exercise any statutory or common law lien or right of setoff.

8.2      <u>Right of Setoff</u>.  Upon the occurrence and during the continuance of any Event of Default, subject to the terms of the Financing Orders, Lender is hereby authorized at any time and from time to time, without notice to Borrower (any such notice being expressly waived by Borrower) and to the fullest extent permitted by law, to setoff and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by Lender and any and all other indebtedness at any time owing by Lender to or for the credit or account of Borrower against any and all of the Obligations.  The rights of Lender under this <u>Section 8.2</u> are in addition to any other rights and remedies (including, without limitation, other rights of setoff) which Lender may have.  Nothing contained in this Agreement or any other DIP Loan Document shall impair the right of Lender to exercise any right of setoff or counterclaim it may have against Borrower and to apply the amount subject to such exercise to the payment of indebtedness of any Borrower unrelated to this Agreement or the other DIP Loan Documents.

8.3      <u>Costs and Expenses</u>.  Subject to the terms of the Financing Orders, Borrower shall reimburse Lender for all fees and expenses of any kind or character whatsoever reasonably incurred by Lender in connection with the Case including, without limitation, fees and expenses of Lender's Professionals (including all fees payable to Houlihan Lokey Capital, Inc., in its capacity as financial advisor pursuant to its engagement letter with Burr & Forman LLP) and fees and expenses in connection with (i) the negotiation and preparation of any of the DIP Loan Documents or any amendment or modification thereto, (ii) the preparation of any motions, orders or other pleadings in the Case, (iii) responding to any requests for waiver, restructuring or forbearance with respect to the Obligations, (iv) the administration of the DIP Loan Documents and the transactions contemplated thereby, (v) any action taken to perfect or maintain the perfection or priority of any Liens with respect to any of the Collateral, including any intangibles taxes, documentary stamp taxes or other taxes or costs which may be payable in connection therewith, (vi) any inspections or audits conducted with respect to Borrower's books and records or any of the Collateral, (vii) any effort to verify, protect, preserve, or restore any of the Collateral or to collect, sell, liquidate or otherwise dispose of or realize upon any of the Collateral, (viii) any litigation, contest, dispute, suit, proceeding or action (whether instituted by or against Lender, Borrower or any other Person) in any way arising out of or relating to any of the Collateral or the validity, perfection or priority of any Liens thereon, or to any of the DIP Loan Documents or the validity,

allowance or amount of any of the Obligations, (ix) the protection or enforcement of any rights or remedies of Lender, and (x) any other action taken by Lender to enforce any of the rights or remedies of Lender.  All amounts chargeable to Borrower under this <u>Section 8.3</u> shall constitute Obligations that are secured by all of the Collateral and shall be payable to Lender on the Termination Date.  The foregoing shall be in addition to, and shall not be construed to limit, any other provision of any of the DIP Loan Documents regarding the reimbursement by Borrower of costs, expenses or liabilities suffered or incurred by Lender.

8.4    <u>Environmental Indemnity</u>.  Subject to the terms of the Financing Orders, Borrower hereby agrees to indemnify Lender, and the shareholders, officers, directors, employees, agents and Affiliates of Lender (collectively, the "<u>Indemnitees</u>"), and hold the Indemnitees harmless from and against any and all losses, liabilities, damages, injuries, costs, expenses and claims of any and every kind whatsoever (including, without limitation, reasonable court costs and attorneys' fees and expenses), which at any time or from time to time may be paid, incurred or suffered by the Indemnitees, with respect to or as a direct or indirect result of the violation by Borrower of any Environmental Laws; or with respect to, or as a direct or indirect result of the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from, properties owned or operated by any Borrower of any hazardous substances or any other hazardous or toxic waste, substance or constituent or other substance (including, without limitation, any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under the Environmental Laws); and the provisions of and undertakings and indemnification set out in this <u>Section 8.4</u> shall survive the satisfaction and payment of the Obligations and the termination of this Agreement; provided that Borrower shall have no obligation to an Indemnitee hereunder with respect to indemnified liabilities arising from the gross negligence, willful misconduct, bad faith, or criminal misconduct of that Indemnitee.

8.5    <u>General Indemnity</u>.  In addition to the payment of expenses pursuant to <u>Section 8.3</u>, subject to the terms of the Financing Orders, Borrower hereby agrees to indemnify and pay the Indemnitees and hold the Indemnitees harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnitees shall be designated a party thereto), that may be imposed on, incurred by or asserted against the Indemnitees, in any manner relating to or arising out of this Agreement, any of the other DIP Loan Documents or any other agreement, document or instrument executed and delivered by Borrower in connection herewith or therewith, the statements contained in any commitment letters delivered by Lender, the agreement of Lender to make the DIP Loan hereunder, or the use or intended use of the proceeds of any Advance hereunder, and the management and operation of Borrower's Business (collectively, the "<u>Indemnified Liabilities</u>"); provided that Borrower shall have no obligation to an Indemnitee hereunder with respect to Indemnified Liabilities arising from the gross negligence, willful misconduct, bad faith, or criminal misconduct of that Indemnitee. To the extent that the undertaking to indemnify, pay and hold harmless set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them.  The provisions of the undertakings and indemnification set out in this <u>Section 8.5</u> shall survive satisfaction and payment of the Obligations and the termination of this Agreement.

8.6    <u>Authority to Act</u>.  Lender shall be entitled to act on any notices and instructions (telephonic or written) believed by Lender in good faith to have been sent or delivered by any person identifying himself as Borrower's Representative, regardless of whether such notice or instruction was in

29

fact delivered by such person, and Borrower hereby agrees to indemnify Lender and hold Lender harmless from and against any and all losses and expenses, if any, ensuing from any such action.

8.7    <u>Notices</u>.  Any notice, request, demand, consent, confirmation or other communication hereunder shall be in writing and shall be deemed received (a) when personally delivered (to the Person or department if one is designated), (b) one (1) business day following the date deposited with Federal Express, Airborne or other national overnight courier, fees prepaid, or (c) three (3) days following the date deposited with U.S. certified or registered mail, return receipt requested, postage prepaid, and addressed in each such case to the parties at their respective addresses set forth below or such other single address as either party may designate in a written notice given as herein provided (except that a change of address notice shall not be effective until actual receipt).

> If to Borrower:                    iPic-Gold Class Entertainment, LLC
> 433 Plaza Real, Suite 335
> Boca Raton, FL 33432
> Attn:  General Counsel
>
> with a copy to:                    Jeffrey Pomerantz
> Pachulski Stang Ziehl & Jones LLP
> 10100 Santa Monica Blvd., 13th Floor
> Los Angeles, CA 90067
> Telephone:  (310) 277-6910
> Facsimile:  (310) 201-0760
>
> If to Lender:                    c/o The Retirement Systems of Alabama
> 201 South Union Street
> Montgomery, AL 36130
> Attn: M. Hunter Harrell
> Telephone: (334) 517-7109
> Facsimile: (334) 517-7099
>
> with a copy to:                    Jeff Baker
> Burr & Forman LLP
> 420 North 20th Street, Suite 3400
> Birmingham, AL 35203
> Telephone:  (205) 458-5279
> Facsimile:  (205) 244-5601

8.8    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Alabama, without reference to principles of conflict of laws.  Any disputes arising hereunder shall be determined by the Bankruptcy Court.

8.9    <u>Amendments and Waivers</u>.  Any provision of this Agreement or any of the other DIP Loan Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by both Borrower and Lender.

8.10    <u>Successors and Assigns</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that Borrower may not assign or otherwise transfer any of its rights or delegate any of its obligations under this Agreement.

8.11    NO ORAL AGREEMENTS, ENTIRE AGREEMENT.  ORAL AGREEMENTS OR COMMITMENTS TO LEND MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT, INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT, ARE NOT ENFORCEABLE.  TO PROTECT BORROWER AND LENDER FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS REACHED BY BORROWER AND LENDER COVERING SUCH MATTERS ARE CONTAINED IN THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS, WHICH COLLECTIVELY COMPRISE A COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN BORROWER AND LENDER.   THIS AGREEMENT EMBODIES THE ENTIRE AGREEMENT AND UNDERSTANDING BETWEEN THE PARTIES HERETO AND SUPERSEDES ALL PRIOR AGREEMENTS AND UNDERSTANDINGS (ORAL OR WRITTEN) RELATING TO THE SUBJECT MATTER HEREOF.

8.12    Severability.  In the event any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

8.13    Counterparts; Electronic Delivery.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  It shall not be necessary that all parties execute the same counterpart.  Counterparts of this Agreement or of any other DIP Loan Document may be executed and delivered by facsimile or email transmission, and any such facsimile or email signature shall be deemed fully effective as an original signature of the party delivering the same.

8.14    Resurrection of the Obligations.  To the extent that Lender receives any payment on account of any of the Obligations, and any such payment or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside, subordinated or required to be repaid to a trustee, receiver or any other Person under any contract, bankruptcy act, state or federal law, common law or equitable cause, then, to the extent of such payment received, the Obligations or part thereof intended to be satisfied and any and all Liens upon or pertaining to any Property or assets of Borrower and theretofore created or existing in favor of Lender as security for the payment of such Obligations shall be revived and continue in full force and effect, as if such payment had not been received by Lender and applied on account of the Obligations.

8.15    No Third Party Beneficiary.  This Agreement is solely for the benefit of the parties and, except as specifically provided in Sections 8.4, 8.5, and 8.18 of this Agreement, is not intended to be for the benefit of any other Person except for any successor or assignee of Lender.

8.16    Independence of Covenants.  All of the covenants contained in this Agreement and the other DIP Loan Documents shall be given independent effect so that if a particular action, event or condition is prohibited by any one of such covenants, the fact that it would be permitted by an exception to, or otherwise be in compliance within the provisions of, another covenant shall not avoid the occurrence of a Default or Event of Default if such action is taken, such event occurs or such condition exists.

8.17    Conflicting Provisions.  In the event any of the terms and provisions of this Agreement conflict with any terms and provisions contained in any other DIP Loan Document, the terms and provisions of this Agreement shall govern.  In the event any of the terms and provisions of this Agreement conflict with any terms and provisions contained in any Financing Order, the terms and provisions of such Financing Order shall govern.

8.18    <u>General Release of Claims</u>.  In consideration of the agreements of Lender set forth herein, and as a material inducement therefor, subject to entry of the Final Order, Borrower, for and on behalf of itself and all those claiming by, through or under it including, without limitation, its bankruptcy estate (collectively, the "<u>Releasing Parties</u>"), does hereby remise, release and forever discharge Lender, Lender's Professionals, and their respective affiliates, parents, divisions, subsidiaries, successors, predecessors, stockholders, officers, directors, agents, employees, successors, and assigns (collectively, the "<u>Released Parties</u>"), of and from any and all claims, demands, liabilities, actions and causes of action of every kind or nature, whether known or unknown, suspected or unsuspected, contingent or matured, concealed, hidden, latent or patent, which may now exist or may in the past have existed, directly or indirectly, from the beginning of time through the Effective Date.

8.19    <u>Waiver of Jury Trial</u>.  **THE PARTIES HEREBY MUTUALLY WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT, OR IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATING TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  THE PARTIES ACKNOWLEDGE THAT THE FOREGOING WAIVER FORMS A MATERIAL PART OF THE CONSIDERATION RECEIVED BY LENDER AS AN INDUCEMENT TO ENTER INTO THE DIP LOAN DOCUMENTS.**

8.20    <u>Lender Agent; Sharing Ratios</u>.  For purposes of convenience, TRSA and ERSA hereby irrevocably appoint TRSA as the agent of Lender for purposes of exercising all rights of review, approval, consent or other discretionary authority reserved to Lender hereunder.  TRSA and ERSA hereby acknowledge and agree that their ownership percentages and sharing ratios with respect to the DIP Loan, the Obligations, the Collateral and all Liens therein shall be as follows: TRSA – 67.00%; ERSA – 33.00%.

**[No further text on this page.  Signature page follows.]**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be properly executed and delivered as of the Effective Date.

**BORROWER:**

IPIC-GOLD CLASS ENTERTAINMENT, LLC, a Delaware limited liability company

By: _____
Print Name: _____
Title: _____

IPIC GOLD CLASS HOLDINGS LLC, a Delaware limited liability company

By: _____
Print Name: _____
Title: _____

IPIC TEXAS, LLC, a Texas limited liability company

By: _____
Print Name: _____
Title: _____

IPIC MEDIA, LLC, a Florida limited liability company

By: _____
Print Name: _____
Title: _____

DELRAY BEACH HOLDINGS, LLC, a Florida limited liability company

By: _____
Print Name: _____
Title: _____

**LENDER:**

TEACHERS' RETIREMENT SYSTEM OF ALABAMA,
a body corporate of the State of Alabama


By: _____
        M. Hunter Harrell, Director of Private Placements

EMPLOYEES' RETIREMENT SYSTEM OF
ALABAMA, a body corporate of the State of Alabama


By: _____
        M. Hunter Harrell, Director of Private Placements

**EXHIBIT A – APPROVED BUDGET**

**[To Be Attached]**

## EXHIBIT B – NOTICE OF BORROWING

_____, 2019

**By FedEx**                                              **By Email**

Teachers' Retirement System Of Alabama          hunter.harrell@rsa-al.gov
201 South Union Street                                   rachel.daniels@rsa-al.gov
Montgomery, AL 36130
Attn: M. Hunter Harrell

RE:     Debtor in Possession Loan and Security Agreement dated August __, 2019, by and among **IPIC-GOLD CLASS ENTERTAINMENT, LLC,** a Delaware limited liability company, **IPIC GOLD CLASS HOLDINGS LLC,** a Delaware limited liability company, **IPIC TEXAS, LLC,** a Texas limited liability company, **IPIC MEDIA, LLC,** a Florida limited liability company, and **DELRAY BEACH HOLDINGS, LLC,** a Florida limited liability company (individually and collectively, "Borrower"), **TEACHERS' RETIREMENT SYSTEM OF ALABAMA,** a body corporate of the State of Alabama created under §§ 16-25-1 _et seq._, of the Alabama Code ("TRSA"), **EMPLOYEES' RETIREMENT SYSTEM OF ALABAMA,** a body corporate of the State of Alabama created under §§ 36-27-1 _et seq._, of the Alabama Code ("ERSA", and together with TRSA, individually and collectively, "Lender") (as at any time amended, the "DIP Loan Agreement")

Ladies and Gentlemen:

This Notice of Borrowing is delivered to you pursuant to Subsection 2.3(a) of the DIP Loan Agreement.  Unless otherwise defined herein, capitalized terms used herein shall have the meanings attributable thereto in the DIP Loan Agreement.  Borrower hereby requests an Advance of DIP Loan proceeds as follows:

Principal Amount:       $_____
Funding Date:             _____
Wiring Instructions:     _____
                                  _____
                                  _____
                                  _____

Attached hereto is copy of the current Approved Budget supporting the amounts drawn hereunder, together with variance and reconciliation through the date of this request.

Borrower hereby certifies that (i) on the date of, and after giving effect to, the Advance requested hereby, no Default or Event of Default has occurred and is continuing; and (ii) on the date of, and after giving effect to, the Advance requested hereby, all of the representations and warranties of Borrower contained in the DIP Loan Agreement and the other DIP Loan Documents are true and correct in all respects as if made on and as of the date of such Advance (except to the extent that such representations and warranties expressly relate solely to an earlier date, in which case such representations and warranties shall have been true and correct on and as of such earlier date); and (iii) that such Advance is in accordance with, and will be used to fund costs and expenses of Borrower set forth in, the Approved Budget; and (iv) all prior Advances have been applied by Borrower in compliance with and for the purposes set forth in the DIP Loan Agreement and the Notice of Borrowing pursuant to which the same

were disbursed.  Borrower hereby ratifies and reaffirms all of the DIP Loan Documents and all Obligations arising thereunder.

      IN WITNESS WHEREOF, Borrower has caused this Notice of Borrowing to be executed and delivered this _____ day of _____, 2019.

           IPIC-GOLD CLASS ENTERTAINMENT, LLC
           IPIC GOLD CLASS HOLDINGS LLC
           IPIC TEXAS, LLC
           IPIC MEDIA, LLC
           DELRAY BEACH HOLDINGS, LLC


           By:   _____
           Its:   _____