# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| iPic-Gold Class Entertainment, LLC, *et al.*,[1] | Case No. 19-11739 (LSS) |
| Debtors. | (Jointly Administered) |
|  | **Objection Deadline: September 4, 2019 at 4:00 p.m. (ET)** |
|  | **Hearing Date: September 11, 2019 at 11:00 a.m. (ET)** |

**MOTION FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTORS; (B) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) SCHEDULING THE AUCTION AND SALE HEARING; AND (D) GRANTING RELATED RELIEF; (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, AND ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby file this motion (the "Motion") for the entry of an order, in the form attached hereto as Exhibit A (the "Bidding Procedures Order"), (a) approving the bidding procedures (the "Bidding Procedures") attached as Exhibit 1 to the Bidding Procedures Order[2] in connection with the sale of any or substantially all of the Debtors' assets (the "Assets") or proposals to sponsor a plan of reorganization (a "Plan"); (b) approving various forms and the manner of notice in connection thereof; (c) approving procedures for the assumption and assignment of executory contracts and unexpired leases (the "Assumption and Assignment Procedures"); (d) scheduling the auction (the "Auction") and the date and time of the hearing to approve the sale (the "Sale

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: iPic Entertainment Inc. (9582); iPic-Gold Class Entertainment, LLC (4684); iPic Gold Class Holdings LLC (6315); iPic Medi, LLC (0150); iPic Texas, LLC (N/A); and Delray Beach Holdings, LLC (1035). The Debtors' principal place of business is 433 Plaza Real, Suite 335, Boca Raton, FL 33432.

[2]     A capitalized term used but not defined herein shall have the meaning ascribed to it in the Bidding Procedures.

Hearing") of the Assets and assumption of certain liabilities of the Debtors (the "Assumed Liabilities"); (e) authorizing the Debtors select one or more stalking horse bidders, if any, and the provision of Bid Protections (as defined herein); and (f) granting related relief.

The Debtors further request that, at the Sale Hearing, this Court enter an order (the "Sale Order"), the proposed form of which will be filed before the Sale Hearing, (a) authorizing the sale of the Assets (the "Sale") free and clear of all liens, claims, interests, and other encumbrances (collectively, "Encumbrances"); (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (c) granting related relief.  The Debtors are also soliciting proposals to serve as a plan proponent and if the Debtors, in consultation with the Consultation Parties (as defined in the Bidding Procedures) decide to proceed to confirm a plan of reorganization they will propose dates for the plan confirmation process.

In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.[3] Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105, 363, 364, 365, and 541 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006

---

[3]      Pursuant to Local Rule 9013-1(f), the Debtor hereby confirms its consent to entry of a final order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

3.      On August 4, 2019 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code thereby commencing these chapter 11 cases.  The Debtors continue to operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner.

4.      On August 14, 2019, the Office of the United States Trustee appointed the following members to the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code: (i) Brookfield Property REIT, Inc.; (ii) Mary Ryan, Class Action Representative; (iii) Regency Centers, L.P.; (iv) SDQ Fee, LLC; and (v) Superl Sequoia Limited.

5.      The Debtors are a leading provider of polished-casual dining in a luxury theater auditorium environment.  The Debtors are one of the largest combined movie theater and restaurant entertainment destinations with locations that provide a luxurious movie-going experience at an affordable price.  The Debtors provide customers with high-quality, chef-driven culinary and mixology in unique destinations that include premium movie theaters, restaurants and lounges.

6.      The Debtors currently operate 123 screens at 16 locations in 9 states, with an additional 2 locations under construction, and have executed leases for an additional 9 sites in California, Georgia, Virginia, Washington, Connecticut, New York, Texas, and Florida.  In addition, the Debtors applied for licenses to operate theaters in Saudi Arabia

DOCS_SF:101608.5

7.     The Debtors continue to pursue a disciplined new store growth strategy in both new and existing markets where they may achieve consistent high store revenues and attractive store-level cash-on-cash returns.  As of the Petition Date, the Company employed approximately 240 full time and 1,770 part-time employees.

8.     A more detailed description of the business and operations of the Debtors, and the events leading to the commencement of these Chapter 11 Cases, is provided in the *Declaration of David M. Baker in Support of First Day Motions* [Docket No. 4] (the "First Day Declaration"), filed concurrently herewith and incorporated herein by reference.

### A.     The Marketing and Sale Process

9.     Currently, the Debtors have built 16 of their planned 20-25 locations.  The Debtors' operations cannot support the approximately $205 million of principal secured indebtedness existing as of the Petition Date.  Prepetition, the Debtors engaged in negotiations with their secured lenders to restructure the Company's debt and to continue to fund operations during a sale process that is intended to locate an acquirer for the Assets or a party willing to sponsor a plan of reorganization.  Ultimately, the Debtors determined that the commencement of these chapter 11 cases and the potential sale or recapitalization of their business under chapter 11 of the Bankruptcy Code represented the best mechanism to maximize value to their economic constituents.

10.     Despite the obstacles, the Debtors believe that their underlying business model remains strong, as it is bolstered by positive guest experience and loyalty.  To that end, the Teachers' Retirement System of Alabama and The Employees' Retirement System of Alabama (together, the "Secured Lenders"), the Debtors' secured lenders, have agreed to provide a debtor in possession financing facility to facilitate a 90 day marketing process, to be led by PJ Solomon ("Solomon"), the Debtors' proposed investment banker.  The Court approved the debtor in

4

possession financing facility on an interim basis pursuant to that certain *Interim Order: (A) Authorizing Debtors in Possession to (I) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364, (II) Grant Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11 U.S.C. §§ 364; (III) Use Cash Collateral, and (IV) Provide Adequate Protection to Prepetition Credit Parties, (B) Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (C) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Bankruptcy Rule 4001-2* [Docket No. 48].

11.     The Debtors engaged Solomon in July 2019.  Shortly after its engagement, Solomon began to market the Debtors in order to effectuate either a recapitalization or sale of the Debtors.  As part of its prepetition marketing efforts, Solomon helped organize marketing materials for the Debtors and ran a process to identify prospective investors, including financial and strategic potential purchasers.  Solomon is familiar with the Debtors' industry, and it contacted parties who had previously participated in auctions in the dine-in motion picture exhibition space as well as theatres more generally and non-traditional restaurants.  In addition, Solomon contacted parties with a track record of successfully investing opportunistically in transactions with turnaround potential.

12.     As of the Petition Date, Solomon had contacted 64 parties in total, of which 31 have signed non-disclosure agreements, and 6 are continuing to negotiate non-disclosure agreement terms.  Upon signing a non-disclosure agreement, parties received a confidential information memorandum, investor deck, and operating model.  As of the Petition Date, approximately 8 parties have been granted access to the Debtors' electronic data room.

13.     As set forth herein, and with the assistance of their proposed advisors, the Debtors intend to continue their postpetition marketing efforts with prospective purchasers and hopefully

structure a recapitalization through a plan or sale.  By this Motion, the Debtors seek approval of

bidding procedures that will facilitate Solomon's efforts to identify a purchaser or plan proponent

to complete the restructuring.  Concurrent with the sale process, the Debtors intend to operate their

business in the ordinary course and maximize the value of their assets in accordance with terms of

the agreed budget with the Secured Lenders.

**RELIEF REQUESTED**

 A.  **Bidding Procedures Order**

 14.  By this Motion, the Debtors seek the entry of the Bidding Procedures Order: (i)

approving the Bidding Procedures; (ii) approving various forms and the manner of notice thereof;

(iii) establishing the Assumption and Assignment Procedures; (iv) authorizing the Debtors to

designate a stalking horse bidder, with the consent of the Secured Lenders and in consultation with

the Consultation Parties, and provide the Bid Protections in connection therewith; (v) approving

the Bid Protections; and (iv) scheduling the Auction and a Sale Hearing.

 15.  Additionally, by this Motion, the Debtors further request that, at the Sale Hearing,

the Court enter the Sale Order.

 B.  **The Bidding Procedures**

 16.  To maximize the value of the Assets for the benefit of the Debtors' estates and

creditors, the Debtors seek to implement a competitive bidding process.  As described more fully

in the Bidding Procedures and the Bidding Procedures Order, the Debtors seek approval to sell the

Assets to a Qualified Bidder that makes the highest or otherwise best offer for the Assets or submits

a proposal to act as a proponent for a plan of reorganization.  The Debtors request that competing

bids for the Assets be governed by the Bidding Procedures and Bidding Procedures Order,

including the submission of any Stalking Horse Bids (as defined below), which, among other

6

things, collectively establish:

a. the requirements that a Potential Bidder (other than a Stalking Horse Bidder) must satisfy to be entitled to participate in the bidding process and become a Qualified Bidder [Bidding Procedures at § 3];

b. the requirements for Qualified Bidders to submit bids and the method and criteria by which such bids become Qualified Bids [Bidding Procedures at §§ 4 and 6];

c. the deadline by which bids must be submitted [Bidding Procedures at § 4(a)];

d. the procedures for conducting the Auction [Bidding Procedures at § 9];

e. the assumption and assignment procedures for executory contracts and unexpired leases [Bidding Procedures Order at ¶¶ 19-22]; and

f. various other matters relating to the sale process generally, the Sale Hearing, due diligence, and designation of a Backup Bidder [Bidding Procedures at §§ 5, 10, 15, 17].

17. In addition, the Debtors seek the authority, subject to the terms of the Bidding Procedures Order, to accept a stalking horse bid from a Potential Bidder (the "Stalking Horse Bid") and enter into a purchase agreement (the "Stalking Horse APA") with such Potential Bidder (the "Stalking Horse Bidder") in the Debtors' business judgment with the consent of the Secured Lenders and in consultation with the Committee (the "Consultation Parties"). To facilitate a competitive, value-maximizing sale transaction, by this Motion, the Debtors request authority, in the exercise of their business judgment, to offer bid protections to any Stalking Horse Bidder in accordance with the terms of any Stalking Horse APA, in the form of (a) a break-up fee of up to an aggregate of three percent (3%) of the Purchase Price of the Stalking Horse Bid and (b) reimbursement for the reasonable out of pocket expenses of the Stalking Horse Bidder in connection with its bid, not to exceed $150,000 (the "Bid Protections")..

18. To the extent the Debtors designate a Stalking Horse Bidder, with the consent of the Secured Lenders and in consultation with the Consultation Parties, the Debtors shall, within

one (1) calendar day thereof, file a notice of such determination with the Bankruptcy Court (the "Stalking Horse Bidder Notice").  The Stalking Horse Bidder Notice, if filed, shall also include a copy of the Stalking Horse Bidder's Qualified Bidder APA, which competing Qualified Bidders must then use the basis to submit their Qualified Bids, and shall include modifications to the bidding and auction procedures necessary to account for the Stalking Horse Bid.

19.    The Debtors will select the highest or otherwise best Qualified Bid for one or more individual Assets or all or substantially all of the Assets (the "Baseline Bid") upon consultation with the Consultation Parties.  In no event shall any Qualified Bidder, other than a Stalking Horse Purchaser be entitled to any Bid Protections.

20.    The Bidding Procedures contain the following provisions, some of which are required to be highlighted pursuant to Local Rule 6004-1(c), and which are more fully described in the Bidding Procedures and the Bidding Procedures Order:[4]

(a)    **Key Dates and Deadlines**.  The following table sets forth the proposed key dates and deadlines set forth in the Bidding Procedures:

| Event | Deadline |
|---|---|
| Deadline to File Objections to Cure Amounts | September 30, 2019 at 4:00 p.m. (Eastern Time) |
| Deadline to Designate a Stalking Horse Bidder | October 4, 2019 |
| Deadline to Submit Bids | October 11, 2019 at 4:00 p.m. (Eastern Time) |
| Deadline for Debtors to Notify Bidders of Status as Qualified Bidders | October 15, 2019 at 5:00 p.m. (Eastern Time) |
| Auction (if necessary) | October 17, 2019 at 10:00 a.m. (Eastern Time) |
| Deadline to File Notice of (a) Successful Bid and Backup Bid and (b) Identity of Successful Bidder and Backup Bidder | 1 day following conclusion of the Auction |

---

[4]    These provisions are excerpted from the Bidding Procedures.  However, to the extent of any inconsistencies between this summary and the Bidding Procedures, the Bidding Procedures shall govern.

| Event | Deadline |
|---|---|
| Deadline to File Objections to Sale | October 18, 2019<br>at 4:00 p.m. (Eastern Time) |
| Deadline to File Objections to Assumption and Assignment of Contracts | October 22, 2019<br>at 4:00 p.m. (Eastern Time) |
| Reply Deadline | October 23, 2019<br>at 4:00 p.m. (Eastern Time) |
| Sale Hearing Date | October 25, 2019<br>at 10:00 a.m. (Eastern Time) |

    **(b)**    **Provisions Governing Qualification of Bidders.**  To participate in the bidding process or otherwise be considered for any purpose under the Bidding Procedures, a person or entity interested in consummating a Sale (a "Potential Bidder") must deliver or have previously delivered to the Debtors, if determined to be necessary by the Debtors in their sole discretion, the following documents: (a) an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement"), to the extent not already executed; (b) identification of the Potential Bidder and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction; and (c) unless publicly available in a filing under applicable securities laws or regulations, the most current audited and latest unaudited financial statements (the "Financials") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors, and (y) a written commitment acceptable to the Debtors and their advisors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the Sale), the adequacy of which will be assessed by the Debtors and their advisors.

    **(c)**    **Stalking Horse and Bid Protections**.  On or before **October 4, 2019**, the Debtors, in consultation with the Consultation Parties and with the consent of the Secured Lenders, may identify the bid of a party to serve as a stalking horse bid (the "Stalking Horse Bidder").  The Debtors may, in consultation with the Consultation Parties and with the consent of the Secured Lenders, identify more than one Stalking Horse Bidder with respect to separate individual Assets.  Pursuant to the Bidding Procedures Order, the Debtors are authorized, but not obligated, in the exercise of their business judgment, in consultation with the Consultation Parties and with the consent of the Secured Lenders, to provide the Stalking Horse Bidder with the bid protections approved pursuant to the Bidding Procedures Order (the

"Bid Protections") without further order of the Court.[5]

To the extent such determination is made to select a Stalking Horse Bidder (or more than one Stalking Horse Bidders with respect to individual Assets), the Debtors will file a notice of such determination which shall include a description of any agreed upon Bid Protections.

**(d)**     **Provisions Governing Qualified Bids**.  A "Qualified Bidder" is a Potential Bidder who satisfies the Bidding Procedures and whose Financials, the Financials of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate the Sale, whose Bid is a Qualified Bid, and that the Debtors determine should be considered a Qualified Bidder, in consultation with the Consultation Parties.  On or before **October 11, 2019 at 5:00 p.m. (Eastern Time)**, the Debtors will notify each Potential Bidder whether such Potential Bidder is a Qualified Bidder and shall provide counsel to the Consultation Parties copies of each Qualified Bid (unless a Consultation Party is a Qualified Bidder or participates in a Qualified Bid with respect to an active Bid).

Notwithstanding anything to the contrary in the Bidding Procedures, without further action of any kind: (a) the Secured Lenders (and any designee of the Secured Lenders, including any entity that may be formed by or on behalf of the Secured Lenders) shall be deemed a Qualified Bidder for all purposes under and in connection with the bidding procedures and may credit bid all or any portion of the DIP Obligations or Pre-Petition Debt (as such terms are defined in the DIP Financing Order) in accordance with 11 U.S.C. § 363(k), including, without limitation, at any Auction; and (b) any credit bid made by the Secured Lenders (or any designee) is, and will be deemed to be, a Qualified Bid in each instance for all purposes under and in connection with the Bidding Procedures and will be deemed to be, and will be evaluated by the Debtors and the Consultation Parties as, a cash Bid for all purposes (including evaluating Bid Assessment Criteria and Overbids). Notwithstanding anything to the contrary contained in the Bidding Procedures or the Bidding Procedures Order, the Secured Lenders shall not be subject to the Bid Requirements set forth in paragraphs 6(c), (f), (h), (i), (m), and (r) of the Bidding Procedures in order to be deemed a Qualified Bidder or submit an Overbid.  For the avoidance of doubt, the Secured Lenders shall not be considered a Potential Bidder and shall not be subject to any requirements applicable to a Potential Bidder.

A proposal, solicitation, or offer for a purchase and sale of one or more individual Assets or all or substantially all of the Assets or for an alternative acquisition transaction (including a chapter 11 plan) (each, a "Bid") by a bidder that is submitted in writing and satisfies each of the following requirements (the "Bid Requirements") as determined by the Debtors, in their reasonable business

---

[5]     Pursuant to the Bidding Procedures Order, the Bid Protections are authorized in the form of (a) a break-up fee of up to an aggregate of three percent (3%) of the Purchase Price of the Stalking Horse Bid and (b) reimbursement for the reasonable out of pocket expenses actually incurred by the Stalking Horse Bidder in connection with its bid, not to exceed $150,000.

judgment, in consultation with the Consultation Parties, shall constitute a "Qualified Bid."

(i) **Assets**.  Each Bid must clearly state which assets and liabilities of the Debtors that the Qualified Bidders are agreeing to purchase and assume.

(ii) **Purchase Price.**  Each Bid must clearly set forth the purchase price in U.S. dollars to be paid for each individual Asset subject to the applicable asset package, including and identifying separately any cash and non-cash components (the "Purchase Price").

(iii) **Deposit.**  On or before the Bid Deadline, each Bid, other than a credit bid, must be accompanied by a cash deposit in the amount equal to 10 percent (10%) of the aggregate cash and non-cash Purchase Price of the Bid, to be held in an interest-bearing account to be identified and established by the Debtors (the "Deposit").

(iv) **Assumption of Obligations.**  Each Bid must clearly state which liabilities of the Debtors the bidder is agreeing to assume.

(v) **Qualified Bid Documents.**  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (including the chapter 11 plan to the extent required by the terms of the Bid) and shall include a schedule of assumed contracts to the extent applicable to the Bid, as well as all other material documents integral to such Bid (the "Qualified Bid Documents").  Such documents must be based on and marked against form documents provided by the Debtors (including a summary of each Bid as may be reasonably requested by the Debtors).  Any modifications to the form of documents provided by the Debtors must be in form and substance acceptable to the Debtors, in consultation with the Consultation Parties.

(vi) **Committed Financing.**  To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution documented to the satisfaction of the Debtors that demonstrates that the Qualified Bidder has:  (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

(vii) **Contingencies.**  A Bid shall not be conditioned on the obtaining or the

sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall be acceptable to the Debtors in their business judgment, in consultation with the Consultation Parties.

(viii)   **Identity.**  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Qualified Bidder if such Qualified Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific persons, including financial advisors and counsel, if any, that the Debtors' advisors should contact regarding such Bid.

(ix)   **Demonstrated Financial Capacity.**  A Qualified Bidder must have, in the Debtors' business judgment, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

(x)   **Time Frame for Closing.**  A Bid by a Qualified Bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors, in consultation with the Consultation Parties.

(xi)   **Binding and Irrevocable.**  A Qualified Bidder's Bid shall be binding and irrevocable unless and until the Debtors accept a higher Bid for such Asset and such Qualified Bidder is not selected as the Backup Bidder.

(xii)   **Expenses and Disclaimer of Fees.**  Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code; *provided*, *however*, that the Debtors may identify a stalking horse bidder pursuant to the Bidding Procedures.

(xiii)   **Authorization.**  Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a

comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

(xiv)     **Completed Diligence.**  Each Bid must include a written acknowledgement and representation that the Qualified Bidder:  (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the bidder's Bid.

(xv)      **Adherence to Bidding Procedures.**  By submitting its Bid, each Bidder shall be deemed to have agreed to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

(xvi)     **Regulatory Approvals and Covenants.**  A Bid must set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the Sale, if any, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible).

(xvii)    **Consent to Jurisdiction.**  The Qualified Bidder shall be deemed to have submitted to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the Closing, as applicable.

**(e)**     **Right to Credit Bid**.  Any Qualified Bidder (including the Secured Lenders, which are deemed a Qualified Bidder) who has a valid and perfected lien on any assets of the Debtors' estates (a "Secured Creditor") and the right and power to credit bid claims secured by such liens, shall have the right to credit bid all or a portion of such Secured Creditor's secured claims within the meaning of section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid its secured claim only with respect to the collateral by which such Secured Creditor is secured.

**(f)**     **Cancellation of Auction and Secured Lenders' Right to Bid.**  If the Debtors do not receive a Stalking Horse Bid or other Qualified Bid by the Bid Deadline, then (i) the Debtors may file a notice cancelling the Auction; and (ii) the Secured

Lenders shall have the opportunity to submit a Bid (by credit bid or otherwise) to purchase all or a portion of the Assets within five (5) business days after the Bid Deadline or by such other date as agreed among the Debtors and Secured Lenders.

**(g)**    **Auction**.  If the Debtors receive a Qualified Bid for an Asset (in addition to the Secured Lenders' deemed Qualified Bid), whether through a Bid for one or more individual Assets or through a Bid for all or substantially all of the Assets (including through a chapter 11 plan of reorganization), the Debtors will conduct the Auction to determine the Successful Bidders with respect to such Asset or Assets, as applicable.  If the Debtors do not receive a Qualified Bid for a given Asset, the Debtors will not conduct the Auction as to such Asset (but the Secured Lenders shall have the opportunity to submit a Bid as provided for herein).  To the extent Qualified Bidders are interested in separate individual Assets and/or all or substantially all of the Assets, the Debtors may, in their sole discretion, conduct separate auctions for the various Assets and Asset packages.

No later than the commencement of the Auction, the Debtors shall notify each Qualified Bidder of the highest or otherwise best Qualified Bid or combination of Qualified Bids for each Asset or Assets, for which such Qualified Bidder submitted a Bid or combination of Bids, as determined in the Debtors' reasonable business judgment, in consultation with the Consultation Parties (the "Baseline Bid"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidder and the Consultation Parties.  The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors reasonably deem, in consultation with the Consultation Parties, relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things:  (a) the amount and nature of the total consideration (including the amount of cash paid to or remaining in the estate pursuant to the Bid); (b) the likelihood of the Qualified Bidder's ability to close the Sale and the timing thereof; (c) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (d) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").

The Auction shall take place on **October 17, 2019 at 10:00 a.m. (Eastern Time)** at the offices of Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, NY 10017, or such later date and time as selected by the Debtors in consultation with the Consultation Parties.  The Auction shall be conducted in a timely fashion according to the Bidding Procedures.

**(h)**    **Provisions Governing the Auction**.  The Debtors and their professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of each Baseline Bid.  All incremental Bids made thereafter for a given Asset shall be Overbids and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids on such Asset.  The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline

Bid, all applicable Overbids, and the Successful Bid.

Only Qualified Bidders and their legal and financial advisors, and the members of and advisors to the Consultation Parties, and each such parties' respective legal and financial advisors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and may speak or Bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to Bid at the Auction.

**(i)**      **Terms of Overbid**. "Overbid" means any Bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each applicable Overbid must comply with the following conditions:

     (i)      **Minimum Initial Overbid**. Bidding shall commence at the Baseline Bid. The first overbid at the Auction (the "Minimum Initial Overbid") shall be in an amount not less than (i) the amount of the Baseline Bid plus (ii) the Bid Protections (if any) plus (iii) $500,000 (the "Initial Overbid Amount").

     (ii)      **Minimum Overbid Increment.** Any Overbid following the Minimum Initial Overbid or following any subsequent Prevailing Highest Bid (as defined below) for all or substantially all of the Assets shall be in increments of value equal to (or exceeding) $250,000, as determined by the Debtors in the exercise of their business judgment, in consultation with the Consultation Parties. The Debtors may establish different overbid increments at the Auction for any individual Asset or other combination of Assets, as determined by the Debtors in the exercise of their business judgment, in consultation with the Consultation Parties.

     (iii)      **Conclusion of Each Overbid Round.** Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors.

           Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified, after consultation with the Consultation Parties, an Overbid as being higher or otherwise better than the Baseline Bid, in the initial Overbid round, or, in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "Prevailing Highest Bid"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors (after consultation with the Consultation Parties) to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

     (iv)      **Overbid Alterations.** An applicable Overbid may contain alterations,

modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures.

(a)  **Closing the Auction.**  The Auction shall continue until there is only one Bid that the Debtors determine, in their reasonable business judgment, and in consultation with the Consultation Parties, to be the highest or otherwise best Bid for such Asset. Such Bid shall be declared the "Successful Bid," and such Qualified Bidder, the "Successful Bidder" and at which point the Auction will be closed as to that Asset. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for each Successful Bid and Backup Bid to be filed with the Court.

(j)  **Backup Bidder**.  The Qualified Bidder with the next highest or otherwise second-best Qualified Bid (the "Backup Bid") for each Asset at the Auction (if the Auction is conducted), as determined by the Debtors in the exercise of their business judgment in consultation with the Consultation Parties, shall be required to serve as a backup bidder (the "Backup Bidder"); *provided that* the Secured Lenders will not be a backup Bidder unless they elect to do so in writing. The Debtors shall announce the identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Qualified Bid open and irrevocable until the closing of the transaction with the applicable Successful Bidder. The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder. If a Successful Bidder fails to consummate its Successful Bid, the Debtors may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

16

**(k)**    **Highest or Otherwise Best Bid.**  When determining the highest or otherwise best Bid, as compared to other Bids, the Debtors may consider the Bid Assessment Criteria.  For the avoidance of doubt, every dollar of a credit bid shall be treated the same as the dollar from a cash bid and a cash bid shall not be deemed higher or otherwise better solely for the reason it is a cash bid and not a credit bid.

### C.    Assumption and Assignment Procedures

21.    The Debtors are seeking approval of the Assumption and Assignment Procedures for notifying counterparties to executory contracts and unexpired leases of proposed Cure Amounts (as defined below) with respect to those executory contracts and unexpired leases that the Debtors propose to assume and assign to the Successful Bidder (the "Transferred Contracts").

22.    As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors will file a notice of potential assumption, assignment and/or transfer of the executory contracts and unexpired leases listed therein (such list, the "Transferred Contract and Cure Schedule"), substantially in the form attached as Exhibit 3 to the Bidding Procedures (the "Assumption and Assignment Notice"), and serve such notice on all non-debtor parties to the Transferred Contracts (the "Contract Counterparties").  The Assumption and Assignment Notice served on each Contract Counterparty shall (i) identify each Transferred Contract; (ii) list the proposed cure amounts, if any, that the Debtors believe must be paid to cure all defaults outstanding under each Transferred Contract (the "Cure Amounts") as of such date; (iii) include a statement that assumption and assignment of such Transferred Contract is not required or guaranteed; and (iv) inform such Contract Counterparty of the requirement to file any Cure Objection or Assignment Objection (each as defined below) by the Cure Objection Deadline or Assignment Objection Deadline (each as defined below).  Service of the Transferred Contract and Cure Schedule upon a Contract Counterparty does not constitute an admission that a particular Transferred Contract is an executory contract or unexpired lease of property, or confirm that the Debtors are required to assume and/or assign such Contract.

23.     According to the Assumption and Assignment Notice, a Contract Counterparty must file any objection to the Cure Amount by **September 30, 2019 at 4:00 p.m. (Eastern Time)** (the "Cure Objection Deadline").  A Contract Counterparty must also file any objection to the assumption and assignment of such Transferred Contract by **October 22, 2019 at 4:00 p.m. (Eastern Time)** (the "Assignment Objection Deadline").

24.     In addition, if the Successful Bidder or Backup Bidder, in accordance with the Bidding Procedures, identifies additional executory contracts or unexpired leases that it wishes to add to the Transferred Contracts and Cure Schedule (each an "Additional Contract") (or wishes to remove a Transferred Contract from the Transferred Contracts and Cure Schedule) the Debtors shall, within 2 calendar days of being informed of such a determination, send a supplemental Assumption and Assignment Notice to the applicable Contract Counterparties to such executory contracts or unexpired leases added or removed from the Transferred Contracts and Cure Schedule.

25.     The Debtors request that the Court require that any objections to a proposed Cure Amount (a "Cure Objection") must be made in writing and filed on the docket for these chapter 11 cases no later than the Cure Objection Deadline and state the basis of such objection with specificity, including, without limitation, the Cure Amount alleged to be due by such Contract Counterparty, and include complete contact information for such Contract Counterparty (including address, telephone number, and email address); (iii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and (iv) be served on the parties set forth in the Bidding Procedures, so as to be actually received by them on or before the Cure Objection Deadline.

26.     The Debtors further request that the Court require any other objections to the assumption and assignment of any of the Transferred Contracts (an "Assignment Objection") must: (i) be made in writing and filed on the docket for these chapter 11 cases no later than the

Assignment Objection Deadline; (ii) state the basis of such objection with specificity and include complete contact information for such Contract Counterparty (including address, telephone number, and email address); (iii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and (iv) be served on the parties set forth in the Bidding Procedures so as to be actually received by them on or before the Assignment Objection Deadline.

27.     In addition, the Debtors request that objections from any Contract Counterparty to an Additional Contract (an "Additional Assignment Objection") must: (i) be made in writing and filed on the docket no later than seven (7) calendar days after the Debtors have sent notice to such Contract Counterparty of its intention to assume and assign such Additional Contract (as applicable, the "Additional Assignment Objection Deadline"), (ii) state the basis of such objection with specificity, including, without limitation, the Cure Amount alleged by such Contract Counterparty, and include contact information for such Contract Counterparty, (iii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and (iv) be served upon the Notice Parties (as defined in the Bidding Procedures) so as to be actually received on or before the Additional Assignment Objection Deadline.

28.     The Assumption and Assignment Notice also provides that Cure Objections and Assignment Objections, if any, will be heard at (i) the Sale Hearing or (ii) on such other date, as the Court may designate prior to or after the Sale Hearing.  Any supplemental Assumption and Assignment Notice relating to an Additional Contract shall provide that Additional Assignment Objections will be resolved at a hearing to be held by the Court (i) on or before seven (7) calendar days from the timely filing of the Additional Assignment Objection or (ii) such other date designated by the Court.

29.     At the Sale Hearing, the Debtors or the Successful Bidder shall (i) present evidence

necessary to demonstrate adequate assurance of future performance by the Successful Bidder and (ii) request entry of an order approving the assumption and assignment of any or all Transferred Contracts to be assumed and assigned to the Successful Bidder.  For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

###### D.    **Scheduling and Notice**

30.    Pursuant to the DIP Loan Agreement, the Debtors are required to obtain entry of the Bidding Procedures Order on or before September 5, 2019, or such later date as may be consented to by the DIP Lender, which order shall (i) establish the deadline for submission of bids to be on or before **October 11, 2019 at 4:00 p.m. (Eastern Time)** (the "Bid Deadline"), (ii) fix the date of the Auction, if necessary, to be on **October 17, 2019**, or such later date as may be consented to by DIP Lender, and (iii) fix the date to obtain entry of an order approving the Sale ("Final Order") to be no later than October 25, 2019, or such later date as may be agreed to in writing by the DIP Lender in its sole discretion.  In addition, the DIP Loan Agreement requires that the closing on the Sale to occur no later than ninety (90) days after the Petition Date, or such later date as may be consented to by the DIP Lender in its sole discretion.

31.    Given the Debtors' prepetition marketing efforts and the approximate 68 day new marketing and diligence period (*i.e.*, the period from the Petition Date through the Bid Deadline) to be established by the Bidding Procedures, the proposed timeline is sufficient to complete a fair and open sale process that will maximize the value received for the Assets.  The most likely interested bidders are among those who previously indicated interest and had access to the data room during the prepetition process to perform due diligence.  Thus, these potential bidders need a shorter length of time for any additional due diligence to submit competing bids.  If new bidders

emerge, the proposed timeline will provide them with sufficient time to perform due diligence given that the process is well understood at this juncture and the material they need is readily available.  Thus, the schedule is sufficient, while respecting the necessity to consummate the Sale as quickly as possible to maximize the value received for the Assets.

32.    **Notice of Sale Hearing**.  On the date the notice of this Motion is filed, the Debtors will cause this Motion and all exhibits hereto, the Bidding Procedures, and a copy of the proposed Bidding Procedures Order, to be served upon (a) the United States Trustee for Region 3; (b) counsel to the Secured Lenders, (c) the top 30 largest unsecured creditors of the Debtors; (d) all parties asserting a security interest in the Assets to the extent any such interest is reasonably known to the Debtors; (e) various federal, state, county and city tax and regulatory authorities; (f) all entities known to have expressed an interest in a transaction with respect to the Assets or that have been identified by the Debtors or their advisors as a potential purchaser of the Assets; (g) the contract counterparties whose contracts are identified as being assigned; and (h) all parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

33.    **Notice of Sale**. Within 4 calendar days of the entry of the Bidding Procedures Order, or as soon thereafter as practicable, the Debtors shall cause to be served, by first-class mail, postage prepaid, a sale notice (the "Sale Notice") setting forth, among other things, the dates established for submission of Qualified Bids, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2, upon the Sale Notice Parties and all of the Debtors' creditors.

34.    **Post-Auction Supplement**.  Following the Auction, the Debtors will promptly file with the Bankruptcy Court a notice (the "Notice of Successful Bidder") that will inform the Bankruptcy Court of the results of the Auction.  The Notice of Successful Bidder will identify,

among other things, (i) the Successful Bidder as the proposed purchaser of the Assets, (ii) the

amount and form of consideration to be paid by the Successful Bidder for the Assets, (iii) the

liabilities to be assumed by the Successful Bidder, and (iv) the Transferred Contracts to be assumed

by the Debtors and assigned to the Successful Bidder, or the Debtors' rights and interests therein

sold and transferred to the Successful Bidder, as the case may be, in connection with the Sale.  The

Notice of Successful Bidder will also include similar information relating to the Backup Bidder

and the Backup Bid.  In addition, the Debtors will attach to the Notice of Successful Bidder (i) any

revised proposed Sale Order approving the Sale to the Successful Bidder, (ii) a copy of the

Qualified Bidder APA entered into by the Debtors and the Successful Bidder following the

Auction, and (iii) any additional information or documentation relevant to the Successful Bid.  The

Debtors will file the Notice of Successful Bidder on the docket for these chapter 11 cases as

promptly as is reasonably practicable prior to the Sale Hearing, but will not be required to serve

the same on any parties-in-interest in these chapter 11 cases.

35.     The Debtors further propose that, within 24 hours of the filing of the Notice of

Successful Bidder, the Successful Bidder and the Backup Bidder will send by overnight delivery

to each contract counterparty whose contract is part of such Bid, the financial and other commercial

information to demonstrate adequate assurance of future performance under such contract.  Such

information will be provided to contract counter parties on a confidential basis.

**E.      Sale Order**

36.     To ensure the Debtors are in compliance with the DIP Loan Agreement, and in light

of the Debtors' limited liquidity, the Debtors request that this Court set the Sale Hearing for a date

that is not later than **October 25, 2019**.  At the Sale Hearing, the Debtors intend to seek the entry

of the Sale Order (a) approving the Sale free and clear of all Encumbrances, and (b) authorizing

the assumption and assignment of the Transferred Contracts, among other things.  Pursuant to the Sale Order, the Debtors will sell their assets free and clear of all Encumbrances to the fullest extent possible pursuant to section 363(f) of the Bankruptcy Code, including without limitation, successor liability or similar theories (except for those Assumed Liabilities and obligations expressly assumed by the Successful Bidder) and the Successful Bidder will be protected from liability for and cannot be pursued for any claims owed by the Debtors.  In addition, the Sale Order will have findings that the Sale is not a fraudulent conveyance.  The Bidding Procedures provide proper and adequate notice for these and the other terms and conditions of the bidding, Auction, and Sale processes.

## BASIS FOR RELIEF REQUESTED

**A.      Approval of the Sale is Warranted under Section 363(b) and the Bidding Procedures are Appropriate and in the Best Interests of the Debtors' Estates and Their Creditors**

37.      Section 363(b)(1) of the Bankruptcy Code provides that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . . " 11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code further provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

38.      A debtor may be authorized to sell assets outside of the ordinary course of business pursuant to section 363 of the Bankruptcy Code if it demonstrates a sound business purpose for doing so.  *See In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del . 2003) (finding that a court should approve a debtor's use of assets outside ordinary course of business if debtor can demonstrate a sound business justification for proposed transaction); *see also In re Montgomery Ward Holding Corp.*, 242 B.R.147, 154 (Bankr. D. Del. 1999) (finding that the debtor's sound business purpose justified its sale of the assets outside of the ordinary course of business).

39.     Indeed, the paramount goal of a chapter 11 process is to maximize the proceeds received by the estate. *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3d Cir. 1986) (noting the fairness and reasonableness of prices); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the ...debtor's duty...is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bag Co. v. Champion Intl Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)); *In re Summit Global Logistics, Inc.*, No. 08-11566, 2008 WL 819934, at *14 (Bankr. D.N.J. Mar. 26, 2008) (describing a proposed transaction as one that "maximize[d] value and return to interested parties."). To that end, courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate of a debtor and therefore are appropriate. *See Integrated*, 147 B.R. at 659 (providing that such procedures "encourage bidding and to maximize the value of the debtor's assets."); *In re Fin. News Network Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate.").

40.     With this in mind, courts have deferred to a debtor's business judgment in the context of bidding and auction procedures. *See In re Trans World Airlines Inc.*, No. 01-0056, 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001) ("It is not the function of a bankruptcy court to independently exercise a business judgment as to which proposal among competing proposals should be adopted by the debtor in effecting a § 363(b) sale.").

41.     In exercising its fiduciary duties and in the sound exercise of the Debtors' business judgment, the Debtors have determined that the Bidding Procedures are the most appropriate method for encouraging competing bids that will maximize creditor recoveries and that will ensure the value received for its assets is the highest and best the market can generate.

42.     The Bidding Procedures provide a framework to facilitate and entertain bids for the purchase of any or all of the Debtors' assets and, if such bids are received, to conduct an Auction in an orderly yet competitive fashion, thereby encouraging bids that maximize the value realized from a sale of the Assets.  In particular, the Bidding Procedures contemplate an open and fair auction process with minimum barriers to entry and provide potential bidders with sufficient time to perform due diligence, many of whom will have likely performed due diligence in the very recent past, and acquire the information necessary to submit a timely and well-informed bid.  The prepetition marketing campaign conducted by Solomon, during which time Solomon solicited at least 64 financial and strategic prospects, will streamline the process of providing adequate information to potential bidders.

43.     The Bidding Procedures provide the Debtors with an adequate opportunity to consider competing bids and select the highest and best offer for the purchase of any or all of the Debtors' assets.  The Debtors therefore believe that submitting the purchase of their assets to a market-based test will ensure maximum recovery for all stakeholders.  Accordingly, the Debtors and their stakeholders can be assured that the consideration obtained will be fair and reasonable and at or above market.

44.     Similar bidding, auction and notice procedures have been previously approved by this Court in other chapter 11 cases. *See, e.g.*, *In re Elk Petroleum, Inc.*, Case No. 19-11157 (LSS) (Bankr. D. Del. Aug. 1, 2019); *In re Achaogen, Inc.*, Case No. 19-10844 (BLS) (Bankr. D. Del.

May 1, 2019); and *In re Orexigen Therapeutics Inc.*, Case No. 18- 10518 (KG) (Bankr. D. Del. Apr. 23, 2018).

45.     In sum, the Debtors believe that the proposed Bidding Procedures create an appropriate framework for expeditiously establishing that the Debtors are receiving the best and highest offer for the Assets.  Accordingly, the proposed Bidding Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances.

**B.      The Purchased Assets Should be Sold Free and Clear of Liens, Claims, and Encumbrances Pursuant to 11 U.S.C. § 363(f)**

46.     In the interest of attracting the best offers, the Debtors request authorization to sell the Assets free and clear of any and all liens, claims, encumbrances, and other interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances, and other interests attaching to the proceeds of the sale of the Assets and distributed as provided for in a further order of the Bankruptcy Court.

47.     Under section 363(f) of the Bankruptcy Code, a debtor may sell estate property free and clear of liens, claims, encumbrances, and other interests if one of the following conditions is satisfied: (i) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (ii) such entity consents; (iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (iv) such interest is in bona fide dispute; or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).  Because section 363(f) of the Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens, claims, encumbrances, and other interests. *See, e.g.*, *In re Dura Automotive Sys., Inc.,* 2007 WL 7728109, at *6 n.32 (Bankr. D. Del. Aug. 15, 2007).

48.    Furthermore, section 105(a) of the Bankruptcy Code grants the court broad discretionary powers, providing that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  This equitable power may be utilized to effectuate the provisions of section 363(f).  *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325, at \*6-\*7 (Bankr. D. Del. Mar. 27, 2001) (highlighting bankruptcy courts' equitable authority to authorize sale of estate assets free and clear).

49.    The Debtors will demonstrate at the Sale Hearing that the sale satisfies the requirements of section 363(f).  Accordingly, the Debtors request authorization to sell the Assets free and clear of all liens, claims, encumbrances, and other interests.

**C.    A Successful Bidder Should be Entitled to the
Protections of Bankruptcy Code Section 363(m).**

50.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *Miami Ctr. Ltd. P'ship v. Bank of New York*, 838 F.2d 1547, 1554 (11th Cir. 1988); *In re Mark BellFurniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, Case No. 03-51524, 2007 WL 1428477 (Bankr. D.N.J. May 11, 2007); *In re Temtechco, Inc.*, 1998 WL 887256, at \*4 (D. Del. 1998).

51.    As noted above, any asset purchase agreement executed by a Successful Bidder will have been negotiated at arm's-length and in good faith in accordance with the Bidding Procedures and Bidding Procedures Order, with each of the parties represented by its own advisors and counsel.  Accordingly, the Debtors request that the Sale Order include a provision that any Successful Bidder for the Purchased Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors maintain that providing the Successful

27

Bidders with such protection will ensure that the maximum price will be received by the Debtors for the Assets.

### D.     Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Should be Authorized

52.     To enhance the value of the Debtors' estates, the Debtors request authority under section 365 of the Bankruptcy Code to assume and assign the executory contracts and/or unexpired leases associated with the Assets to the Successful Bidder.  The Debtors further request that the Sale Order provide that the assigned executory contracts and/or unexpired leases will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder(s) notwithstanding any provisions in such assigned contracts and/or leases, including those described in sections 365(b)(2), (f)(1) and (f)(3) of the Bankruptcy Code, that prohibit such assignments.

53.     A debtor may, subject to court approval, assume and assign executory contracts and unexpired leases under section 365(a) of the Bankruptcy Code.  Courts routinely approve motions to assume and assign executory contracts or unexpired leases upon a showing that a debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.  *In re Fleming Co. Inc.*, 499 F.3d 300, 305 (3d Cir. 2007).  The assumption and assignment of the executory contracts and/or unexpired leases related to the Assets is an integral component of the Sale, without which the Sale would not be a viable option.

54.     Section 365(b)(1) of the Bankruptcy Code requires that, if there has been a default in a debtor's unexpired lease or executory contract, other than certain nonmonetary defaults as set forth in the statute, such unexpired lease or executory contract may not be assumed unless, at the time of the assumption, (i) such default is cured or there is adequate assurance that such default will be cured, (ii) compensation or adequate assurance of compensation is provided for any actual pecuniary loss resulting from such default and (iii) adequate assurance of future performance under

the lease is provided.  11 U.S.C. § 365(b)(1).

55.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *EBG Midtown South Corp. v. McLaren/Hart Env. Eng' g Corp.* (*In re Sanshoe Worldwide*), 139 B.R. 585, 593 (S.D.N.Y. 1992); *see also In re Fleming Co. Inc.*, 499 F.3d at 305; *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001).

56.    As set forth above, pursuant to the terms of the proposed Bidding Procedures Order, the Debtors will send the Assumption and Assignment Notice to all counterparties to the executory contracts and unexpired leases notifying such counterparties of the potential assumption by the Debtors and assignment to the Successful Bidder of such contracts and/or leases.  The Assumption and Assignment Notice will also set forth the Cure Amount, if any, owing for each such contracts and/or leases according to the Debtors' books and records.

57.    Counterparties to such contracts and/or leases will be given sufficient time (as set forth herein and in the proposed Bidding Procedures Order) to object to the proposed Cure Amounts, if any, set forth in the Assumption and Assignment Notice.  If no objection is filed with regard to a particular Cure Amount, such Cure Amount shall be binding on the Debtors, the Successful Bidder(s), and the applicable non-Debtor counterparty.  The payment of the Cure Amounts specified in the Assumption and Assignment Notice (or a different amount, either agreed to by the Debtors or resolved by this Court as a result of a timely-filed objection by the relevant non-Debtor counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under the applicable executory contract(s) and/or lease(s) pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine, before the Sale Hearing, that a particular lease or contract is not truly

executory, and does not need to be cured to transfer the Assets to the Successful Bidder.

58.     Section 365(f)(2)(B) of the Bankruptcy Code states that a debtor may assign its unexpired leases and executory contracts if, *inter alia,* the assignee provides "adequate assurance of future performance."   11 U.S.C. § 365(f)(2)(B).   If necessary, the Successful Bidder must submit, among other things, written evidence of the ability to provide adequate assurance of future performance under the applicable contracts or leases as set forth above and in the Bidding Procedures Order.   The affected non-Debtor counterparties will also be able to challenge the ability of the Successful Bidder to provide adequate assurance as provided in the Bidding Procedures Order.

59.     Any assumption and assignment of an assigned contract and/or lease will be subject to all of the provisions of such contract and/or lease, to the extent required by applicable law and in accordance with applicable provisions of the Bankruptcy Code.   The Bidding Procedures are designed to ensure that any Successful Bidder is financially able and prepared to undertake all of the relevant obligations under the assigned contracts and/or leases.   The Debtors, together with the relevant Successful Bidder, will establish, as necessary, at the Sale Hearing, the requisite adequate assurance of future performance pursuant to section 365 of the Bankruptcy Code with respect to the potential assumption and assignment of the applicable assigned contracts and/or leases.   Consequently, assumption and assignment of the assigned executory contracts and/or leases in connection with the Sale is appropriate under the circumstances.

## E.     __The Proposed Notice is Appropriate Under Bankruptcy Rule 2002.__

60.     The notices contemplated by the Bidding Procedures give notice of the proposed Sale including a disclosure of the time and place of an auction, the terms and conditions of the Sale, and the deadline for filing any objections.   The Debtors submit that the notice procedures comply with Bankruptcy Rule 2002 and include information regarding the Bidding Procedures

30

necessary to enable interested bidders to participate in the Auction, and constitutes good and adequate notice of the Bidding Procedures and the other components of the Auction. Therefore, the Debtors respectfully request that this Court approve the proposed notice procedures.

**F.    Relief from Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.**

61.    Under Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order. The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for fourteen (14) days, unless the court orders otherwise.

62.    To preserve the value of the Debtors' estates and limit the costs of administering and preserving the Assets, it is critical that the Debtors close the Sale of the Assets as soon as possible after all closing conditions have been met or waived. Accordingly, the Debtors hereby request that the Court waive the fourteen (14) day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

63.    The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Committee; those creditors holding the 30 largest unsecured claims against the Debtor's estates; (c) all persons and entities that have filed a request for service of filings in these chapter 11 cases pursuant to Bankruptcy Rule 2002; (d) all parties that assert liens, claims, and encumbrances, and other interests with respect to the Assets, including, but not limited to, the Secured Lenders; (e) all entities known to have expressed an interest in bidding on the Assets; (f) all known counterparties to the Debtors' executory contracts

and unexpired leases; and (g) the Internal Revenue Service, the Securities and Exchange Commission and any other federal, state or local governmental agency to the extent required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or order of the Court.  The Debtors submit that no other or further notice need be provided.

## **<u>CONCLUSION</u>**

WHEREFORE, the Debtors request that this Court enter the Bidding Procedures Order, the Sale Order, and further relief as the Court may deem just and appropriate.

Dated:   August 15, 2019                           PACHULSKI STANG ZIEHL & JONES LLP


*/s/ Peter J. Keane*
Jeffrey N. Pomerantz (CA Bar No. 143717)
Debra I. Grassgreen (CA Bar No. 169978)
Peter J. Keane (DE Bar No. 5503)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:     jpomerantz@pszjlaw.com
                dgrassgreen@pszjlaw.com
                pkeane@pszjlaw.com

*Proposed Attorneys for Debtors
and Debtors in Possession*