## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>iPic-Gold Class Entertainment, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-11739 (LSS)<br><br>(Jointly Administered)<br>**Related to Docket No. 15** |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO LIENS AND CLAIMS COVERING CERTAIN UNENCUMBERED ASSETS IN CONNECTION WITH DEBTORS' DIP FINANCING MOTION

The Official Committee of Unsecured Creditors (the "Committee") of iPic-Gold Class Entertainment, LLC, *et al.*, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), hereby objects to the provision of liens and superpriority claims covering unencumbered assets[2] in connection with *Debtors' Motion for Interim and Final Orders: (A) Authorizing Debtors in Possession to (I) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, And 364, (II) Grant Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11 U.S.C. §§ 364; (III) Use Cash Collateral, and (IV) Provide Adequate Protection to Prepetition Credit Parties, (B) Modifying Automatic Stay Pursuant To 11 U.S.C. §§ 361, 362, 363, And 364; and (C) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) And (C) And Local Bankruptcy Rule 4001-2* [D.I. 15] (the "DIP Motion").[3]  In support of the Objection, the Committee states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: iPic Entertainment, Inc. (9582); iPic-Gold Class Entertainment, LLC (4684); iPic Gold-Class Holdings LLC (6315); iPic Media, LLC (0150); iPic Texas, LLC (N/A); and Delray Beach Holdings, LLC (1035).  The Debtors' principal place of business is 433 Plaza Real, Suite 335, Boca Raton, FL 33432.

[2] References to unencumbered assets herein refers to any unencumbered assets on which the DIP Lenders are seeking liens and superpriority claims, except for Avoidance Actions and their proceeds, which are expressly subject to entry of a final order.  Because the liens and claims covering Avoidance Actions are subject to a final order, the Committee will address this issue at the final hearing, absent a resolution.

[3] Capitalized terms not defined herein have the meaning ascribed to them in the DIP Motion.

**Preliminary Statement**

1.      The DIP Motion does not explain the extent or identify any pre-petition assets that are or may be unencumbered as of the Petition Date.  For their part, the DIP Lenders assert that all of the Debtors' pre-petition property is encumbered as of the Petition Date.  The Committee, formed less than two weeks ago, is in the very beginning phases of its investigation of TRSA's liens and claims and is no position to identify the unencumbered assets in connection with the DIP Motion, which the Debtors have the burden to prove is appropriate under the circumstances. As such, the impact of the Court's ruling at the upcoming second interim hearing is currently unknown.  What is clear, however, is that absent Committee action now, general unsecured creditors may find themselves without a remedy if unencumbered assets are later discovered.

2.      Notwithstanding the DIP Lenders' position that the Debtors' pre-petition assets are encumbered by pre-petition liens, the DIP Lenders insist on having liens and superpriority claims covering unencumbered collateral to secure the DIP Facility.  The DIP Lenders' basic contention is that liens and superpriority claims should be permitted because the DIP Facility is a "new money" DIP loan that is not a roll up.  The DIP Lenders would like to view the DIP Facility in a vacuum, without considering the respective collateral of the DIP Facility and pre-petition loan or how the DIP Lenders intend to use the liens and claims on unencumbered collateral to improve the collateral position of TRSA's pre-petition term loan.

3.      It is highly likely that pre-petition lenders (which are also the DIP Lenders) are vastly undersecured, making it highly unlikely that their term loan will be repaid from the proceeds of any all assets sale.  It is equally likely that the DIP Lenders, which have priming liens, are substantially oversecured by the encumbered pre-petition collateral.  The DIP Lenders intend to manipulate the payoff of the DIP Facility by applying the value of any unencumbered assets first to pay the DIP Facility.  This is not being done to protect the DIP Facility – it is a

transparent design to unfairly improve TRSA's collateral position under its pre-petition term loan, to the detriment of unsecured creditors.

4.    If the DIP Lenders were not attempting to use the DIP Facility's liens and superpriority claims to enhance the pre-petition loan's collateral position, they would confirm that they will pay off the priming DIP Loan first, and in doing so, look to encumbered assets to pay off the DIP Facility, and then, only if necessary, resort to unencumbered assets to pay off the DIP Facility.  This arrangement would give the DIP Lenders exactly the same collateral base on the DIP Facility, while preventing TRSA from receiving a windfall on account of their pre-petition loan by allowing the lenders to seize on encumbered and unencumbered collateral to pay down their approximately $220 million in collective debt.  But the DIP Lenders' goal is not to protect the already oversecured DIP Facility – it is to enhance their pre-petition collateral base through an improper disguised rollup, which the Court should not approve.

5.    In sum, the Court should either deny the liens and superproprity claims on unencumbered assets altogether or require that the priming DIP Facility be paid off prior to the pre-petition debt, and that in doing so, the DIP Lenders shall use assets encumbered by TRSA's pre-petition term loan to repay the DIP Facility first.

## **Background**

**A.    The Chapter 11 Cases**

6.    On August 5, 2019 (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.    On the Petition Date, the Debtors filed several "first-day" motions seeking interim and final relief, including the DIP Motion.  On August 6, 2019, the Court entered interim orders

granting the DIP Motion [D.I. 48] (the "Interim DIP Order").  Unlike certain other objectionable provisions of the Interim DIP Order (such as the granting of liens and claims on Avoidance Actions, section 506(c) surcharge and section 552(b) equities of the case waivers), the liens and claims on unencumbered assets were not expressly subject to a final order.  The Court scheduled a final hearing on all interim orders for September 11th.

8.      On August 14, 2019, the United States Trustee for the District of Delaware appointed the Committee.

9.      On August 23, 2019, the Committee filed a motion to schedule an expedited second interim hearing on the DIP Motion [D.I. 142], to avoid additional funds being drawn on the DIP Facility prior to a hearing on the propriety of the liens and claims covering unencumbered assets in the Interim DIP Order.  The Committee also requested that the Court prohibit the Debtors from drawing the $4 million budgeted for August 23-29 prior to the hearing. That same day, the Court entered an Order [D.I. 143] scheduling a second interim hearing on the DIP Motion solely on the unencumbered assets issue, for August 29 at 11:00 a.m., setting an objection deadline of August 28th at noon, and scheduling a telephonic hearing for August 26 at 1:00 p.m. on the Committee's request to prohibit the Debtors from drawing on the $4 million prior to the hearing.

**B.      The Debtors' Relationship with the DIP Lenders and the Proposed DIP Facility.**

10.      On or about February 1, 2018, all of the Debtors except iPic Entertainment, Inc. (the "Borrowing Debtors") entered into a loan agreement (as modified from time to time, the "Pre-Petition Loan Agreement") with the Teachers' Retirement System of Alabama ("TRSA") and the Employees' Retirement System of Alabama ("ERSA" and together with TRSA, the "DIP Lenders") for a term loan facility in an amount not to exceed $255,828,169.  *See* DIP Motion at ¶ 13.  As of the Petition Date, the Debtors estimated the aggregate principal owed by the

4

Borrowing Debtors under the Pre-Petition Loan Agreement to be $205,340,772 (the "Prepetition

Secured Debt"). *Id.* at ¶ 15. The Debtors assert that the Prepetition Secured Debt is secured by

valid, binding, enforceable, and perfected first-priority liens in the Borrowing Debtors' Pre-

Petition Collateral.[4] *Id.* at ¶ 14.

11.      On the Petition Date, the Debtors filed the DIP Motion seeking interim and final

orders authorizing the Debtors to obtain post-petition financing (the "DIP Facility") pursuant to

that certain Debtor-in-Possession Loan and Security Agreement (the "DIP Agreement") with the

DIP Lenders. Under the proposed DIP Facility, the DIP Lenders proposed to furnish up to

$16,000,000 in post-petition financing. Pursuant to the DIP Agreement, the DIP Lenders will

receive, on account of the DIP Facility, (i) a first-priority, secured lien on all the Borrowing

Debtors' assets (both pre-petition and post-petition collateral)[5] and (ii) a superiority

administrative claim for all obligations under the DIP Facility, which will have priority over all

administrative expenses in the Debtors' cases.

### Argument

12.      Courts recognize that "[d]ebtors in possession generally enjoy little negotiating

power with a proposed lender, particularly when the lender has a prepetition lien on cash

collateral." *Res. Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug

Stores, Inc.)*, 145 B.R. 312, 317 (9th Cir. BAP 1992). As a result, courts are hesitant to approve

financing terms that are considered harmful to an estate and its creditors. *See, e.g., In re Ames

Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "the court's discretion

under section 364 is to be utilized on grounds that permit reasonable business judgment to be

---

[4] The term "Pre-Petition Collateral" is not defined in the DIP Motion except by reference to the Pre-Petition Loan Agreement and related documents.

[5] Including all avoidance actions under chapter 5, subject to entry of a final order.

exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). Thus, while certain favorable terms may be permitted as a reasonable exercise of a debtor's business judgment, bankruptcy courts have rejected financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the sole (or primary) benefit of the lender. *See, e.g., Ames*, 115 B.R. at 38; (citing *In re Tenney Vill. Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989)) (holding that the terms of a postpetition financing facility must not "pervert the reorganizational process from one designed to accommodate all classes of creditors . . . to one specially crafted for the benefit" of one creditor).

13.     Indeed, the Court should approve a proposed debtor in possession financing only if such financing "is in the best interests of the ***general*** creditor body." *In re Roblin Indus., Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985, emphasis added) (citing *Otte v. Mfrs. Hanover Commercial Corp. (In re Texlon Corp.),* 596 F.2d 1092, 1098-99 (2d Cir. 1979) and *In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983). *See also Tenney Vill. Co.*, 104 B.R. at 569) ("The Debtor's pervading obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries"). Moreover, the proposed financing must be "fair, reasonable, and adequate." *In re Crouse Grp., Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987). For the reasons set forth below, the provisions of the Interim DIP Order granting liens and claims on unencumbered assets (*See* Interim DIP Order at §§ 9(a), 10), do not satisfy these basic principles of fairness to the entire creditor body at large.)[6]

---

[6] The Interim DIP Order provides that, subject to a final order, the DIP Lenders will have liens and superpriority claims securing the DIP Facility in Avoidance Actions. Because these particular encumbered assets are subject to a final order, the Committee is not addressing them here and will do so in connection with the final hearing. Moreover, the Committee intends to address at the final hearing whether the DIP Lenders can rely on provisions of an interim order when the provisions are modified or stricken in a final order, with respect to money advanced during the interim period.

**A. The DIP Facility is an impermissible and disguised "roll up" that has the impact of improper cross-collateralization.**

14.     The DIP Lenders claim that the liens and superpriority claims covering unencumbered assets should be approved because the DIP Facility is a "new money" loan that does not include a "roll up" of any pre-petition debt.  *See* DIP Motion at ¶ 2.  They are wrong. While the DIP Facility technically results in new money entering the estate, and does not use the words "roll up," the impact of the liens and claims on unencumbered assets to secure the DIP Facility has the same impact as a roll up here.  Specifically:

- The pre-petition secured debt is a term loan that is woefully undersecured;

- The DIP Facility - a priming loan - is likely woefully oversecured by encumbered assets, making it unnecessary to secure it further with unencumbered assets to protect the DIP Facility's priming position; and

- The Interim DIP Order does not require the DIP Lenders to pay off the DIP Facility first and look to encumbered assets first to pay off the DIP Facility, which has the intended impact of improving the collateral position of the pre-petition term loan.

15.     If this is not a "roll-up," it is not clear what would be.  *See Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (defining a "roll up" as a case "where prepetition claims are transformed into postpetition, administrative expenses").  Here, the Debtors admit that the DIP Facility is contemplated to be used, at least in part, to pay pre-petition debt *from the same lender*.  *See* Interim DIP Order at ¶ 7(d) ("No proceeds of any DIP Loan shall be used to (i) make any payment in settlement or satisfaction of any pre-petition claim (*excluding the Pre-Petition Debt*) ….").

16.     This type of arrangement—whether a "roll up" in disguise as something else—has been repeatedly rejected by bankruptcy courts throughout the country.  *See, e.g.*, *In re Equalnet Commc'ns. Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) (denying post-petition financing

including a roll-up because "a secured creditor's prepetition loan balance could not be paid off and/or 'rolled into' a postpetition line of debtor in possession financing, with resultant enhancement of collateral position and administrative priority"); *In re Berry Good, LLC*, 400 B.R. 741, 745 (Bankr. D. Ariz. 2008) (refusing to allow debtors to use post-petition DIP proceeds to pay pre-petition debts to the same lender); *New World Pasta*, 322 B.R. at 369 n.4 (noting that roll ups "have the effect of improving the priority of a prepetition creditor, either through securing previously unsecured claims or paying previously unsecured claims").

17.     Indeed, because of their inherent unfairness to other creditors, courts in this District require a debtor to demonstrate particularized need for such a provision under the specific facts of the case.  *See, e.g.*, *In re Aleris Int'l. Inc.*, Case No. 09-10478 (Bankr. D. Del.) (BLS) Mar. 16, 2009 Hearing Tr. 29:13-15 ("I mean, you understand as a general proposition under our local rules, roll ups aren't favored.").  *See* **Exhibit A**.  Judge Carey's bench denial of post-petition financing in *In re LandSource Cmtys. Dev.*, Case No. 08-11111 (Bankr. D. Del.) (LSS) is particularly instructive as to the heavy burden debtors carry when seeking approval of a roll up:

> One of the problems here, and it's not often a problem in my experience, is that there's just no evidence of value of anything here.  So I'm not able to determine on this record what's necessary to protect the D-I-P Lenders for the value of what they're agreeing to lend.  They haven't justified the need for a roll up in the way of adequate protection.  It contains 506(c) waivers, avoidance actions, which are sometimes included, I know, in Lender's collateral, but I have to be convinced, or at least the Committee has to be convinced, that there's some light at the end of the tunnel as a reason for doing that.

Landsource DIP Hearing Tr., July 14, 2008 (206:25-207:1-10).  *See* **Exhibit B**.

18.     These general concerns become more acute where, as here, the debt is being rolled up for the benefit of an *undersecured* prepetition creditor, thereby converting a prepetition

claim into a postpetition claim that is endowed with the enhanced collateral package and super-priority claim status. *See In re Gibson Brands, Inc.*, Case No. 18-11025 (Bankr. D. Del.) (CSS) May 2, 2018 Hearing Tr. 108:24-109:5 ("And as I said in colloquy, I don't find roll-ups particularly troubling with certain reservations. Generally, they don't change the positions of lower-tier creditors, because they're still behind the same amount of debt they would otherwise be behind. ***There are caveats to that; collateral packages changes, and if a roll-up is used to expand the collateral package, that could be troubling.***") (emphasis added). *See* **Exhibit C**.

19.     In addition to being an impermissible roll up, the impact of the DIP Lenders' attempt to apply encumbered assets first to the DIP Facility is a back-door way of cross-collateralization, which should not be permitted. *See Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co., Inc.)*, 963 F.2d 1490, 1496 (11th Cir. 1992) ("Cross-collateralization is directly inconsistent with the priority scheme of the Bankruptcy Code.").

20.     In short, the DIP Lenders' attempt to use unencumbered assets to pay off its DIP Facility first has the direct impact of leaving encumbered assets to pay off the pre-petition secured debtor, thereby stripping the value of the unencumbered assets from the recoveries of general unsecured creditors, who will in all likelihood not benefit from the upcoming proposed asset sale sought by TRSA or from the Debtors' continued operations during the marketing and sale process.  As such, the Court should not permit the DIP Facility to be secured by unencumbered assets or give the DIP Facility superpriority claims covering those same unencumbered assets.

### B.  The DIP Facility is not in the best interest of the estates.

21.     Regardless of whether the DIP Facility is an impermissible disguised roll up or has improper cross-collateralization impact, its unencumbered collateral provisions are not in the best interest of the Debtors, their creditors and estates as proposed.  As a threshold matter, the

Debtors have not met their burden of identifying the unencumbered assets (except, of course, Avoidance Claims which are subject to a final order and thus not being addressed here).  The Committee is just beginning its lien investigation and is in no position to estimate the extent of unencumbered collateral.  The Committee is, however, concerned that given the Debtors' Saudi Arabia expansion aspirations, vehicles which are subject to unique (and often state-specific) perfection rules, and expensive equipment, there may ultimately be valuable unencumbered collateral.  If so, that collateral should benefit the general unsecured creditors as a whole.

22.    The structure of the DIP Facility as proposed virtually (and intentionally) eliminates any reasonable prospect that the value of unenumbered collateral could be realized by anyone other than TRSA.  Upon a credit bid, the DIP Lenders want to look to the value of unencumbered assets first to pay off the DIP Facility, saving as much value of the encumbered assets as possible to pay off their own pre-petition loan, which is wholly undersecured and highly unlikely to be repaid in full.  In a section 363 sale, the DIP Lenders indisputably would be required to pay off the DIP Facility first.  In paying off the DIP Facility, the DIP Lenders should not be permitted to use the proceeds that may be attributable to unencumbered assets to pay off the DIP Facility first.  If a lien or superpriority claim covering unencumbered assets is granted, the DIP Lenders should only be allowed to look to unencumbered assets to pay off the DIP Facility if encumbered assets are insufficient to pay off the DIP Lender.  As such, the anti-marshaling paragraph of the Interim Order (§ 19(f)) is inappropriate under these facts and should be replaced with an express requirement as to how the DIP Facility must be paid, if the Court is inclined to approve the unencumbered assets provisions in the first instance.  Without these basic

protections, which would provide the *same security* to the DIP Facility, unsecured creditors would be better off if the DIP Facility were not provided at all.[7]

<u>**Conclusion**</u>

**WHEREFORE**, the Committee respectfully requests that the Court (i) deny the DIP Motion, unless the DIP Lenders agree to eliminate the provisions granting liens and claims on unencumbered collateral or confirms that the DIP Facility will be paid first and that encumbered assets will be used first to pay off the DIP Facility; and (ii) grant the Committee such other and further relief as the Court deems just and appropriate.

Dated: August 28, 2019
      Wilmington, DE

                      **COLE SCHOTZ P.C.**

                      */s/ G. David Dean*
                      G. David Dean (No. 6403)
                      Patrick J. Reilley (No. 4451)
                      Katherine M. Devanney (No. 6356)
                      500 Delaware Ave., Suite 1410
                      Wilmington, DE 19801
                      Telephone: (302) 652-3131
                      Facsimile: (302) 652-3117
                      ddean@coleschotz.com
                      preilley@coleschotz.com
                      kdevanney@coleschotz.com

                      *Proposed Counsel to the Official Committee of Unsecured Creditors*

---

[7] If successful here, the Committee will address at the final hearing whether the DIP Lenders can rely on the liens and claims on unencumbered assets with respect to the funds drawn by the Debtors after the first-day hearing.