**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>iPic-Gold Class Entertainment, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-11739 (LSS)<br><br>(Jointly Administered)<br><br>**Related to Docket Nos. 15 and 48** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
THE DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS: (A) AUTHORIZING
DEBTORS IN POSSESSION TO (I) OBTAIN POSTPETITION FINANCING
PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364; (II) GRANT LIENS AND
SUPERPRIORITY CLAIMS TO POSTPETITION LENDERS PURSUANT TO
11 U.S.C. §§ 364; (III) USE CASH COLLATERAL AND (IV) PROVIDE
ADEQUATE PROTECTION TO PREPETITION CREDIT PARTIES,
(B) MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§ 361, 362,
363, AND 364; AND (C) SCHEDULING FINAL HEARING PURSUANT TO
BANKRUPTCY RULES 4001(b) AND (c) AND LOCAL BANKRUPTCY RULE 4001-2**

The Official Committee of Unsecured Creditors (the "Committee") of iPic-Gold Class

Entertainment, LLC and its related debtors and debtors-in-possession (collectively, the

"Debtors"), hereby objects to the *Debtors' Motion for Interim and Final Orders: (A) Authorizing*

*Debtors in Possession to (i) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362,*

*363, and 364; (ii) Grant Liens and Superiority Claims to Postpetition Lenders Pursuant to 11*

*U.S.C. §§ 364; (iii) Use Cash Collateral; and (iv) Provide Adequate Protection to Prepetition*

*Credit Parties (B) Modifying Automatic Stay Pursuant to 11 U.S.C.  §§ 361, 362, 363, and 364;*

*and (C) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local*

*Bankruptcy Rule 4001-2* [Docket No. 15] (the "DIP Motion").  In support of the Objection, the

Committee states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: iPic Entertainment, Inc. (9582); iPic-Gold Class Entertainment, LLC (4684); iPic Gold-Class Holdings LLC (6315); iPic Media, LLC (0150); iPic Texas, LLC (N/A); and Delray Beach Holdings, LLC (1035).  The Debtors' principal place of business is 433 Plaza Real, Suite 335, Boca Raton, FL 33432.

## PRELIMINARY STATEMENT

1.      In deciding whether to enter a final order approving the DIP Motion[2] (a "Final DIP Order"), the Court must evaluate what is in the best interests of the Debtors' estates and their overall creditor body.  In doing so, the proper framework is **not** whether another lender would agree to provide a subordinated DIP because RSA as Pre-Petition Credit Parties refused to allow another DIP loan to prime their grossly undersecured position.  The answer to that is obvious.  The correct analysis is whether the estates and creditors are better off with the DIP Facility as proposed or no postpetition loan at all.

2.      At a minimum, the Court should require that entry of a Final Order be conditioned on material modifications that make unsecured creditors at least no worse off in Chapter 11 than they would be in Chapter 7 without the DIP Facility.  Given that RSA is highly unlikely to be fully paid from the proposed sale process, to achieve this minimum threshold, any Final Order should ensure that Avoidance Claims and Avoidance Proceeds are unequivocally preserved, and that unencumbered assets[3] can only be a source of recovery for the DIP Lenders (and not the Pre-Petition Credit Parties through their back-door adequate protection liens and claims) in the event that encumbered assets are insufficient to pay off the DIP Facility in full.  Moreover, any Final Order should fully preserve the **statutory** surcharge and "equities of the case" rights, as well as the right (and remedy) of the Committee to challenge RSA liens and claims and bring other claims against RSA that may be uncovered, in these cases involving limited liability company Debtors whose structure may pose obstacles to obtaining derivative standing.

---

[2] All capitalized terms not otherwise defined herein have the meaning ascribed to them in the DIP Motion.  All capitalized terms not defined in this Preliminary Statement have the meaning ascribed to them in the sections below or the DIP Motion, as applicable.

[3] The phrase "unencumbered assets" refers to assets of the Debtors as of the Petition Date that were not subject to a security interest and fully-perfected lien as of the Petition Date.  "Unencumbered assets" does not include Avoidance Claims and Avoidance Proceeds, which are address separately herein.

3.      If these changes are made - thereby clearing the path for a Chapter 11 sale process - any Final Order should also eliminate or substantially modify RSA's proposed unchecked credit bidding rights and provide Committee professionals with an adequate budget, as compared to the grossly disproportionate and one-sided budgets for the Debtors' and RSA's professionals.

4.      Without these important revisions, the DIP Facility would benefit no one except RSA, effectively (i) taking unencumbered assets, Avoidance Claims and Avoidance Proceeds that should be reserved for unsecured creditors, (ii) insulating itself from estate claims including those specifically provided by statute, and (iii) rigging a sale process designed to be entirely controlled by RSA while lying in wait with unfettered credit bid rights.  If RSA wants to sell its collateral through a bankruptcy - and reap its benefits - the process must be fair to other creditors whose claims are also important and deserving of a chance for recovery.

## BACKGROUND

### A.      General Background

5.      On August 5, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.  Since the Petition Date, the Debtors have remained in possession of their assets and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      On the Petition Date, the Debtors filed numerous first-day motions, including the DIP Motion.  On August 6, 2019, during the first-day hearing, the Court entered an order granting the DIP Motion on an interim basis (the "Interim DIP Order") [D.I. 48].

7.      On August 14, 2019, the Office of the United States Trustee for Region 3 appointed a five-member Committee consisting of: (i) Mary Ryan, Class Action Representative, (ii) Superl Sequoia Limited, (iii) SDQ Fee, LLC, (iv) Regency Centers, L.P., and (v) Brookfield

Property REIT, Inc. *See* D.I. 96. The Committee selected Cole Schotz P.C. to serve as its counsel and Dundon Advisers LLC to serve as its financial advisor.

8.       On August 29, 2019, the Court held a second interim hearing on the DIP Motion on the limited issue of the propriety of the DIP Lenders' liens and superpriority claims on certain unencumbered assets (*i.e.*, unencumbered assets except Avoidance Claims and Avoidance Proceeds). At the hearing the Committee argued that the Debtors failed to meet its burden to show that the liens and superpriority claims were necessary to secure the DIP Liens (as defined in the DIP Motion), and that alternatively, RSA should be required to pay the DIP Loan off first, and in doing so, should be required to marshal encumbered assets prior to looking to any unencumbered assets. At the second interim hearing, the Court ruled that DIP Lenders' liens on the unencumbered assets would remain, on the condition that the Committee would be in no worse position regarding its marshaling and related credit bidding arguments at the final hearing.

**B.       The Debtors' Pre-Petition Secured Debt**

9.       As of the Petition Date, pursuant to that certain Second Amended & Restated Master Loan and Security Agreement, dated February 1, 2019, as amended by Modification Agreement dated June 22, 2018, as further amended by Second Modification Agreement dated June 29, 2018, as further amended by Third Modification Agreement dated March 4, 2019 (the "Pre-Petition Loan Agreement"), by and among iPic-Gold Class Entertainment, LLC, iPic Gold Class Holdings, LLC, iPic Texas, LLC, iPic Media, LLC, Delray Beach Holdings, LLC and Bay Colony Realty, LLC (the "Pre-Petition Obligors"), Teachers' Retirement System of Alabama ("TRSA"), as administrative and collateral agent (together, the "Pre-Petition Agent") and TRSA and The Employees' Retirement System of Alabama (the "ERSA" and, together with TRSA, "RSA"), as lenders (the "Pre-Petition Lenders" and collectively with the Pre-Petition Agent, the

"Pre-Petition Credit Parties"), made a term loan facility available to the Pre-Petition Obligors in an aggregate principal amount not to exceed $225,828.169.  *See* DIP Motion at ¶13.

10.     Pursuant to the Pre-Petition Loan Agreement, each of the Pre-Petition Obligors granted the Pre-Petition Agent, for the benefit of the Pre-Petition Credit Parties and to secure such Pre-Petition Obligors' obligations and indebtedness under the Pre-Petition Loan Documents, first priority liens on and security interests in the Collateral (the "Pre-Petition Security Interests"), as defined in the Pre-Petition Loan Agreement and Collateral Documents (hereafter, the "Pre-Petition Collateral").  *Id*. at ¶14.  The Debtors believe that the Pre-Petition Security Interests are binding, valid, and enforceable.

11.     As of the Petition Date, the Debtors (excluding iPic Entertainment, Inc.) believe that they owe approximately $205,340,772 in principal under the Pre-Petition Loan Agreement. *Id*. at ¶15.

## C.     The DIP Facility

12.     The Debtors filed the DIP Motion on the Petition Date.  The DIP Motion seeks authority for the Debtors (excluding iPic Entertainment, Inc.) to borrow up to $16 million under the DIP Facility, pursuant to that certain Debtor-In-Possession Loan and Security Agreement, by and among the Debtors (excluding iPic Entertainment, Inc.), as borrowers, and RSA, as lenders (collectively, the "DIP Lenders").

13.     The DIP Facility, as approved on an interim basis by the Interim DIP Order, contains objectionable and overreaching terms that should not be approved by this Court. Among other things, the Interim DIP Order:

(i)       improperly waives the estates' statutory section 506(c) surcharge and section 552(b) 'equities of the case' rights, upon entry of a Final DIP Order (Interim DIP Order at ¶¶10, 13(a), 13(b), 14, and 16);

(ii)      as detailed during the August 29th hearing, the Interim DIP Order contains inappropriate anti-marshalling (and related credit bidding) provisions, subject to the Final DIP Order, designed to ensure that unsecured creditors never see any benefit from unencumbered assets up to $16 million that might be uncovered (Interim DIP Order at ¶¶19(e) and (f));

(iii)     allows RSA to credit bid, subject to a Final Order, in a manner that is highly likely to chill bidding and either result in a lower third-party sale price or allow RSA to obtain the assets through a lower credit bid (Interim DIP Order at ¶13(e));

(iv)      contains an extraordinarily one-sided budget for the Debtors' *and* DIP Lenders' professionals, together with a broad sweeping "Prohibited Purpose" definition designed to stymie the Committee's efforts to discharge their duties, including investigating and pursuing claims against the Lenders and others if appropriate (Interim DIP Order at ¶¶12, 15, 17, 18 and Exhibit 1);

(v)       grants RSA (as DIP Lenders) liens and Superpriority Claims covering Avoidance Claims and Avoidance Proceeds, subject to entry of the Final DIP Order (Interim DIP Order at ¶¶6(e), 10, 13(a), and 13(b));

(vi)      contains a sweeping definition of "Collateral Diminution" far beyond the scope of diminution rights that might otherwise be allowed under the Bankruptcy Code or applicable law and provides Adequate Protection Liens and Adequate Protection Claims

6

covering unencumbered assets, as well as Avoidance Claims and Avoidance Proceeds upon entry of the Final DIP Order (Interim DIP Order at ¶13); and

(vii)    provides inappropriate stipulations including a release of all Pre-Petition Credit Parties (the "Stipulations") that could stymie any chance that the Committee or other party could challenge the validity or priority of RSA's pre-petition liens and claims or assert claims against RSA for any wrongful conduct that might be uncovered later, especially in light of the fact that the primary operating Debtor is a Delaware limited liability company as to which the Committee may not be able to obtain traditional derivative standing under recent Delaware case law (Interim DIP Order at ¶¶5, 26).

## ARGUMENT

### A.    The Section 506(c) Surcharge and Section 552(b) Waivers are Improper.

14.    Paragraph 16 of the Interim DIP Order provides that, with the exception of the Carve-Out and all expenses that are accrued and unpaid through the date of an Event of Default under the line items in the Budget designated as Payroll Costs, Sales Taxes and PACA/PASA Claims, "no costs or expenses of administration shall be imposed upon any DIP Lender, any Pre-Petition Credit Party or any of the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code…."[4]  *See* Interim DIP Order at ¶16.  Paragraph 14 of the Interim DIP Order further provides that the "equities of the case" exception of section 552(b) of the Bankruptcy Code shall not apply.  *See* Interim DIP Order at ¶14.  These waivers are subject to entry of a Final Order, and thus, like any other provision subject to a Final Order, RSA cannot rely on their inclusion in

---

[4] Section 506(c) states as follows:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c).

7

the Interim DIP Order during any period between entry of the Interim DIP Order and Final DIP

Order if they are ultimately stricken from or modified in a Final DIP Order.

15.     The Committee objects to the inclusion of such waivers in Final DIP Order.  The

section 506(c) surcharge waiver serves no purpose other than to eliminate a potential avenue of

recovery for the Debtors' estates by ensuring that certain costs of the Debtors' restructuring will

be borne by unsecured creditors, not the party for whose benefit this case is being administered -

RSA.  Waiving surcharge rights would also contravene the intent behind section 506(c).  *In re*

*Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging

a lienholder with the costs and expenses of preserving or disposing of the secured collateral is

that the general estate and unsecured creditors should not be required to bear the cost of

protecting what is not theirs.").  While it may be appropriate to grant a surcharge waiver when

the Committee consents and there is a global deal, that is certainly not the case here, and thus,

this important statutory right must remain intact.

16.     Indeed, courts routinely reject attempted waivers of surcharge rights under section

506(c) when they are subject to challenge.  *See, e.g., In re The Colad Group, Inc.*, 324 B.R. 208,

224 (Bankr. W.D.N.Y. 2005) (refusing to approve DIP financing with a Section 506(c) waiver);

*In re Willingham Invs., Inc.*, 203 B.R. 75, 80 (Bankr. M.D. Tenn. 1996) ("The Court holds that

First Tennessee's prepetition claim is not immune from surcharge under § 506(c)); *In re Visual*

*Indus., Inc.*, 57 F.3d 321, 325 (3d Cir. 1995) ("[Section] 506(c) is designed to prevent a windfall

to the secured creditor…. The rule understandably shifts to the secured party … the costs of

preserving or disposing of the secured party's collateral, which costs might otherwise be paid

from the unencumbered assets of the bankruptcy estate….") (internal citation omitted); *Kivitz v.*

*CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) ("The reason for [section 506(c)] is

that unsecured creditors should not be required to bear the cost of protecting property that is not theirs and to require the secured party to bear the cost of preserving or disposing of its own collateral."); *In re AFCO Enters., Inc.*, 35 B.R. 512, 515 (Bankr. D. Utah 1983) ("When the secured creditor is the only entity which is benefited by the trustee's work, it should be the one to bear the expense.  It would be unfair to require the estate to pay such costs where there is no corresponding benefit to unsecured creditors").

17.    Moreover, any provision in the Final Order that would infringe upon the estates' or parties' powers to assert any argument concerning the "equities of the case" exception of Section 552(b) of the Bankruptcy Code is inappropriate.  The purpose of the "equities of the case" exception is to balance the need to preserve valid security interests with the need to protect the interests of unsecured creditors. *See, e.g., Nanuet Nat. Bank v. Photo Promotion Associates, Inc. (In re Photo Promotion Associates, Inc.)*, 61 B.R. 936, 939-40 (Bankr. S.D.N.Y. 1986); *In re Muma Servs.*, 322 B.R. 541, 558-59 (Bankr. D. Del. 2005) (MFW); *In re Patio & Porch Sys., Inc.*, 194 B.R. 569, 575 (Bankr. D. Md. 1996) ("11 U.S.C. § 552 grants the court broad equitable powers in determining the extent of the security interest Creditor may be allowed to maintain postpetition.").  For example, a debtor or other contributing parties may provide value that is used in combination with a secured creditor's collateral to generate assets (often cash) that could be considered proceeds of the secured creditor's collateral. *See Photo Promotion Associates,* 61 B.R. at 939-40.  In this circumstance, the "equities of the case" exception would allow the Court to allocate value to the estates to avoid a windfall to RSA.  Allowing RSA to insulate itself from the carefully crafted balance of section 552(b) improperly restrains the Committee and the estates, and thus should be stricken.  Like the surcharge waiver, uncontested orders with global agreements with the committee contain section 552(b) waivers.  Without a deal, however,

waiving rights granted by the statute, especially in these cases which are being run primarily to liquidate RSA's collateral, would be improper.

**B.**      **The Anti-Marshaling Provisions of the Interim DIP Order are Improper.**

18.      Paragraph 19(f) of the Interim DIP Order provides that RSA, either as DIP Lenders or Pre-Petition Credit Parties, shall not be subject to the equitable doctrine of marshaling with respect to the DIP Collateral, which includes unencumbered assets and, subject to a Final Order, also would include Avoidance Claims and Avoidance Proceeds.  Relatedly, paragraph 19(e) permits RSA, as DIP Lenders and Pre-Petition Credit Parties, to credit bid, "individually or on a combined basis, up to the full amount of the applicable outstanding DIP Obligations and Pre-Petition Debt (as applicable) … in any sale of the DIP Collateral … or Pre-Petition Collateral …, as applicable …."  Interim DIP Order at ¶19(e).

19.      Because the DIP Collateral includes unencumbered assets, as well as Avoidance Claims and Avoidance Proceeds upon entry of a Final Order, the collective effect of these two sub-paragraphs is to allow RSA to block unsecured creditors from ever seeing the benefits of unencumbered collateral, Avoidance Claims and Avoidance Proceeds, up to $16 million.  As such, it is without debate that, given RSA's undersecured position, a Chapter 7 conversion would be more favorable to general unsecured creditors than approval of the DIP Facility without marshaling conditions.

20.      The two above-mentioned sub-paragraphs should be replaced with a provision affirmatively requiring that, in the event of a third-party sale or disposition through credit bid of the Debtors' assets through a section 363 process or a plan, the DIP Facility must be paid off or credited first (as applicable), and the DIP Lenders must first look to proceeds or value (as applicable) of Pre-Petition Collateral encumbered as of the Petition Date to pay off or credit the DIP Facility.  As discussed at the hearing on August 29th and in the Committee's written

10

objection prior to that hearing, providing this basic protection in the Final DIP Order would give RSA as DIP Lenders the same exact collateral, while ensuring that RSA as Pre-Petition Credit Parties do not misuse the DIP Facility protections to muster a windfall.  If the Committee's proposal is adopted, unencumbered assets, as well as Avoidance Claims and Avoidance Proceeds (to the extent not stricken from the DIP Collateral altogether, which they should be, as discussed below) would be preserved for unsecured creditors.  The Committee's proposal, which was supported by the Debtors at the August 29th hearing, is a fair outcome that would protect the DIP Facility in the same way and the general unsecured creditors simultaneously.  Absent conditioning RSA's DIP liens on marshaling provisions, the unsecured creditors would never see the benefit of any unencumbered assets (and Avoidance Claims and Proceeds to the extent not otherwise removed from the DIP Collateral) that might be uncovered up to $16 million.

**C.    Credit Bidding by RSA is Likely to Chill Bidding.**

21.    In addition to furthering impermissible anti-marshaling tactics through its credit bidding provisions, paragraph 19(e) of the Interim DIP Order grants RSA the substantive right to credit bid in the first instance, subject to section 363(k) of the Bankruptcy Code.  *See* Interim DIP Order at ¶19(e).[5]  Pursuant to section 363(k), courts have discretion to deny a secured creditor the ability to credit bid.  *See* 11 U.S.C. § 363(k) ("At a sale under subsection (b) of this section of the property that is subject to a lien that secures an allowed claim, **unless the court for cause orders otherwise** the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.") (emphasis added).  While the Bankruptcy Code does not define "cause," it is a "flexible concept enabling a court to fashion an appropriate remedy on a case-by-

---

[5] The Debtors' bidding procedures, proposed simultaneously with the DIP Motion, also permits RSA to credit bid pursuant to section 363(k).  *See* proposed bidding procedures, D.I. 104-2 at ¶4.

case basis." *In re NJ Affordable Homes Corp.*, 2006 WL 2128624 at *16 (Bankr. D.N.J. June 29, 2006).

22.    Credit bidding should not be allowed when it would chill bidding and threaten notions of fairness in the bankruptcy process. *See In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 316 n.14 (3d Cir. 2010) ("A court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to…foster a competitive bidding environment."); *In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 60–61 (Bankr. D. Del. 2014) (KG).   Indeed, bidders are often unenthused and deterred at the prospect of competing with a secured creditor.  *See, e.g. Fisker*, 510 B.R. at 60 ("the 'for cause' basis upon which the Court is limiting Hybrid's credit bid is that bidding will not only be chilled without the cap; bidding will be frozen."); *In re Antaeus Technical Servs., Inc.*, 345 B.R. 556, 564 (Bankr. W.D. Va. 2005) ("Such a sale is like getting into an auction in which the other party is actually the owner of the property being sold, whose interest is not in actually obtaining the subject property but in playing poker to see what is the highest bid which the independent bidder is willing to make."); *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) (denying "approval of the bid procedures [as they] would not enhance the bid process and may in fact chill bidder interest").

23.    In the present case, RSA's right is likely to chill third-party interest in the sale of the Debtors' assets.  RSA's claim is substantially undersecured, which would allow RSA to credit bid over any reasonable bidder, regardless of whether the price for the assets is consistent or even exceeds their market value.   To make matters worse, RSA's credit bidding right is not limited to a "floor" which would give potential third-party bidders some assurance that RSA would decline to credit bid at a certain price.   In addition, the

40000/0601-17724483v4

simultaneously proposed bidding procedures require RSA's consent to any stalking horse and gives RSA consultation rights up to the point at which it submits a credit bid.

24.    Permitting RSA to be "in the room" making decisions about the bidding process, including having consent rights regarding the selection of a stalking horse, while allowing RSA to overbid a stalking horse later, is almost certain to turn away potential buyers.   This overall structure violates the objectiveness that bidding procedures and bankruptcy sales were designed to foster, deters potential buyers from investing in the diligence necessary for a lively sale process, and therefore chills bidding.

25.    If RSA wants to credit bid, it should not be given any consultation or consent rights and it should be required to establish a floor price at which RSA would agree not to credit bid.   Moreover, any credit bidding rights should expressly preserve the rights of the Debtors, the Committee and other parties in interest to challenge the amount of a credit bid through a sale objection.   Without these reasonable parameters, the Committee is deeply concerned that RSA's involvement will detract from bidders and result in a much larger deficiency claim, further diluting the unsecured claims pool, or worse, allow RSA to acquire the Debtors at an artificially low credit bid number.

26.    Finally, assuming the Court permits RSA to credit bid at all, the timing of the credit bid request necessarily predates the conclusion of the Committee's investigation deadline, which will be ongoing long after the September 11th final hearing.   Notably, Section 363(k) of the Bankruptcy Code permits credit bidding of underlined allowed claims only.   *See* 11 U.S.C. § 363(k). While the Committee would not object to RSA's right to credit bid on the basis that the Committee's investigation is ongoing (assuming such credit bidding right is granted), any credit bidding right must, at a minimum, be expressly subject to the right to recover from RSA to the

extent it is later determined that RSA credit bid assets believed to be encumbered at the time, but that are ultimately found to be unencumbered.

**D.    The Budget and "Prohibited Purpose" Provisions of the Interim DIP Order are Overtly Designed to Stifle the Committee's Challenges to RSA.**

27.    The fees payable to the Committee's professionals under the Interim DIP Order and Budget are grossly inadequate, especially as compared to the Debtors' and RSA's professionals.  All other professionals in these cases will be sufficiently compensated.  In fact, for the thirteen-week period between August 2, 2019 and October 31, 2019 (the "Budget Period"), the Budget and back-up schedules provide for over $2 million in professional fees for the Debtors' professionals *compared to $280,000 for the Committee's professionals.*  That limits the funding available for the Committee's professionals to *less than 15%* of the amount provided to the Debtors' professionals.  As for counsel, the Budget proposes to carve out over $1 million for the Debtors and $150,000 for the Committee.  This gross disparity should not be approved by the Court.

28.    The proposed allocation of fees and aggregate funds payable to the Debtors' professionals is simply too one-sided in these Chapter 11 cases.  For a Chapter 11 case to be run successfully and equitably, a debtor must make adequate provisions for committee compensation, and there must be somewhat of an even playing field between the Debtors and the Committee.

29.    Perhaps just as troubling is the provision of $1,225,000 for Pre-Petition Credit Parties' professionals in the fees budget as adequate protection under section 506(c).  *See* Interim DIP Order at ¶13.  The Pre-Petition Credit Parties are *undersecured*, and despite what should be a more measured role in the cases, RSA's counsel is budgeted to be paid more than the Debtors' and Committee's counsel combined. Adequate protection payments in the amount $1,225,000

14

are excessive and inappropriate for these cases to pay counsel to a secured creditor, especially when combined with the other adequate protection granted to RSA under paragraph 13 of the Interim DIP Order (which will be address below).   While the Court cannot force RSA to carveout additional funds to professionals, the Court can (and should) order that, if RSA does not do so, the line items for the Debtors', RSA's and Committee's professionals should be consolidated and the lines of demarcation disregarded.

30.     Moreover, the Interim DIP Order provides that the Committee may only spend up to $25,000 (the "Investigation Budget") for the fees and expenses incurred convection with the investigation of any Pre-Petition Security Interest, Pre-Petition Debt or Prepetition Loan Documents.  *See* Interim DIP Order at ¶18.  This amount is insufficient for the Committee and its professionals in view of the size and complexities of these cases.  Many courts "insist on a carve-out . . . in a reasonable amount designed to provide for payment of the fees of . . . the committees' counsel . . . in order to preserve the adversary system."  *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).  "Absent such protections, the collective rights and expectations of all parties-in-interest are sorely prejudiced."  *Id.*  As such, the Investigation Budget and the Final DIP Order should be changed to increase the Investigation Budget to at least $50,000, which is entirely reasonable—and indeed necessary—under the circumstances.

31.     Moreover, the Interim DIP Order provides that neither the Carve-Out nor the proceeds of the DIP Facility shall be used to pay any professional for a "Prohibited Purpose," which includes, in part, objecting to the validity or enforceability to the Interim DIP Order or any DIP Obligations.  *See* Interim DIP Order at ¶18.  The Committee's fiduciary and statutory duties cannot be impeded by onerous restrictions designed to prevent the Committee from doing its job properly.  The "Prohibited Purpose" restriction should be removed, except to the extent that a

15

Prohibited Purchase involves an adversary proceed or contested matter filed against RSA challenging its liens or claims or bringing other affirmative claims for recovery against RSA.

32.     Lastly, the Interim DIP Order provides for a maximum of $250,000 for all reasonable fees and expenses incurred by Professionals **retained by the Borrower** that are incurred from and after the date of delivery of a Default Notice.  *See* Interim DIP Order at ¶17. This provision should be expanded to include the Committee's professionals.[6]

E.      **The DIP Lenders Should Not be Granted a Lien on or Superpriority Claim Payable Out of Avoidance Claims or Avoidance Proceeds.**

33.     The Interim DIP Order provides that the DIP Collateral shall include a lien on Avoidance Claims and Avoidance Proceeds or other property recovered related to Avoidance Claims upon entry of the Final DIP Order.  *See* Interim DIP Order at ¶6(e).  The Interim DIP Order also provides for Superpriority Claims which can be payable out of Avoidance Claims and Avoidance Proceeds upon entry of the Final DIP Order.

34.     The Committee objects to the DIP Lenders' liens on Avoidance Claims and Avoidance Proceeds, as well as the DIP Lenders' ability to be paid a Superpriority Claim out of Avoidance Claims or Avoidance Proceeds.  Avoidance actions are not truly property of a debtor's estate, but instead are rights that the estate holds in trust for the benefit of creditors.  *See Official Comm. of Unsecured Creditors v. Chinery* (*In re Cybergenics Corp.*), 330 F.3d 548, 568 (3d Cir. 2003) (noting that the underlying intent of the avoidance powers is the recovery of valuable assets for the benefit of a debtor's estate); *Robinson v. First Fin. Mgmt. Corp. (In re Sweetwater)*, 55 B.R. 724, 731 (D. Utah 1985), *rev'd on other grounds*, 884 F.2d 1323 (10th Cir.

---

[6] The Committee hopes this omission was an unintentional oversight and not an attempt to stiff Committee professionals in the event of a default while paying the Debtors' professionals.

40000/0601-17724483v4

1989) ("The avoiding powers are not 'property' but a statutorily created power to recover property.").

35.    Accordingly, bankruptcy courts often restrict the ability of debtors-in-possession to encumber avoidance actions. *See, e.g., Official Comm. of Unsecured Creditors v. Goold Electronics Corp. (In re Goold Electronics Corp.)*, 1993 WL 408366, *3-4 (N.D. Ill. Sept. 22, 1993) (vacating DIP financing order to the extent that the order granted the lender a security interest in the debtor's preference actions). Because of the unique nature of avoidance actions, courts have recognized that, at least with respect to proceeds recovered pursuant to Section 544(b) of the Bankruptcy Code, "empowering the trustee or debtor in possession to avoid a transaction by pursuing an individual creditor's cause of action is a method of forcing that creditor to share its valuable right with other unsecured creditors." *Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000); *see also Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("When recovery is sought under § 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer."); *Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002) ("[T]he purpose of § 547 is to ensure fair distribution between creditors, while the purpose of § 548 is to protect the estate itself for the benefit of all creditors."); *Mellon Bank (East), N.A. v. Glick (In re Integrated Testing Prods. Corp.)*, 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all the creditors, has a right to recover payments made as preferences); *Sweetwater*, 884 F.2d at 1328 ("[P]ost-petition avoidance actions should be pursued in a manner that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike....").

17

36.     Granting the DIP Lenders liens and Superpriority Claims covering Avoidance Claims and Avoidance Proceeds provides unnecessary additional sources of recovery to the DIP Lenders and eliminates one of the limited sources of recovery the general unsecured creditors have in these Chapter 11 cases.  A lien on Avoidance Action proceeds interferes with the estates' ability to maximize recoveries for all creditors.  It is the exception, not the general rule, that a DIP lender receives a lien or superpriority claim covering avoidance claims or their proceeds. The Court should certainly not approve that arrangement here, in this contested DIP loan proceeding.

**F.      The Adequate Protection Paragraph in the Interim DIP Order Must be Revised to be Consistent with the Law and Limited to Replacement Liens on Encumbered Assets as of the Petition Date.**

37.     Section 361 of the Bankruptcy Code provides that adequate protection, to the extent necessary under Sections 362, 363, or 364 of the Bankruptcy Code, may be provided by "providing to such entity an additional or replacement lien *to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property[.]*" 11 U.S.C. § 361(2) (emphasis added).  It is the Pre-petition Credit Parties' burden to prove that they are entitled to adequate protection. *Zink v. Vanmiddlesworth*, 300 B.R. 394, 402 (N.D.N.Y. 2003) ("As this Court reads sections 363 and 1205, the initial burden is typically on the creditor to show that adequate protection is necessary because of the likelihood that the value of the collateral is declining or for some other reason.").

38.     Assuming they can establish their entitlement to adequate protection at all, the Pre-Petition Parties also have the burden of proving *how much* adequate protection is necessary to make them whole.  Congress intentionally left this standard open-ended so that courts had the flexibility to examine diminution on a case-by-case basis:

> [Section 361] does not specify how value is to be determined nor does it specify when it is to be determined.  These matters are left to case-by-case interpretation and development.  It is expected that the courts will apply the concept in light of facts of each case and general equitable principles.

H.R. Rep. No. 595 at 339, 1978 U.S. Code Cong. & Ad. News at 6295.

39.     Despite this clear Congressional edict for courts to determine diminution under the facts of a particular case, the definition of "Collateral Diminution" in the Interim DIP Order includes a laundry list of things that the Court may—but need not—consider in ruling on any diminution claim.[7]  Effectively, the Debtors and Pre-Petition Credit Parties seek to usurp the Court's Congressionally-given authority and force the Court to interpret Section 361 in a particular way.

40.     While this tactic is questionable enough as a general principle, it is particularly egregious where, as here, the Pre-Petition Credit Parties and the DIP Lenders are one in the same.  By way of example, in consenting to the priming DIP Liens, the Pre-Petition Credit Parties have voluntarily *chosen* to allow their own DIP Lien to trump them.  It is most disingenuous for the Pre-Petition Credit Parties to insert a definition that unilaterally defines diminution to require the Court to rule in their favor because of their own conduct as DIP Lenders.  Thus, any Final DIP Order should extract the definition of Collateral Diminution and limit any diminution rights to those granted by the Bankruptcy Code and applicable law.  RSA

---

[7] As used in the Interim DIP Order, "Collateral Diminution" shall mean an amount equal (and limited) to the aggregate diminution of the fair market value of any of the Pre-Petition Collateral (including Cash Collateral) from and after the Petition Date for any reason provided for in the Bankruptcy Code, including, without limitation, any such diminution resulting from the Carve-Out, the use of Cash Collateral, the priming of the Pre-Petition Agent's security interests in and liens on the Pre-Petition Collateral by the DIP Liens pursuant to the DIP Loan Documents and the Interim DIP Order, the depreciation, sale, loss or use by any Debtor (or any other decline in value) of such Pre-Petition Collateral, the amount of any fees and expenses paid to retained professionals in these Chapter 11 Cases, in accordance with the Budget, and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code. *See* Interim DIP Order at ¶13.

should not be permitted to enhance its chances of proving diminution by crafting a definition requiring the Court to apply a slanted formula to calculate the diminution.

41.      In addition to the overly broad definition of Collateral Diminution, the Interim DIP Order provides for Adequate Protection Liens (*i.e.*, "replacement liens" in the DIP Collateral) and Adequate Protection Claims (a form of superpriority claim subordinate to the DIP Lenders' Superpriority Claims) to RSA as Pre-Petition Credit Parties covering, unencumbered assets, Avoidance Actions and Avoidance Proceeds.  While a court may grant a replacement lien or other lien on unencumbered assets as adequate protection, there must be a showing that such a lien (or superpriority claim) is needed to adequately protect a pre-petition perfected secured position.  The Committee insists that RSA (or the Debtors, as movant) satisfy their burden of proof at the final hearing regarding the need to give RSA as Pre-Petition Credit Parties adequate protection liens and claims covering unencumbered assets.  The Committee submits that it is wholly improper for such liens and claims to cover Avoidance Actions and Avoidance Proceeds, for the same reasons discussed above concerning RSA as DIP Lenders.

**G.      The Stipulations are Inappropriate.**

42.      It is inappropriate to grant the Pre-Petition Credit Parties releases from any and all "Claims" and for the Debtors to provide admissions, stipulations and agreements as set forth in the Interim DIP Order in this particular case.  *See* Interim DIP Order at ¶¶ 5, 26.  Recent decisions cast doubt on whether a creditors' committee can obtain derivative standing to prosecute claims when debtors are limited liability companies, as we have here.  In *Official Comm. of Unsecured Creditors v. Convest Group Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 221, 283-285 (Bankr. D. Del. 2018), Judge Carey considered whether an official committee of unsecured creditors had standing to pursue derivative claims on behalf of a Delaware limited liability company.  The Court ruled that the Delaware Limited Liability

Company Act is "clear and unambiguous about who can bring a derivative action: the plaintiff 'must be a member or an assignee.'" *Id*. at 284 (citing 6 Del. C. § 18-1002). The court reasoned that because the committee was neither a member nor an assignee, it did not have standing to bring a breach of fiduciary duty claim. *Id.*; *see also Beskrone v. OpenGate Cap. Group. (In re PennySaver USA Publishing, LLC)*, 587 B.R. 445, 467 (Bankr. D. Del 2018) (Delaware bankruptcy court dismissed a chapter 7 trustee's derivative claims for breach of fiduciary duties owed to creditors of an LLC because the creditors were neither assignees or member so the LLC). Because the Committee may be required to take an *assignment* from the Debtors to prosecute certain claims against RSA, as opposed to obtaining derivative standing, the Debtors' provision of the Stipulations (including releases) could severely undermine an assignee's ability to pursue claims against RSA. As such, any Final Order should: (i) provide that, to the extent necessary to pursue estate any claims or rights against RSA, the Debtors are deemed to assign those estates rights to the Committee, and that the Committee is authorized to prosecute those assigned claims, each without the need for further order of the Court; and (ii) eliminate the Stipulations provided by the Debtors. Without these changes, it is possible that certain rights the estates may have against RSA would be without a meaningful remedy.[8]

---

[8] In addition to the above objections, the Committee notes that it should be provided with reporting concurrently with the Lenders, and that modifications to the Budget should not be made without advanced notice to the Committee and an opportunity to object. The Committee expects that the parties will mutually agree to these changes.

40000/0601-17724483v4

**WHEREFORE**, the Committee respectfully request that the Court approve the DIP

Motion only to the extent the Final DIP Order is modified in accordance with this Objection and

grant the Committee such other and further relief as the Court may deem just and proper.


Dated:  September 4, 2019                                  Respectfully submitted,
        Wilmington, DE

                                                          **COLE SCHOTZ P.C.**

                                                          */s/ G. David Dean*
                                                          G. David Dean (No. 6403)
                                                          Patrick J. Reilley (No. 4451)
                                                          Katherine M. Devanney (No. 6356)
                                                          500 Delaware Ave., Suite 1410
                                                          Wilmington, DE 19801
                                                          Telephone: (302) 652-3131
                                                          Facsimile: (302) 652-3117
                                                          ddean@coleschotz.com
                                                          preilley@coleschotz.com
                                                          kdevanney@coleschotz.com

                                                          *Proposed Counsel to the Official*
                                                          *Committee of Unsecured Creditors*

40000/0601-17724483v4