## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>iPic-Gold Class Entertainment, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-11739 (LSS)<br><br>(Jointly Administered)<br><br>**Related to Docket No. 104** |

### OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, AND ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OR <u>REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>

The Official Committee of Unsecured Creditors (the "Committee"), by its undersigned counsel, hereby objects to the *Motion for Entry of Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases* [Docket No. 104] (the "Sale Motion").[2]   In support of this Objection, the Committee relies on the Declaration of Phillip Preis (the "Preis Declaration") attached hereto and incorporated herein as **Exhibit A**.   In further support of this Objection, the Committee respectfully represents as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: iPic Entertainment, Inc. (9582); iPic-Gold Class Entertainment, LLC (4684); iPic Gold-Class Holdings LLC (6315); iPic Media, LLC (0150); iPic Texas, LLC (N/A); and Delray Beach Holdings, LLC (1035).  The Debtors' principal place of business is 433 Plaza Real, Suite 335, Boca Raton, FL 33432.

[2] Capitalized terms used, but not defined, shall have the meaning ascribed to them in the Sale Motion.

## PRELIMINARY STATEMENT[3]

1.     On October 17, 2019, the Debtors conducted an auction for the sale of substantially all of their assets.  The participants were the RSA (the purported senior secured lender and insider) and Cinemex, a strategic bidder with successful theater operations in Mexico and elsewhere, including the U.S.  After hours of contract negotiations prior to going on the record, the Cinemex bid was finalized, and the RSA was asked to bid against that contract.  The Cinemex contract committed to take 8 of the 16 open theater locations, associated transferable liquor licenses, 6 of the 9 leases under development or construction, and opportunities in Saudi Arabia.  The liquor licenses for open theatres, the 9 leases for unopened theaters, and the Saudi Arabia opportunities are unencumbered.  The RSA's responsive bid proposed to take the unencumbered transferable liquor licenses, but intentionally failed to commit to take any of the unencumbered leases, which only would have value if purchased as part of a larger transaction involving new iPic locations.  Indeed, the Debtors intend to reject any leases not assumed by a purchaser.  The RSA bid in this way to ensure that the unsecured creditors would be left holding the bag at the conclusion of the sale, fully understanding the risk of doing so based on statements made on the record at the auction by the Committee that it would be supporting the bid of Cinemex based on the way RSA structured its bid.

2.     The RSA is collectively the largest common shareholder of Inc.,[4] the publicly-traded parent company in the Debtors' enterprise that was formed to achieve what was ultimately a failed IPO in 2018 which in part led to bankruptcy.  Prior to the IPO, the RSA had an official iPic board designee, and the RSA had extensive veto power over any major iPic decisions – even

---

[3] Capitalized terms not defined in this Preliminary Statement have the meaning ascribed to them in the sections below.

[4] As of the Petition Date, Village Roadshow Attractions USA Inc. held the same number of shares as the RSA.

ones the board approved. The RSA's prior formal designee remained on the new Inc. board after the IPO. For a variety of reasons, the RSA is an insider of the Debtors. Therefore, the Debtors' decision to sell to the RSA should not be afforded business judgment protection and must be examined under a heightened scrutiny standard.

3.      But even if the business judgment standard applied (which it does not), the Cinemex bid would still be the best bid. The Cinemex Bid will result in a ***lower claims pool*** and will result in a ***higher return*** of unencumbered cash to the estate for payment of claims. Moreover, the Cinemex Bid results in less execution risk, as the RSA has failed to disclose its eventual operator to the parties or their eventual new landlords. For these reasons, the Court should find that the Cinemex Bid is the highest and best bid.

## RELEVANT FACTS

### A.   The RSA's Investment in iPic

4.      In 2010, the RSA decided to team up with Hamid Hashemi to expand Mr. Hashemi's single luxury movie theater location dubbed "iPic" to other United States locations. Mr. Hashemi was introduced to the RSA by another luxury theater group, in which the RSA made a failed investment in 2007 known as "Gold-Class Cinemas." The Gold-Class Cinemas concept was successful in Australia, but for a variety of reasons, it did not take off in the U.S. as planned, expanding only to six locations by 2010 and sustaining massive losses. The original idea was to have at least 30 locations across America.

5.      The Gold-Class Cinema group, needing an exit plan, pitched to the RSA that Mr. Hashemi could take over operations of the six locations, convert them to iPics like his single theater in Milwaukee, and expand to other U.S. locations. The RSA ultimately agreed to invest in Mr. Hashemi and iPic to salvage its prior failed investment with the Australian-based luxury theater operator, taking a collective 30% equity interest in a newly-formed operating entity,

60022/0001-17945486v3

Debtor iPic Gold-Class Entertainment, LLC ("iPic").[5]  In addition to taking equity in iPic, the RSA negotiated operating agreement provisions that would give the RSA a board seat with iPic.

6.      Despite having a minority position on the board and a minority equity position, the RSA demanded almost full control of the company.  Namely, the RSA required an operating agreement giving the RSA veto rights over virtually every major decision of the company or board outside the ordinary course of business for so long as the RSA held equity in iPic.  For all of this, the RSA paid no capital into iPic on account of its equity interest, at least on the surface. Instead, the RSA and the Australian operator crafted a mechanism for tax purposes that would have the RSA agree to "waive" what were worthless amounts owed by the Gold-Class Cinemas operating company's owner in exchange for its 30% equity in iPic.  Just like the Gold-Class deal in 2007, the RSA actually capitalized its equity through a series of disguised "loans," while the other equity holders were required to make equity capital contributions; all the while, the RSA's equity was not diluted when other equity holders were required to answer capital calls that the RSA answered with so-called "loans."

**B.    iPic's Financial Woes and Decision to Go Public**

7.      Ultimately, Mr. Hashemi did not turn out to be a better operator than the Gold Class Cinema group as the RSA had hoped.  Over the years, the iPic theaters struggled mightily due to mounting real estate obligations and other financial missteps.  Like the Gold-Class group, Mr. Hashemi's plan was to expand operations to a level that would render operations profitable, but iPic ultimately had only 16 open locations as of the filing of these bankruptcy cases. Through an aggressive real estate strategy, iPic, led by Mr. Hashemi, decided to enter into leases for 9 other theatre locations, all of which remain unopened today.  The RSA eventually decided

---

[5] "iPic," as used herein, refers to the operating LLC, the enterprise, and brand generally, as applicable.

that Mr. Hashemi was also not the right person to operate the RSA's luxury theater venture and informed Mr. Hashemi in approximately early 2019 that alternative plans needed to be explored.

8.      In the meantime, Mr. Hashemi had been searching for other sources of capital and eventually decided to attempt an initial public offering ("IPO"), which occurred in February 2018.  The RSA, which had its own designee on the iPic board, approved the IPO.  At the time of the IPO, the RSA was owed approximately $200 million on its investments, disguised as "loans." iPic expected to raise $50 million in the IPO, but that goal was a pipe dream that was destined to fail from the start, in part due to the RSA's smothering so-called "secured" position and unwillingness to restructure it to incentivize other institutional investors to participate. Predictably, the IPO was dead on arrival and raised far less the amount anticipated (approximately $17 million), while in the meantime strapping the enterprise with the additional burdens of a publicly-traded company (e.g., reporting obligations).

**C.    The Restructuring of iPic**

9.      As part of the IPO, the enterprise was necessarily restructured.  Debtor iPic Entertainment, Inc. ("Inc.") was formed to act as the ultimate parent company and the entity that was publicly traded on NASDAQ.  Inc. now wholly-owns and manages Debtor iPic Gold Class Holdings, LLC ("Holdings"), which in turn now wholly owns and manages iPic, the operating entity formed in 2010.  The equity that the RSA and others formerly held in iPic was ultimately moved up to the Inc. level.  Inc. has shares of Class A and Class B common stock outstanding, which vote collectively on all matters except those prohibited by law.  The board, which formally governed iPic (the operating LLC), was moved up to the newly formed Inc. level.  The board of iPic ceased to exist after the IPO restructuring.

10.     As part of the restructuring required by the IPO, the RSA no longer had a formal board designee, because Inc. would now elect directors at an annual meeting and pursuant to

Inc.'s newly-created bylaws and certificate of incorporation. Significantly, however, the RSA's formal iPic designee, George Philip at the time, was appointed to the Inc. board. Mr. Philip also served on another board for the RSA.

11.    While Mr. Philip was no longer the RSA's official board designee, upon information and belief, he continued to serve as a board member for Inc. after the IPO. As of the Petition Date, the RSA collectively held over 24 percent of the shares of Inc. common stock. *See* Case No. 19-11737, Docket No. 1 (Inc. petition), at pp. 29 and 47 (showing that the ERSA owns 7.9739 percent and TRSA owns 16.1895 percent of Inc. shares). The Committee is not aware of any change in the RSA's ownership of Inc. The Committee inquired from the RSA for confirmation of this fact prior to filing this Objection, and the RSA ignored the Committee's request.

**D.    The Bankruptcy Filings**

12.    After the disastrous IPO, in approximately late 2018, the RSA decided to force the Debtors to engage in a "valuation" process. In the meantime, Mr. Hashemi was attempting to find other investors after the failed IPO. Those investors did not materialize, and the RSA remained unwilling to restructure any portion of its so-called debt to convertible notes or other equity instrument to incentivize new money to be invested by third parties. The RSA also began to tighten restrictions on use of cash and demand that the Debtors use funds to hire professionals such as RSA's eventual financial advisor, as opposed to using those funds for operations. Given these restrictions, and the RSA's refusal to engage in discussions with other investors, the Debtors concluded that they had no choice but to cede to the RSA's demand to undertake a sale process.

13.    On August 5, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On August 14, 2019, the Office of

6

the United States Trustee for Region 3 appointed a five-member Committee consisting of: (i) Mary Ryan, Class Action Representative, (ii) Superl Sequoia Limited, (iii) SDQ Fee, LLC, (iv) Regency Centers, L.P., and (v) Brookfield Property REIT, Inc. *See* Docket No. 96.

**E.    The DIP Motion and Final DIP Order**

14.    On the Petition Date, the Debtors filed the *Motion for Interim and Final Orders: (A) Authorizing Debtors in Possession to (i) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364; (ii) Grant Liens and Superiority Claims to Postpetition Lenders Pursuant to 11 U.S.C. §§ 364; (iii) Use Cash Collateral; and (iv) Provide Adequate Protection to Prepetition Credit Parties (B) Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (C) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Bankruptcy Rule 4001-2* [Docket No. 15] (the "DIP Motion").

15.    The DIP Motion sought authority for the Debtors (excluding Inc., which was not a pre-petition "borrower") to borrow up to $16 million. After two interim hearings and a lengthy final hearing, the Court entered the *Final Order: (A) Authorizing Debtors in Possession to (i) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364; (ii) Grant Liens and Superiority Claims to Postpetition Lenders Pursuant to 11 U.S.C. §§ 364; (iii) Use Cash Collateral; and (iv) Provide Adequate Protection to Prepetition Credit Parties (B) Modifying Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364* [Docket No. 322] (the "Final DIP Order").

16.    In ruling on the DIP Motion, the Court found, among other things, that (i) any adequate protection lien on Unencumbered Property (defined below) was expressly limited to proving diminution on account of its prepetition claims; (ii) the RSA can only seek recovery on its DIP loan liens against the Unencumbered Property and proceeds thereof in the event the DIP

Collateral is insufficient to satisfy the DIP Loans in full; and (iii) the RSA was not entitled to

waivers of the section 506(c) surcharge or section 552(b) equities of the case provision.

17.    The Unencumbered Property includes the following:

- the Debtors' liquor licenses;
- leases for certain theaters under construction located in (i) Atlanta, Georgia and (ii) Irvine, California;
- new theater property leases under development (but not yet under construction) located in (i) Norwalk, Connecticut; (ii) Fort Lauderdale, Florida; (iii) Sunrise, Florida; (iv) Frisco, Texas, (v) Hicksville, New York; (vi) McLean Virginia; (vii) Kirkland, Washington;
- the Debtors' current office lease located in Boca Raton, Florida, another planned office lease in Delray Beach, Florida;
- Saudi Arabia development opportunities; and
- commercial tort claims (including the AMC Claim, Avoidance Actions, any claims against directors and officers, and the proceeds of the foregoing).

18.    The Final DIP Order provided for a period to challenge the RSA's prepetition

"liens and claims" through October 14, 2019, the sixtieth (60th) day post-Committee formation.

The RSA and the Committee originally agreed to extend the challenge deadline through October

22, 2019, and subsequently agreed to extend the challenge deadline through November 4, 2019.

**F.    The Sale Motion and Auction**

19.    The day after the Committee was formed, on August 15, 2019, the Debtors filed

the Sale Motion. On September 13, 2019, at the same hearing as the final hearing on the DIP

Motion, the Court approved bidding procedures and subsequently entered the *Order (A)*

*Approving Bidding Procedures for the Sale of Substantially All Assets of the Debtors; (B)*

*Approving Procedures for the Assumption and Assignment of Executory Contracts and*

*Unexpired Leases; (C) Scheduling the Auction and Sale Hearing; and (D) Granting Related*

*Relief* (the "Bidding Procedures Order") [Docket No. 273].

20.    The Bidding Procedures Order established October 11, 2019, at 4:00 p.m.

(Eastern Time) (the "Bid Deadline") for all Potential Bidders to submit a Qualified Bid (as

8

defined in the Bidding Procedures Order).  Cinemex Holdings USA, Inc. ("Cinemex") submitted a Qualified Bid before the Bid Deadline.  The RSA was deemed a qualified bidder pursuant to the Bidding Procedures Order and ultimately submitted a bid.

21.    On October 17, 2019, the Debtors conducted an auction for the Debtors' assets that spanned into the next day.  At the conclusion of the auction, the Debtors declared the RSA as the successful bidder with the highest or otherwise best Bid of a credit bid of $56 million (valued at $50.85 million after deductions) (the "RSA Bid").  Cinemex was declared as the Backup Bidder with a backup cash bid of $48.8 million (the "Cinemex Bid").  The Committee reserved its rights on the record and indicated that the Committee supported the Cinemex Bid as the highest and best.  The RSA fully understood, based on statements on the record at the auction, that the structure of its bid, intentionally designed to leave the unsecured creditors with nothing, would draw an objection from the Committee as to which bid was highest and best.

22.    Each bid committed to take 8 of the 16 open (and encumbered) theater locations and certain associated, unencumbered, transferable liquor licenses.  The RSA Bid contained an option to take six more open location leases and the Boca Raton office lease, which is month-to-month.  The RSA Bid did not ascribe any portion of the purchase price in its bid to the Boca Raton lease.

23.    The key economic distinctions between the bids are: (i) the Cinemex Bid committed to assume 6 of the 9 unencumbered theater leases and allocated a purchase price of $600,000 ($100,000 per lease) to those leases (and the Saudi Arabia opportunity), while the RSA Bid, of course, did not commit to take any of the unencumbered theater leases so as to avoid paying the estates for those assets; (ii) the RSA Bid was valued approximately $2 million higher than the Cinemex Bid, meaning that the RSA's unsecured deficiency claim would be marginally

higher under the Cinemex Bid; and (iii) the fee to PJ Solomon is $750,000 lower under the RSA

bid, meaning that the RSA deficiency claim would increase by that amount in the event the

Cinemex bid is selected.  Both bids seek to take certain unencumbered liquor licenses associated

with the 8 open locations, which were not allocated a value under either bid at the auction.

Neither bid took the anticipated new Delray office lease, the Avoidance Actions, or commercial

tort claims or their proceeds, all of which would remain with the estates for distribution to

creditors notwithstanding which bid is ultimately selected as the highest and best.

24.    Mr. Preis of Dundon Advisers, LLC, the Committee's financial advisor, prepared

an analysis of the two bids.  *See* Preis Dec., Exhibit 1.  The purpose of this analysis is to show

the projected unsecured creditor claims pool and the unencumbered cash that would be paid to

the estates under each bid (*i.e.*, to isolate the two economic differences between the bids).  Mr.

Preis's analysis, with the assumptions described therein, shows that the Cinemex Bid is superior

to the RSA Bid economically, because it would result in a lower creditor pool and more

unencumbered cash coming into the estate.  Mr. Preis did not attempt to conduct a waterfall

analysis, because there is too much uncertainty at this point as to how administrative and priority

claims would be paid (as discussed below, the Committee submits that the RSA should be

required to pay them as a condition to approval of a sale to either bidder, for the benefit of the

RSA, a clear insider that was a full participant in the cause of this bankruptcy).

## ARGUMENT

### A.    The Proposed Sale to the RSA is Subject to Heightened Scrutiny.

40.    Prior to analyzing which bid is highest and best, the Court must determine the

appropriate standard applicable to the Sale Motion.  Ordinarily, a sale motion would be subject

to a debtor's business judgment; however, when the sale is to an insider, the standard of review

is significantly heightened.  *See, e.g., Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill.*

*Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) (holding that "[t]he sale process will be under the close scrutiny of the Court as required where the stalking horse is an insider"); *Shuck v. Seminole Oil & Gas Corp. (In re Seminole Oil & Gas Corp.)*, No. 91-1636 (HEW), 1992 WL 110720, at \*6 (4th Cir. May 22, 1992) ("[T]ransactions involving insiders should be closely scrutinized") (quoting *Harman v. First Am. Rank (In re Jeffrey Bigelow Design Grp., Inc.)*, 956 F.2d 479, 484 (4th Cir. 1992)). *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) (denying debtor's motion to assume restructuring support agreement and stating that the "heightened scrutiny" standard closely examines transactions involving insiders).

40.    The RSA is an insider for multiple independent reasons. *First*, the RSA is a statutory insider by virtue of its status as an affiliate of Inc., which in turn indirectly wholly owns iPic and iPic's subsidiaries. The definition of an "insider" under the Bankruptcy Code includes an "affiliate or insider of an affiliate [of the debtor] as if such affiliate were the debtor." 11 U.S.C. § 101(31)(E). The Bankruptcy Code defines "affiliate" as an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor. 11 U.S.C. § 101(2). The term "entity" includes government units, such as the RSA. 11 U.S.C. § 101(15). The RSA, comprised of the ERSA and TRSA, is a government unit that owns approximately 24 percent of Debtor Inc.'s voting shares. *See* Case No. 19-11737, Docket No. 1.

41.    Given the RSA's long history with the Debtors – behaving as one entity at every step, including in these bankruptcy cases and at the auction – the Court should aggregate ERSA and TRSA's ownership of Inc. when analyzing whether the RSA is an affiliate of Inc. *See UVAS Farming Corp. v. Laviana Invs., N.V. (In re UVAS Farming Corp.)*, 89 B.R. 889, 891 (Bankr. D.N.M. 1988) (treating a group of minority shareholders as one for purposes of the 20%

calculation under section 101(2)(A) of the Bankruptcy Code). So too here, the Court should find that the RSA's collective 24% voting ownership of Inc. makes the RSA its affiliate, and, therefore, statutory insider.

42.      *Second*, the RSA is a statutory insider because Mr. Philip, who was the RSA's formal designee (*i.e.*, agent) on the iPic board when the IPO was approved, remains on Inc.'s board, upon information and belief. Of course, directors of a debtor are statutory insiders. 11 U.S.C. 101(31)(B)(i). Although he may no longer technically be considered RSA's formal "designee" because of the IPO, Mr. Philip undoubtedly remains the RSA's board member, upon information and belief, in everything but formal title. To find otherwise would raise form over substance.

43.      *Third*, to the extent the RSA is not a statutory insider, which it is, the RSA is a non-statutory insider. "[I]n light of Congress' use of the term 'includes' in § 101(31), courts have identified a category of creditors, sometimes called 'non-statutory insiders,' who fall within the definition but outside of any of the enumerated categories." *Schubert v. Lucent Techs. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 395 (3d Cir. 2009) (citing *Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*, 531 F.3d 1272, 1276 (10th Cir. 2008)). A non-statutory insider does not fall neatly within any express statutory category, but rather maintains a close relationship with the debtor such that his or her conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor. *See Rupp v. United Sec. Bank (In re Kunz)*, 489 F.3d 1072, 1079 (10th Cir. 2007) (citations omitted). The Third Circuit has held that the proposition of control is unnecessary for a finding of non-statutory insider status (though the RSA did in fact have substantial control over iPic in this case). *Winstar*, 554 F.3d at 396. "[R]ather, the question 'is whether there is a close relationship [between debtor and creditor] and ... anything other than

closeness to suggest that any transactions were not conducted at arm's length.'" *Id.* at 396-97 (citations omitted).

44.    Several facts weigh in favor of a finding that the RSA is a non-statutory insider, including: (i) the RSA's collective 24% voting securities in Inc.; (ii) Mr. Philip's board seat; and (iii) between iPic's 2010 formation through the 2018 IPO, the RSA was unquestionably a statutory insider due to its formal designee on the iPic board, as well as its ability to veto virtually all major decisions of the board pursuant to the iPic operating agreement in place prior to the IPO.  In sum, there should be no reasonable debate that the RSA is both a statutory and non-statutory insider.

### B.    The Cinemex Bid is Objectively the Best Bid.

45.    The overriding goal of any proposed asset sale under section 363 of the Bankruptcy Code is to maximize the proceeds received by a debtor's estate. *See Official Comm. of Unsecured Creditors of Cybergenics Corp., v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003).  To accomplish that goal, bankruptcy courts are necessarily given discretion and latitude in conducting a sale. *See Wintz v. Am. Freightways, Inc. (In re Wintz Cos.)*, 219 F.3d 807, 812 (8th Cir. 2000) (bankruptcy courts "have ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets"); *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) (the bankruptcy court is "generally afforded wide latitude in deciding whether to grant or deny approval of estate asset sales," and judicial interference with the debtor's discretion is appropriate "for the purpose of safeguarding the interest of parties concerned, such as creditors and bidders"); *see also In re Castre, Inc.*, 312 B.R. 426, 430-31 (Bankr. D. Colo. 2004) (bankruptcy court "has the power to disapprove a proposed sale recommendation by the trustee or DIP, if the Court has an awareness that there is another

proposal in hand which, from the estate's point of view, is better or more acceptable.") (citing *In re Broadmoor Place Investments, L.P.*, 994 F.2d 744 (10th Cir. 1993)).

46.     In making this evaluation, the Court should consider what is in the best interest of *all* creditors, not just a select few.  *See In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 373 (5th Cir. 1987) ("[a] principal goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the Chapter 11 debtor by preserving going concern value and thereby enhancing the amounts recovered by ***all creditors***.") (emphasis added), aff'd, 484 U.S. 365 (1988); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (citing *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)); *In re Reading Broad, Inc.*, 386 B.R. 562, 575 (Bankr. E.D. Pa. 2008) (noting that "the purpose of a bankruptcy sale is to obtain the highest and best price for the estate ***and thus for its creditors and equity holders***") (emphasis added); *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 428 (Bankr. S.D. Tex. 2009) (denying 363 sale that would transfer the debtors' assets to its secured creditor that it otherwise could not achieve through foreclosure); *In re Fremont Battery Co.*, 73 B.R. 277, 279 (Bankr. N.D. Ohio 1987) (denying sale, in part, on basis that the proceeds from the proposed sale would, at most, benefit one creditor only. The sale would not create proceeds that would inure to the benefit of the unsecured creditors).

47.     In comparing competing bids, it is well-settled that "[t]he highest bid does not always equate to the *best* bid for the estate." *In re Scimeca Found., Inc.*, 497 B.R. 753, 779 (Bankr. E.D. Pa. 2013) (*quoting In re Diplomat Const., Inc.,* 481 B.R. 215, 219 (Bankr.N.D.Ga.2012)); *accord In re Volpe Indus., Inc.*, 2013 WL 4517983, at *5 (D. Mass. Aug. 23, 2013).  Instead, the court must determine whether the debtors "carefully weighed the competing bids rather than mechanistically recommending the facially higher bid." *Id.*  The

Court must consider "[f]actors such as contingencies, conditions, timing, or other uncertainties in an offer that may render [the higher bid] it less appealing." *In re Family Christian, LLC*, 533 B.R. 600, 621 (Bankr. W.D. Mich. 2015) (*citing Scimeca Found.*, 497 B.R. at 779). *See also Lithograph Legends, LLC v. U.S. Trustee*, 2009 WL 1209469 (D. Minn. Apr. 30, 2009) ("And, when considering whether a transaction will be in the estate's best interest, it is equally within a bankruptcy court's discretion to consider factors other than the dollar amount.") (citing *Broadmoor*, 994 F.2d at 745); *In re Gulph Woods Corp.*, 1988 WL 134688, at *4 (Bankr. E. D. Pa. Dec. 13, 1988) (noting that "there must be a strong showing of adequate notice and good faith, as well as *feasibility*, of the transaction, to prompt us to approve a pre-confirmation" sale pursuant to Bankruptcy Code section 363) (emphasis added) (internal quotations omitted).

48.    Accordingly, even if the Court analyzes the sale under the business judgment standard, the Cinemex Bid is still the better bid for the estates and creditor body for multiple reasons.

49.    *First*, the Cinemex bid is objectively better economically. As detailed in the Preis Declaration, the projected unsecured creditor pool will be significantly higher under the RSA Bid based on the leases both bidders have agreed to assume. While the RSA's deficiency claim would be higher under the Cinemex Bid, the projected lease rejection damages that would be avoided under the Cinemex Bid relating to the unencumbered leases far exceeds the increased amount of the RSA deficiency claim.[6] In addition, and most importantly, the Cinemex Bid includes a commitment to acquire 6 unencumbered theater leases for $600,000 (and the Saudi

---

[6] The calculation of the 15% rent reserved numbers, as applicable, under the development and construction leases were based on the Court's decision in *In re Filene's Basement, LLC*, 2015 WL 1806347 (Bankr. D. Del. Apr. 16, 2015). In that case, the Court held that the 15% (capped at three years) was temporal and did not refer to the overall amounts due under the lease. In this case, if *Filene's Basement* were adopted, the rejection damages would be lower for these leases. The Committee applies this case to take a conservative view of projected lease rejection damages and for no other purpose, including any possible claim objections.

Arabia opportunity, which may need to be separately valued along with the liquor licenses). The RSA, on the other hand, has not committed to take *any* of the unencumbered theater leases, and as the RSA well knows, the leases would be valueless without them being taken as part of the overall bid to run as a iPic. In fact, the Debtors have indicated that they intend to reject any leases not sold to the winning bidder.

50.     *Second*, the Cinemex Bid has less execution risk. Cinemex is an experienced and successful theater operator based in Mexico, with operations in the U.S. that would be expanded with this acquisition. The RSA, on the other hand, has failed thus far to disclose how it intends to operate the business post-sale, or whether, and for how long, current management will stay in place to transition the business to a new operator. Without these details, it is impossible to gauge the risk of a third failed RSA-selected operator. With the RSA's history in the industry, the Court should consider the substantial risk that a successful RSA bid could lead to another failure. For these reasons, the Court should quite easily determine that the Cinemex Bid is highest and best.

**C.     Approval of Either Bid for Insider RSA's Benefit Should be Conditioned on Provisions to Protect Unsecured Creditors.**

51.     The Court should not approve a sale to either bidder unless such approval is conditioned on provisions to protect the general unsecured creditors over which the RSA would prefer to trample.

52.     *First*, the RSA should not be permitted to use this Court to sell the Debtors' assets without assurances that the sale will not leave the estate unable to fund unbudgeted, allowed administrative expense claims (including section 503(b)(9) claims and wind-down expenses

necessary to achieve a plan of liquidation) and allowed priority claims.[7]  As this Court is aware, the RSA did not receive surcharge or equities of the case waivers in the Final DIP Order, and rather than requiring the Committee to prosecute a separate surcharge action, which would be expensive and unnecessary, the Court should ***condition*** the approval of any sale for the benefit of insider RSA on a commitment to leave behind enough funds to pay administrative and priority claims, so the parties can proceed to a chapter 11 plan of liquidation to prosecute avoidance actions and other possible litigation claims for the benefit of unsecured creditors.

53.    *Second*, the Court should also condition any sale on a finding that the proceeds of any Unencumbered Property sold remain unencumbered, consistent with the intent of this Court's rulings in the Final DIP Order.  Based on the provisions of the RSA Bid (as discussed in the next section), it appears that the RSA intends to make a hyper-technical argument that the ***proceeds*** of Unencumbered Property, once sold in this sale process, should all of a sudden now be subject to the RSA's liens, even though the Court expressly protected the Unencumbered Property in the first instance in the Final DIP Order.  The Court should not permit the RSA to end-run the Court's ruling by forcing briefing and needless litigation on an argument that is wrong and completely inconsistent with the intentions of the Court's prior rulings on preserving unencumbered assets.

54.    *Third*, the Court should impose a requirement on the Debtors to place the proceeds of any Unencumbered Property into a separate account, which shall not be used for any purpose pending further order of the Court expressly permitting such proceeds to be used.  As noted above, the RSA should fund other unbudgeted claims ahead of general unsecured creditors, and the proceeds of Unencumbered Property should be reserved, absent a further Court

---

[7] The Debtors have not yet sought approval of a bar date, so the universe of priority and administrative expense claims are not precisely known.  The Court should require the Debtors to file a bar date motion post-sale.

60022/0001-17945486v3

order showing a specific need to use those funds in a different manner to pay higher priority creditors.

55.    *Fourth*, any sale approval order should confirm that the Committee's challenge rights are not impacted by the sale. The Committee is still evaluating whether to bring an action against the RSA, as the RSA is in the process of producing documents to the Committee it agreed to produce. If the Cinemex Bid is successful, the Committee's challenge rights should be preserved to permit disgorgement. If the RSA Bid is successful, the Committee's challenge rights should be preserved to permit an affirmative recovery against the RSA, as prepetition lenders, to the extent of any credit bid.

### D.    The Court Should Defer Any Valuation Determinations Requiring Expert Testimony to a Subsequent Date.

56.    The Unencumbered Property at issue in the Sale Motion consists of the unencumbered leases, certain transferable liquor licenses and the "Saudi Arabi opportunity." If the Cinemex Bid is successful, the unencumbered leases need not be valued, because they are separately accounted for in the purchase price. The liquor licenses, however, would still need to be valued (as well as the Saudi Arabi opportunity potentially), and the Court should hold a sufficient sum of money in escrow pending that valuation.

57.    If the RSA Bid is successful, the liquor licenses would similarly need to be valued. If the RSA ultimately decides to assume any of the unencumbered leases on which it has an option, those leases would need to be valued, unless the Court accepts the price that Cinemex has agreed to pay for them as their value. The RSA should be required to post an amount sufficient to cover the liquor licenses, plus $600,000 to cover the unencumbered leases the RSA has an option to assume.

**D.**    **If the RSA Bid is Approved, Certain Provisions Should be Modified.**

58.    Any sale order approving the RSA Bid to move forward (either as the leading or backup bidder) should require modifications to certain contract provisions.  Specifically, section 2.1(b) (Unencumbered Property) of the RSA contracts provides:

> Unencumbered Property.    To the extent that any Purchased Assets constitute Unencumbered Property, as determined by a Final Order of the Bankruptcy Court, an amount in *cash equal to the fair market value* of such Unencumbered Property, as determined by a Final Order of the Bankruptcy Court; *provided that such amount shall be offset and reduced on a dollar-for-dollar basis to the extent that the Pre-Petition Credit Parties hold a perfected first-priority security interest in the proceeds of such Unencumbered Property, as determined by such Final Order of the Bankruptcy Court.* The net amount payable under this <u>subsection (b)</u> shall be payable in immediately available, good funds of the United States of America (funds delivered in this manner are referred to herein as "Good Funds") on the later of the Closing Date or the date that is three (3) Business Days after entry of such Final Order of the Bankruptcy Court determining the amount, if any, due hereunder (such amount, the "Cash Amount"). *(emphasis added)*

59.    There are two main issues with this provision.  *First*, it is inappropriate for the RSA to attempt to determine the valuation standard for the Unencumbered Property.  *Second*, the RSA Bid suggests that the RSA is attempting to offset the value of Unencumbered Property against its prepetition claim.   The Pre-Petition Credit Parties do not have a lien on Unencumbered Property, and the sale of such Unencumbered Property should not convert unencumbered assets to a lien on their proceeds.  As noted above, any sale order approving the sale to either bidder should be conditioned on protecting the proceeds of Unencumbered Property.   This contractual provision is separately inappropriate, because it appears to be attempting to set up a circumvention of the Court's prior ruling.

60.    In addition, section 15.2 (Reasonable Access to Records and Certain Personnel) provides as follows:

> Reasonable Access to Records to Certain Personnel. For a period of one (1) year following the Closing, (i) the Purchaser shall permit Sellers' counsel and other professionals and counsel for any successor to Sellers and their respective professionals

(collectively, "***Permitted Access Parties***") reasonable access to the financial and other books and records relating to the Purchased Assets or the Business, which access shall include (x) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (y) Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Purchaser for the reasonable costs and expenses thereof, and (ii) Purchaser shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access during regular business hours to assist Seller and the other Permitted Access Parties in their post-Closing activities (including, without limitation, preparation of tax returns), *provided* that such access does not unreasonably interfere with the Purchaser's business operations.

61.     This section is too limited.  The buyer should be required to preserve all records for at least two years post-closing and provide the Debtors, the Committee and any other estate representative (such as a trustee) access to records during the chapter 11 cases.  Records will be needed for matters such as, for example claims reconciliation, preparation of tax returns and the pursuit of any litigation.

## CONCLUSION

The Committee respectfully requests that the Court enter an Order: (i) finding that the Cinemex Bid is the highest and best bid; (ii) conditioning approval of the Cinemex Bid on the RSA's funding of all unbudgeted allowed administrative expense claims, including an appropriate wind-down budget to confirm a plan of liquidation, and all allowed priority claims; (iii) requiring the Unencumbered Property sold to Cinemex (including the $600,000 for the unencumbered leases, an amount to be determined for the liquor licenses, and the Saudi Arabia opportunity) to be placed in a separate account not to be used absent further Order of the Court; (iv) requiring the Debtors to escrow a portion of the sale proceeds sufficient to cover the value of the liquor licenses that Cinemex is purchasing (and the Saudi Arabia opportunity), pending their subsequent valuation; (v) providing that any portion of the Cinemex purchase price used to pay

60022/0001-17945486v3

the RSA's prepetition claims be subject to disgorgement pending the outcome of any action the Committee may institute by the challenge period; and (vi) granting the Committee such other and further relief as may be just and proper under the circumstances.

Dated: October 22, 2019

**COLE SCHOTZ P.C.**

G. David Dean (No. 6403)
Patrick J. Reilley (No. 4451)
Katherine M. Devanney (No. 6356)
500 Delaware Ave., Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com
preilley@coleschotz.com
kdevanney@coleschotz.com

*Counsel to the Official Committee of Unsecured Creditors*

60022/0001-17945486v3